Mark I. Bane (MB 4883)
Mark R. Somerstein (MS 9721)
Shuba Satyaprasad (SS 5875)
James A. Wright III (JW 3007)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: 212-596-9000
Fax: 212-596-9090

Proposed Attorneys for the Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------x
: 
In re : Chapter 11
: 
SILICON GRAPHICS, INC., *et al.*, : Case No. 09-_____ (      )
: 
Debtors. : (Jointly Administered)
: 
---------------------------------x

**MOTION OF THE DEBTORS FOR AUTHORITY TO PAY
PREPETITION SALES, USE, FRANCHISE,
AND OTHER TAXES AND GOVERNMENT CHARGES**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Silicon Graphics, Inc. ("Silicon Graphics"), on behalf of itself and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby submits this motion (the "Motion") for an order (the "Order") (i) authorizing, but not directing, the Debtors to pay all accrued and outstanding sales, use, and franchise taxes and other such taxes and government charges as the Debtors, in their sole discretion, deem necessary; and (ii) authorizing the Debtors to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payments approved under the Motion where such method of payment has been dishonored postpetition. In support of the

Motion, the Debtors submit the Declaration of Gregory S. Wood in Support of Chapter 11 Petitions and First Day Motions and Applications, sworn to on March 31, 2009 (the "<u>Wood Declaration</u>"), and respectfully represent and set forth as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory predicates for the relief requested herein are section 105(a), 363(b), and 507(a) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "<u>Bankruptcy Code</u>").

### Background

2. On the date hereof (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code. Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and manage their properties as debtors in possession. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

### The Debtors' Businesses

3. Founded in 1981, the Debtors began as manufacturers of graphics display terminals based on proprietary software and hardware. Over the past 28 years, the Debtors have grown into a leader in high performance computing and data management. Their products and services are targeted toward the scientific, technical, and business communities, which require significant computing power and fast and efficient data movement both within the systems and to and from large-scale data storage to solve challenging data-intensive computing, data management, and visualization problems. The Debtors sell solutions that consist of a combination of their clustered computing servers, shared memory servers, data storage products,

2

and visualization systems, integrated with a choice of software, customer support services, and professional services. These solutions allow end users to access, analyze, transform, manage, visualize, and store very large amounts of data in real time or near real time.

4. The Debtors serve markets such as defense and strategic systems, weather and climate, physical sciences, life sciences, energy (including oil and gas), aerospace, automotive, general manufacturing, media and entertainment, and business intelligence and data analytics. Customers use the Debtors' systems to simulate global climate changes, accelerate the engineering of new automotive designs, support homeland security initiatives, manage video content archives, and gain business intelligence through data-mining.

5. The Debtors operate through two business segments: Products (the "Products Segment") and Global Services (the "Global Services Segment").

   a. Products Segment. The Products Segment is comprised of the Debtors' core products ("Core Products") and legacy systems ("Legacy Systems"), which allow customers to run data-intensive applications rapidly and to store and visualize their data. This segment includes (i) a broad line of products designed to address the demands of high-performance computing and data management applications, such as the Debtors' high-performance computing systems, storage products, and visualization systems, (ii) legacy systems which are no longer actively marketed to new customers, and (iii) software to increase the efficiency, performance, and manageability of the Core Products and Legacy Systems and to assist in visualization and storage management.

   b. Global Services Segment. The Global Services Segment, which includes customer support and professional services, offers services (i) to support the Debtors' computing systems, software, and storage products, and (ii) to assist the Debtors' customers in developing solutions to meet their business objectives and maximize the return on their technology investment.

6. Headquartered in Sunnyvale, California, the Debtors have direct sales and distributions in over a dozen countries, including Australia, Belgium, France, Germany, Israel, the Netherlands, Spain, and the United Kingdom. To enhance their direct sales force, the

3

Debtors use indirect channels, including resellers and authorized distributors, in all countries in which they have a presence and more than twenty additional countries.

7.     As of December 26, 2008, the Debtors' unaudited consolidated financial statements, which include the assets and liabilities of non-Debtor foreign subsidiaries, reflected total assets of approximately $390 million and total liabilities of approximately $526 million.  As of March 1, 2009, the Debtors had approximately 800 employees in the United States.

### 2006 Reorganization

8.     On May 8, 2006, the Debtors commenced voluntary chapter 11 bankruptcy proceedings (the "2006 Reorganization") in the United States Bankruptcy Court for the Southern District of New York to adjust the Debtors' costs and capital structure to better reflect their corporate size and needs.  Pursuant to the plan for the 2006 Reorganization, the Debtors significantly delevered their balance sheets by (i) equitizing their senior notes; (ii) paying a 27.66% recovery to the general unsecured creditors; and (iii) paying all other claims in full.  During the 2006 Reorganization, and in response to market pressures and changes within the computing industry, the Debtors developed a road map to transition from a boutique for specialized, high-performance machines into a strong competitor with more diversified products and services and increased market reach.  Thus, the Debtors emerged from bankruptcy protection on October 17, 2006, with an improved capital structure, fewer legacy costs, and a new, more competitive business model.

### Credit Facility

9.     The exit facility issued upon the Debtors' emergence from the 2006 Reorganization is the Debtors' current debt facility, which is governed by that certain Senior Secured Credit Agreement (as amended, modified, or supplemented from time to time, the "Secured Credit Facility"), dated as of October 17, 2006, by and among Silicon Graphics, Inc.,

4

Silicon Graphics Federal, Inc., and Silicon Graphics World Trade Corporation, as Borrowers, the lenders party thereto, and Wilmington Trust FSB (the "Agent"), as Administrative Agent and Collateral Agent (as successor to Morgan Stanley Senior Funding, Inc. and Morgan Stanley & Co. Incorporated). The current lenders under the Secured Credit Facility are affiliates of Watershed Capital Partners, Monarch Alternative Capital LP, Whippoorwill Associates, Inc., D.E. Shaw & Company, Symphony Asset Management, Southpaw Asset Management, Lampe Conway & Co. LLC, Wellpoint, Inc., the President and Fellows of Harvard College, Quadrangle Master Funding Ltd., and Lehman Commercial Paper, Inc. (the "Secured Lenders").

10. The Secured Credit Facility is secured by substantially all of the Debtors' assets and the assets of their domestic subsidiaries and is due to mature on October 17, 2011. As of March 27, 2009, there was approximately $141.5 million in principal outstanding under the term loan and approximately $20.7 million in principal outstanding under the revolver.

**Events Leading to these Chapter 11 Cases**

11. Since the 2006 Reorganization, the Debtors have faced a number of challenges in their transition to their new business model, which, taken together, have negatively impacted the company's overall financial performance. The challenges relate partly to legacy problems continuing from before the 2006 Reorganization, such as a burdensome cost structure, hardware commoditization, increased competition, and delays in the introduction of new technology. In addition, the Debtors based their projections on their ability to grow into their cost structure, increase sales and market capture for their new cluster computing products, software, and service offerings, and implement a new solution-based selling approach. While the Debtors realized some success, they fell short of this plan to penetrate new markets or capture a greater share of existing markets. Combined, these factors have caused decreased revenues, net losses, and a decline in the Debtors' available cash position.

5

12. Prior to the Petition Date, the Debtors and their advisors explored multiple restructuring alternatives, including the sale of all or portions of the Debtors' operations, new debt or equity capital infusions, reorganizations of the Debtors' operations, and a comprehensive restructuring of the Debtors' balance sheet. As part of this process, in June 2008, the Debtors retained Houlihan Lokey Howard & Zukin ("Houlihan Lokey") as their financial advisor, and through Houlihan Lokey, approached approximately 150 potentially interested parties, including strategic and financial groups in the United States and around the world, to investigate opportunities for a sale of the Debtors' businesses as a going concern. In addition, the Debtors engaged in a continuing dialogue with the Secured Lenders and examined numerous alternatives to address their short-term and long-term needs. Ultimately, in early March 2009, the Debtors' M&A process produced offers for all or a portion of their businesses from 3 potential buyers, including Rackable Systems, Inc. ("Rackable").

13. After further discussions, Rackable and the Debtors reached agreement on the terms of an asset purchase agreement under which an affiliate of Rackable (the "Buyer") will serve as a stalking horse bidder for a sale (a "Sale") of substantially all of the Debtors' assets (the "Acquired Assets") through an auction in chapter 11 pursuant to section 363 of the Bankruptcy Code.

14. After carefully considering all alternatives, the Debtors have determined that the Sale is the best way to maximize the value of the Debtors' businesses and in the best interests of the Debtors' estates, creditors, and all parties-in interest. The Debtors believe that the Sale is critical to their ability to survive as a viable enterprise that produces world-class computing solutions. Moreover, the Sale will preserve jobs for the many employees of the Debtors who will be retained by the Buyer.

**Relief Requested**

15. In the ordinary course of business, the Debtors incur certain sales, use, franchise, value added, goods and services, and other taxes (collectively, the "Taxes"), as well as business license and annual report fees (the "Business License Fees" and collectively with the Taxes, the "Taxes and Fees"), that are payable directly to various state, local, and foreign taxing authorities (collectively, the "Taxing Authorities")[1] as such payments become due. In addition, the Debtors seek authority to pay any Taxes and Fees required to restore or maintain the Debtors' corporate good standing in each state in which they are incorporated or do business.

16. Although the Debtors' records reflect that they are current on all Taxes that have become due as of the Petition Date, there is a lag between the time when the Debtors incur an obligation to pay the Taxes and the date such Taxes and Fees become due. Various Taxing Authorities may therefore have claims against the Debtors for Taxes that are accrued prepetition but remain unpaid as of the Petition Date. Further, there may be Taxes incurred or collected from sales and services provided prepetition that will come due shortly after the Petition Date.

17. The Debtors' failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business. Some, if not all, of the Taxing Authorities may initiate an audit of the Debtors if the Taxes and Fees are not paid timely. Such audits will unnecessarily divert the Debtors' attention away from the reorganization process. Further, if the Debtors do not pay the Taxes and Fees in a timely manner, the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates.

---

[1] A list of the Taxing Authorities is attached to the Motion as Exhibit A.

7

18. By the Motion, the Debtors request entry of an order authorizing, but not directing, them to pay, in their sole discretion, the Taxes and Fees to the relevant Taxing Authorities in the ordinary course of business, including reimbursement to non-Debtor subsidiaries for any such amounts paid. To the extent that any transfers, deposits, or checks issued by the Debtors on account of prepetition Taxes and Fees have not cleared as of the Petition Date, the Debtors also seek entry of an order authorizing and directing banks and other financial institutions to honor and process such payments.

**A.   Prepetition Sales, Use, Franchise, and Other Taxes**

19. The Debtors estimate that the total amount of prepetition sales, use, and franchise Taxes owing to the various Taxing Authorities will not exceed $123,000.[2] Any amounts that are actually due, but have not yet been paid to the Taxing Authorities because of the bankruptcy filings, represent a small fraction of the Debtors' total assets. Moreover, some of these outstanding tax liabilities are for trust fund taxes that the Debtors have collected and hold in trust for the benefit of the Taxing Authorities. Such funds do not constitute property of the estate and could not otherwise be used by the estates.

**B.   Business License Fees**

20. Many state governments require the Debtors to obtain a business license and pay Business License Fees associated with the license and the filing of annual reports with such jurisdictions.[3] The requirements for a company to obtain a business license and the manner in which the Business License Fees are computed vary according to the tax law of the applicable

---

[2] This estimate does not include any potential prepetition tax liability that may later come due as the result of an audit. Any potential audits may result in additional tax liability. The Debtors, therefore, request that the relief sought in the Motion apply likewise to any liability resulting from audits of prepetition taxes, if such liability arises.

[3] These annual reports provide the state governments with updated information regarding the Debtors' businesses – for example, whether a particular Debtor continues to conduct business in such state or whether its officers or directors have changed.

8

jurisdiction, but are generally based upon gross receipts. As of the Petition Date, the Debtors estimate that approximately $2,450 in Business License Fees have not yet been paid.

### C.     VAT/GST

21.     The Debtors collect and pay value added taxes and goods and services taxes in the ordinary course of buying and selling goods in foreign jurisdictions (the "VAT/GST Foreign Authorities"), including, among others, Australia, Austria, Belgium, Canada, the Czech Republic, Denmark, Finland, France, Germany, Israel, Italy, the Netherlands, Norway, Spain, Sweden, Switzerland, and the United Kingdom. For the VAT/GST Foreign Authorities, the Debtors are required to register as a collector of "Value Added" Tax and "Goods and Services" Tax ("VAT/GST"). As a VAT/GST registrant, the Debtors are responsible for collecting the VAT/GST charged to customers for taxable goods and services sold or supplied to them, holding such VAT/GST in trust, and remitting the VAT/GST to the applicable VAT/GST Foreign Authorities with the filing of a VAT/GST return.

22.     VAT/GST registrants are entitled to claim an input tax credit ("ITC") to recover the VAT/GST paid (or still owed) on purchases and expenses used, consumed, sold, or supplied in their commercial activities. To claim an ITC, the purchases and expenses must be reasonable in quality, nature, and cost in relation to the nature of the company's business. As a VAT/GST registrant, the Debtors offset the VAT/GST they collect with the ITC they are entitled to recover and submit monthly or quarterly statements, depending on the foreign government, to the applicable VAT/GST Foreign Authority regarding their VAT/GST payment or receivable owed. As of the Petition Date, the Debtors estimate that they have collected approximately $2,981,000 in VAT/GST, offset by ITCs of approximately $1,207,000, leaving a net payment of approximately $1,774,000 owed prepetition to the VAT/GST Foreign Authorities.

**D.     Excise Taxes**

23.     The Debtors also collect, withhold, or incur various taxes, fees, and charges, including (i) backup withholding taxes under section 3406 of the Internal Revenue Code, (ii) withholding taxes on certain payments to foreign persons, (iii) charges in connection with the importation of goods, (iv) federal excise taxes imposed on the importation of certain products, and (v) other similar federal, state or local taxes, charges and fees (including, without limitation, any amounts required to be withheld or collected under applicable law) (collectively, the "Excise Taxes" and, together with the VAT/GST, the "Other Excise Taxes").  Although the Debtors believe that no additional excise taxes, other than those discussed above, are due and owing as of the Petition Date, out of an abundance of caution, the Debtors request authority to satisfy any such obligations should the Debtors learn of their existence.

**Basis For Relief and Applicable Authorities**

24.     There are five bases for granting the relief requested in the Motion: (i) portions of the Taxes may be entitled to priority status pursuant to section 507(a)(8) of the Bankruptcy Code; (ii) to the extent that Taxes are "trust fund" taxes, they are not property of the Debtors' estates; (iii) governmental entities may sue the Debtors' directors and officers for unpaid Taxes, distracting them from the Debtors' reorganization efforts; (iv) payment of the Taxes and Fees is justified under section 363(b) of the Bankruptcy Code; and (v) section 105(a) of the Bankruptcy Code and this Court's general equitable powers permit this Court to grant the requested relief.

25.     First, a portion of the Taxes may be entitled to priority status under section 507(a)(8) of the Bankruptcy Code and to that extent must be paid in full under any plan of reorganization.  See 11 U.S.C. § 1129(a)(9)(C).  Payment of the Taxes in the ordinary course of

business will therefore affect only the timing of the payments and not the amounts that the applicable Taxing Authorities will ultimately receive. Thus, such payments will not prejudice the rights of the Debtors' general unsecured creditors.

26. Second, some of the Taxes constitute "trust fund" taxes that the Debtors are required to collect from third parties and hold in trust for the benefit of the Taxing Authorities. As a consequence, the Debtors do not have an equitable interest in such Taxes. Such Taxes do not constitute property of the Debtors' estates and are, arguably, not subject to the automatic stay. See Begier v. IRS, 496 U.S. 53, 66-67 (1990) (holding that any prepetition payment of trust fund taxes is not an avoidable preference because such funds are not property of the debtor's estate); City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95 (3d Cir. 1994) (observing that it is a "well-settled principle that . . . funds held in trust are not 'property of the estate'"); see also 11 U.S.C. § 541(d) (excluding equitable interests of third parties from the debtor's estate.) Accordingly, payment of such Taxes does not prejudice the rights of any of the Debtors' other creditors, and the Debtors should be permitted to pay any Taxes that constitute trust fund taxes as they come due.

27. Third, some state taxing authorities could hold the Debtors' directors and officers personally liable if the Debtors failed to meet the obligations imposed upon them to remit unpaid "trust fund" taxes. See, e.g., John F. Olson et al., Director & Officer Liability: Indemnification and Insurance § 3:21 (2003) (stating that "some states hold corporate officers personally liable for any sales tax and penalty owed and not paid by the corporation, regardless of cause"); Cal. Rev. & Tax Code § 6829 (West 2009). To the extent that such accrued "trust fund" taxes were unpaid as of the Petition Date, the Debtors' officers could be subject to lawsuits or criminal prosecution in certain jurisdictions during the pendency of this chapter 11 case. Such

potential lawsuits would prove extremely distracting for the Debtors, for the named officers and directors, and for this Court, which may be asked to entertain various motions seeking injunctions with respect to the potential state court actions. Therefore, it is in the best interests of the Debtors' estates and the Debtors' prospects for reorganization to eliminate the possibility of the foregoing distractions.

28.    Fourth, this Court also may authorize the Debtors to pay the prepetition Taxes and Fees under 363(b)(1), which provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). This section gives the court "broad flexibility in tailoring its orders to meet a wide variety of circumstances." Ionosphere Clubs, Inc., 98 B.R. at 175. Before the court can apply section 363(b) in its favor, the debtor must "articulate some business justification, other than mere appeasements of major creditors." Id. (finding that the debtor gave "sound business reasons for its decision to pay pre-petition wages," those reasons being that it was necessary to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale.")

29.    The Debtors' failure to pay the prepetition Taxes and Fees could have a material adverse effect on the Debtors' operations because the Taxing Authorities could take actions (which could include the initiation of audits, lien filings, and lift-stay motions) against the Debtors for such non-payment which could cause significant administrative problems for the estates and consume the Debtors' valuable time and resources. Prompt and regular payment of the prepetition Taxes and Fees will avoid those unnecessary and distracting governmental actions.

30. Finally, section 105(a) of the Bankruptcy Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The purpose of section 105(a) of the Bankruptcy Code is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." See 2 Alan N. Resnick, et al., Collier on Bankruptcy ¶ 105.01 (15th ed. rev. 2008). Thus, section 105 of the Bankruptcy Code codifies the Bankruptcy Court's inherent equitable powers. The relief requested in the Motion is critical to the Debtors' operations and reorganization and therefore is justified under section 105(a) of the Bankruptcy Code.

31. In numerous chapter 11 cases, courts in this district have authorized debtors to pay their prepetition tax and fee obligations. See, e.g., In re Bally Total Fitness of Greater New York, Inc., Case No. 08-14818 (BRL) (S.D.N.Y. Dec. 5, 2008) [Docket No. 35]; In re Lexington Precision Corp., Case No. 08-11153 (MG) (Bankr. S.D.N.Y. Apr. 22, 2008) [Docket No. 81]; In re Stone Barn Manhattan, LLC (fka Steve & Barry's Manhattan LLC), Case No. 08-12579 (ALG) (S.D.N.Y. July 29, 2008) [Docket No. 286]; In re Granite Broadcasting Corp., Case No. 06-12984 (ALG) (S.D.N.Y. Jan. 5, 2007) [Docket No. 86].

32. Nothing in the Motion should be construed as impairing the Debtors' ability to contest the amounts or validity of any Taxes and Fees owed to the various Taxing Authorities or requiring the Debtors to pay any of the applicable Taxes and Fees, and the Debtors expressly reserve all of their rights with respect thereto.

33. Based on the foregoing, the Debtors submit that the requested relief is necessary and appropriate, is in the best interests of their estates and creditors, and should be granted in all respects.

**Payment of Checks Issued and Other**
**Transfers Made in Respect of the Taxing Authorities**

34.  The Debtors pay Taxing Authorities with funds drawn by checks (the "Checks") or by means of electronic fund transfers (the "Electronic Transfers"). Before the Petition Date, certain Taxing Authorities have been sent Checks or Electronic Transfers that did not clear as of the Petition Date.

35.  To the extent any Check or Electronic Transfer has not cleared its banks as of the Petition Date, the Debtors request the Court authorize the banks, in the Debtors' sole discretion, to receive, process, honor, and pay the Checks or Electronic Transfers. If the Taxing Authorities have not received payment for amounts owed, the Debtors seek authority to issue replacement Checks, re-issue Electronic Transfers, or otherwise make payments to the Taxing Authorities. The Debtors represent that each of the Checks and Electronic Transfers can be readily identified as relating directly to the authorized payment of amounts owed to Taxing Authorities. Accordingly, if the relief requested is granted, Checks and Electronic Transfers other than those relating to authorized payments will not be honored inadvertently.

**Waivers**

36.  To successfully implement the foregoing, the Debtors seek a waiver of the notice requirements under Rule 6004(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**The Debtors Satisfy Bankruptcy Rule 6003**

37.  Rule 6003 of the Bankruptcy Rules provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty days after

the Petition Date. Fed. R. Bankr. P. 6003. As described above and in the Wood Declaration, the relief requested herein is critical to the Debtors' business operations and ability to reorganize. Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors, as described above, and that Bankruptcy Rule 6003 has been satisfied.

## Memorandum of Law

38.     The Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, the Debtors submit that no separate memorandum of law is required pursuant to Rule 9013-1 of the Local Bankruptcy Rules.

## Notice

39.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of the Motion on (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to the Agent for the Secured Lenders; and (iii) the creditors holding the 50 largest unsecured claims against the Debtors' estates (on a consolidated basis). In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

## No Prior Request

40.     No prior request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form attached to the Motion as <u>Exhibit B</u>:  (i) authorizing, but not directing, the Debtors to pay all accrued and outstanding Taxes and Fees as the Debtors, in their sole discretion, deem necessary; (ii) authorizing the Debtors to reissue checks, wire transfers, automated clearing house payments, electronic payments, or other similar methods of payment for payments approved under the Motion where such method of payment has been dishonored postpetition; and (iii) granting such other and further relief as is just and proper.

Dated: New York, New York
      April 1, 2009

Respectfully submitted,

ROPES & GRAY LLP

<u>/s/ Mark R. Somerstein</u>
Mark I. Bane (MB 4883)
Mark R. Somerstein (MS 9721)
Shuba Satyaprasad (SS 5875)
James A. Wright III (JW 3007)
1211 Avenue of the Americas
New York, NY 10036
Tel:  212-596-9000
Fax: 212-596-9090

Proposed Attorneys for the Debtors
and Debtors in Possession