Proposed Date for Bidding Procedures Hearing: April 3, 2009 at a time to be set by the Court
Proposed Objection Deadline for Bidding Procedures Hearing: at the Bid Procedures Hearing
Proposed Date of Auction: April 28, 2009 at 10:00 a.m. (ET)
Proposed Sale Approval Hearing: April 29, 2009 at a time to be set by the Court
Proposed Objection Deadline as to Sale: April 28, 2009 at 12:00 p.m. (ET)

Mark I. Bane (MB 4883)
Mark R. Somerstein (MS 9721)
Shuba Satyaprasad (SS 5875)
James A. Wright III (JW 3007)
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel:  212-596-9000
Fax:  212-596-9090

Proposed Attorneys for the Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| **In re** | Chapter 11 |
| **SILICON GRAPHICS, INC.,** *et al.*, | **Case No. 09-_____ (          )** |
| **Debtors.** | **(Jointly Administered)** |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF (A) AN ORDER
(I) APPROVING BID AND NOTICE PROCEDURES AND BID PROTECTIONS AND
(II) AUTHORIZING THE DEBTORS TO FILE CERTAIN SCHEDULES UNDER SEAL;
(B) AN ORDER SETTING AN EMERGENCY HEARING ON THE BID PROCEDURES;
AND (C) AN ORDER (I) APPROVING AN ASSET PURCHASE AGREEMENT
BETWEEN THE DEBTORS AND THE BUYER, OR SUCH OTHER PURCHASE
AGREEMENT(S) BETWEEN THE DEBTORS AND THE SUCCESSFUL BIDDER;
(II) AUTHORIZING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE ASSETS
OF THE DEBTORS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS; (III) AUTHORIZING THE ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES IN CONNECTION THEREWITH; (IV) AUTHORIZING THE DEBTORS TO
<u>OBTAIN POSTPETITION FINANCING; AND (V) GRANTING RELATED RELIEF</u>**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Silicon Graphics, Inc. ("<u>Silicon Graphics</u>"), on behalf of itself and its affiliated

debtors and debtors in possession in the above-captioned cases (collectively, "<u>SGI</u>" or the

"Debtors"), hereby submits this motion (the "Motion") for the entry of an order (a) substantially in the form attached hereto as Exhibit A (the "Bid Procedures Order"), (i) approving the bid procedures provided in Exhibit B (the "Bid Procedures"), certain notice procedures for the Auction (as defined below), and certain bid protections for the Buyer, and (ii) authorizing the Debtors to file the Excluded Schedules (as defined below) to the Stalking Horse Agreement (as defined below) under seal pursuant to Section 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure; (b) substantially in the form attached hereto as Exhibit C, setting an emergency hearing on entry of the Bid Procedures Order for Friday, April 3, 2009; and (c) substantially in the form attached hereto as Exhibit D (the "Sale Order"), (i) approving an asset purchase agreement (the "Agreement") for the sale of substantially all of the Debtors' assets to an entity affiliated with Rackable Systems, Inc. (the "Buyer"), or to the Successful Bidder (as defined below) to be identified at the Auction, (ii) authorizing the sale of all or substantially all of the Debtors' assets (a "Sale" or "Transaction") free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Encumbrances"), (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Buyer or the Successful Bidder, and (iv) authorizing the Debtors to obtain postpetition financing.  In support of this Motion, the Debtors submit the Declaration of Gregory S. Wood in Support of Chapter 11 Petitions and First Day Motions and Applications, sworn to on March 31, 2009 (the "Wood Declaration"), and respectfully represent and set forth as follows:

## Jurisdiction

1.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory predicates for the relief requested herein are sections 105(a), 107(b), 363, 364(c), 365, 503, and 507 of the Bankruptcy Code and

Rules 2002, 3007, 4001, 6004, 6006, 9006, 9007, 9014, and 9018 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**Background**

2.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition with this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code").  Sections 1107(a) and 1108 of the Bankruptcy Code authorize the Debtors to continue to operate their businesses and manage their properties as debtors in possession.  No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

**The Debtors' Businesses**

3.      Founded in 1981, the Debtors began as manufacturers of graphics display terminals based on proprietary software and hardware.  Over the past 28 years, the Debtors have grown into a leader in high performance computing and data management.  Their products and services are targeted toward the scientific, technical, and business communities, which require significant computing power and fast and efficient data movement both within the systems and to and from large-scale data storage to solve challenging data-intensive computing, data management, and visualization problems.  The Debtors sell solutions that consist of a combination of their clustered computing servers, shared memory servers, data storage products, and visualization systems, integrated with a choice of software, customer support services, and professional services.  These solutions allow end users to access, analyze, transform, manage, visualize, and store very large amounts of data in real time or near real time.

4.      The Debtors serve markets such as defense and strategic systems, weather and climate, physical sciences, life sciences, energy (including oil and gas), aerospace, automotive, general manufacturing, media and entertainment, and business intelligence and data analytics.  Customers use the Debtors' systems to simulate global climate changes, accelerate the

engineering of new automotive designs, support homeland security initiatives, manage video content archives, and gain business intelligence through data-mining.

5. The Debtors operate through two business segments:  Products (the "<u>Products Segment</u>") and Global Services (the "<u>Global Services Segment</u>").

   a. <u>Products Segment</u>.  The Products Segment is comprised of the Debtors' core products ("<u>Core Products</u>") and legacy systems ("<u>Legacy Systems</u>"), which allow customers to run data-intensive applications rapidly and to store and visualize their data.  This segment includes (i) a broad line of products designed to address the demands of high-performance computing and data management applications, such as the Debtors' high-performance computing systems, storage products, and visualization systems, (ii) legacy systems which are no longer actively marketed to new customers,  and (iii) software to increase the efficiency, performance, and manageability of the Core Products and Legacy Systems and to assist in visualization and storage management.

   b. <u>Global Services Segment</u>.  The Global Services Segment, which includes customer support and professional services, offers services (i) to support the Debtors' computing systems, software, and storage products, and (ii) to assist the Debtors' customers in developing solutions to meet their business objectives and maximize the return on their technology investment.

6. Headquartered in Sunnyvale, California, the Debtors have direct sales and distributions in over a dozen countries, including Australia, Belgium, France, Germany, Israel, the Netherlands, Spain, and the United Kingdom.  To enhance their direct sales force, the Debtors use indirect channels, including resellers and authorized distributors, in all countries in which they have a presence and more than twenty additional countries.

7. As of December 26, 2008, the Debtors' unaudited consolidated financial statements, which include the assets and liabilities of non-Debtor foreign subsidiaries, reflected total assets of approximately $390 million and total liabilities of approximately $526 million.  As of March 1, 2009, the Debtors had approximately 800 employees in the United States.

**2006 Reorganization**

8.      On May 8, 2006, the Debtors commenced voluntary chapter 11 bankruptcy proceedings (the "2006 Reorganization") in the United States Bankruptcy Court for the Southern District of New York to adjust the Debtors' costs and capital structure to better reflect their corporate size and needs. Pursuant to the plan for the 2006 Reorganization, the Debtors significantly delevered their balance sheets by (i) equitizing their senior notes; (ii) paying a 27.66% recovery to the general unsecured creditors; and (iii) paying all other claims in full. During the 2006 Reorganization, and in response to market pressures and changes within the computing industry, the Debtors developed a road map to transition from a boutique for specialized, high-performance machines into a strong competitor with more diversified products and services and increased market reach. Thus, the Debtors emerged from bankruptcy protection on October 17, 2006, with an improved capital structure, fewer legacy costs, and a new, more competitive business model.

**Credit Facility**

9.      The exit facility issued upon the Debtors' emergence from the 2006 Reorganization is the Debtors' current debt facility, which is governed by that certain Senior Secured Credit Agreement (as amended, modified, or supplemented from time to time, the "Secured Credit Facility"), dated as of October 17, 2006, by and among Silicon Graphics, Inc., Silicon Graphics Federal, Inc., and Silicon Graphics World Trade Corporation, as Borrowers, the lenders party thereto, and Wilmington Trust FSB (the "Agent"), as Administrative Agent and Collateral Agent (as successor to Morgan Stanley Senior Funding, Inc. and Morgan Stanley & Co. Incorporated). The current lenders under the Secured Credit Facility are affiliates of Watershed Capital Partners, Monarch Alternative Capital LP, Whippoorwill Associates, Inc., D.E. Shaw & Company, Symphony Asset Management, Southpaw Asset Management, Lampe

Conway & Co. LLC, Wellpoint, Inc., the President and Fellows of Harvard College, Quadrangle Master Funding Ltd., and Lehman Commercial Paper, Inc. (the "Secured Lenders").

10.     The Secured Credit Facility is secured by substantially all of the Debtors' assets and the assets of their domestic subsidiaries and is due to mature on October 17, 2011.  As of March 27, 2009, there was approximately $141.5 million in principal outstanding under the term loan and approximately $20.7 million in principal outstanding under the revolver.

**Events Leading to these Chapter 11 Cases and Prepetition Sale Efforts**

11.     Since the 2006 Reorganization, the Debtors have faced a number of challenges in their transition to their new business model, which, taken together, have negatively impacted the company's overall financial performance.  The challenges relate partly to legacy problems continuing from before the 2006 Reorganization, such as a burdensome cost structure, hardware commoditization, increased competition, and delays in the introduction of new technology.  In addition, the Debtors based their projections on their ability to grow into their cost structure, increase sales and market capture for their new cluster computing products, software, and service offerings, and implement a new solution-based selling approach.  While the Debtors realized some success, they fell short of this plan to penetrate new markets or capture a greater share of existing markets.  Combined, these factors have caused decreased revenues, net losses, and a decline in the Debtors' available cash position.

12.     Prior to the Petition Date, the Debtors and their advisors explored multiple restructuring alternatives, including the sale of all or portions of the Debtors' operations, new debt or equity capital infusions, reorganizations of the Debtors' operations, and a comprehensive restructuring of the Debtors' balance sheet.  As part of this process, in June 2008, the Debtors retained Houlihan Lokey Howard & Zukin ("Houlihan Lokey") as their financial advisor to

provide assistance with evaluating these strategic alternatives.  The Debtors also began routine meetings with the Secured Lenders to discuss various restructuring options and the Debtors' financial situation.

13.  To investigate the opportunities for a sale of the Debtors' businesses outside of bankruptcy as a going concern, Houlihan Lokey reached out to approximately 150 potentially interested parties, including strategic and financial groups in the United States and around the world.  Houlihan Lokey also examined different deal structures, including a sale of the Debtors as a whole or in portions to parties in different regions, and explored the possibility of various stand-alone reorganization scenarios.  This process generated significant interest in the Debtors' businesses, and a number of parties conducted extensive diligence into the Debtors and made various offers to purchase all or part of the Debtors' businesses.

14.  Despite these promising results, the Debtors were unable to reach agreement on a sale or other restructuring in 2008, partly due to the ongoing credit crisis in the United States and related distress in the equity markets.  Mindful of their deteriorating cash position, the Debtors began a final push to re-explore the possibility of a sale or other restructuring in early 2009. Through Houlihan Lokey, the Debtors approached all potentially interested parties whom they had previously contacted to determine if any of these parties would be interested in a transaction with the Debtors.  At the same time, the Debtors and Houlihan Lokey continued to consider options with the Secured Lenders for a possible debt-for-equity exchange and a reorganization on a stand-alone basis.  The Debtors ultimately set a deadline of early March 2009 for firm bids, and received offers for all or a portion of their business from 3 potential buyers, including the Buyer.

**Stalking Horse Agreement**

15.     Following further discussions between the Buyer and the Debtors, the parties reached agreement on a term sheet for the Buyer to serve as a stalking horse in an auction.  After intense negotiations, the parties reached agreement shortly before the commencement of these chapter 11 cases on the terms of an asset purchase agreement (the "Stalking Horse Agreement") under which the Buyer will serve as a stalking horse bidder for a sale of substantially all the Debtors' assets (the "Acquired Assets") through an auction in chapter 11 pursuant to section 363 of the Bankruptcy Code.  A copy of the Stalking Horse Agreement is attached as Exhibit E. Subject to the receipt of higher and better proposals through the Bid Procedures, the Debtors believe the Stalking Horse Agreement represents the best alternative available for the Debtors, their creditors, and all parties in interest.

**Breakup Fee and Expense Reimbursement**

16.     In certain circumstances, the Stalking Horse Agreement provides for the Buyer to receive a breakup fee of $1 million (the "Breakup Fee") and reimbursement of expenses of up to $1 million (the "Expense Reimbursement") for the amount of all of the Buyer's expenses (including expenses of outside counsel, accountants, and financial advisers) incurred since December 7, 2007 in connection with Buyer's evaluation, consideration, and negotiation of a possible transaction with the Debtors and in connection with the transactions contemplated by the Stalking Horse Agreement.

17.     As provided in the Stalking Horse Agreement, the Breakup Fee and Expense Reimbursement are payable if any one of the following occurs:[1]

---

[1]     The summary of the Breakup Fee and Expense Reimbursement provisions in the Stalking Horse Agreement contained in this Motion is qualified in its entirety by reference to the Stalking Horse Agreement itself.  Any conflict between the terms described in this Motion and the Stalking Horse Agreement shall be resolved in favor of the Stalking Horse Agreement.

(a) <u>Buyer Not Successful Bidder</u>: the Buyer is not identified as the Successful Bidder following completion of the Auction, and:

    (i) at the time the Successful Bidder is identified, the Buyer is not in material breach of any material provision of the Stalking Horse Agreement;

    (ii) the Buyer has not terminated the Stalking Horse Agreement (other than pursuant to Sections 9.1(c) or 9.1(e) of the Stalking Horse Agreement); and

    (iii) a sale of all or a material part of the Purchased Assets to a party or parties (collectively, a "<u>Third-Party</u>") other than the Buyer (the "<u>Third-Party Sale</u>") is consummated; *provided*, *however*, that a stand-alone reorganization, including a reorganization under which the Debtors' secured lenders receive substantially all the equity and/or debt in the reorganized Debtors, shall not constitute a Third-Party Sale;

(b) <u>Third-Party Sale Within Six Months of Bidding Procedures Order</u>: a Third-Party Sale is consummated (whether in these chapter 11 cases or, if converted into cases under chapter 7 of the Bankruptcy Code, such chapter 7 cases) within six months of the approval of the Bidding Procedures Order, and:

    (i) at the time of the Third-Party Sale, the Buyer is not in material breach of any material provision of the Stalking Horse Agreement; and

    (ii) the Buyer has not terminated the Stalking Horse Agreement (other than pursuant to Sections 9.1(c), 9.1(e), or 9.1(h) of the Stalking Horse Agreement);

(c) <u>Chapter 11 Plan</u>: One or more of the Debtors files a chapter 11 plan contemplating the sale or retention of a material portion of the Acquired Assets by the Debtors in a manner substantially inconsistent with the terms of the Stalking Horse Agreement in circumstances in which the Debtors' secured lenders receive more than 50% of the equity and/or debt in the reorganized Debtors or any other successor entity (an "<u>Inconsistent Plan</u>").

18. The Buyer's willingness to go forward with the Stalking Horse Agreement is expressly conditioned on approval of the Breakup Fee and Expense Reimbursement. As discussed below, the Debtors believe that the benefits of the Stalking Horse Agreement justify

the Breakup Fee and Expense Reimbursement and submit that agreeing to these conditions is a reasonable exercise of the Debtors' business judgment.

## Bid Procedures

19.     Following entry of the Bid Procedures Order, the Debtors and Houlihan Lokey will begin soliciting bids for the Acquired Assets under the Bid Procedures. The Bid Procedures describe, among other things, the assets available for sale, the manner in which bids become "qualified," the coordination of diligence efforts among bidders and the Debtors, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Successful Bidder. The Debtors will consider all proposals received in accordance with the Bid Procedures. The price the Successful Bidder will pay for the Acquired Assets and the terms and conditions for the sale of such assets will be established at the Auction.

20.     The Debtors crafted the Bid Procedures to allow for an expedited sale while simultaneously fostering an active bidding process for the Acquired Assets. The Debtors submit that the proposed Bid Procedures will provide for an orderly and fair Auction that will generate the highest and best bid for the Acquired Assets.

21.     The following sets forth a summary of the key provisions of the Bid Procedures:

## Marketing Process

(a)     Contact Parties:  The Debtors, in consultation with Houlihan Lokey, have developed a list of parties the Debtors believe may potentially be interested in and would have the financial resources to consummate a competing Transaction to that of the Buyer (a "Competing Transaction"). This list includes both potential strategic investors and financial investors (each, individually, a "Contact Party," and collectively, the "Contact Parties"). Following entry of the Bid Procedures Order, the Debtors and Houlihan Lokey will commence contacting the Contact Parties to explore interest in Competing Transactions. Contact Parties may include parties who the Debtors or their advisors previously contacted regarding a Transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a Transaction. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing

process, as appropriate.  The Debtors will notify the Buyer of the names of any Contact Party and will keep the Buyer apprised of all contacts with any Contact Party.

(b)  <u>Information Package</u>:  The Debtors may distribute to each Contact Party an "<u>Information Package</u>," comprising:

    (i)  A cover letter;

    (ii)  A copy of the Bid Procedures; and

    (iii)  A copy of a confidentiality agreement in form and substance acceptable to the Debtors (the "<u>Confidentiality Agreement</u>").

(c)  <u>Access to Diligence Materials</u>:  To participate in the bidding process and receive access to a virtual data room (the "<u>Diligence Materials</u>"), a party must submit an executed Confidentiality Agreement to the Debtors.  A party who qualifies for access to Diligence Materials shall be a "<u>Preliminarily Interested Party</u>."

(d)  All due diligence requests must be directed to Houlihan Lokey.

(e)  For any Preliminary Interested Parties who are competitors of the Debtors or are affiliated with competitors of the Debtors, the Debtors reserve the right to withhold any Diligence Materials the Debtors determine, in their sole discretion, are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Party.

## Auction Qualification Process

To be eligible to participate in the Auction, each offer, solicitation, or proposal (other than an offer, solicitation, or proposal from the Buyer) (each, a "<u>Bid</u>"), and each party (other than the Buyer) submitting such a Bid (each, a "<u>Bidder</u>") must satisfy the conditions listed below.  The Debtors, in their sole discretion, shall determine compliance with each condition:

(a)  <u>Good Faith Deposit</u>:  A Bid (other than a Bid in which the sole purchase price consideration is a credit bid under section 363(k) of the Bankruptcy Code) must be accompanied by a deposit in the amount of $2,000,000 to an interest bearing escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>").

(b)  <u>Higher or Otherwise Better Terms</u>:  A Bid must be on terms that are higher or otherwise better than the terms of the Stalking Horse Agreement.

(c)  <u>Documentation</u>:  A Bid must include (i) executed transaction documents to effect the Competing Transaction (the "<u>Competing Transaction Documents</u>") and (ii) a copy of the Stalking Horse Agreement marked to

show all changes requested by the Bidder (including those related to purchase price). The foregoing documents (including the matters contemplated by section (e) below), shall be provided to the Agent and the Buyer promptly (and in any event within 2 hours) after they are provided to the Debtors.

(d)     <u>Purchase Price; Related Terms</u>:  A Bid must propose a purchase price, or credit bid an amount of secured debt, of at least $27,000,000, reflecting the purchase price under the Stalking Horse Agreement plus the Breakup Fee and Expense Reimbursement payable under the Stalking Horse Agreement.  No Bidder, other than the Buyer, shall be entitled to any expense reimbursement, breakup fee, termination fee, or similar fee or payment.

(e)     <u>Executory Contracts and Leases</u>:   Competing Transaction Documents shall identify all of the Debtors' executory contracts and unexpired leases that the Bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction (collectively, the "<u>Assigned Contracts</u>").

(f)     <u>Corporate Authority</u>:  A Bid must include written evidence that demonstrates appropriate corporate authorization for the Bidder to consummate the proposed Competing Transaction; <u>provided</u>, that if the Bidder is an entity specially formed for the purpose of effecting the Competing Transaction, then the Bidder must furnish written evidence of the approval of the Competing Transaction by the equity holder(s) of such Bidder.

(g)     <u>Proof of Financial Ability to Perform</u>:  A Bid must include written evidence that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all executory contracts and leases to be assumed and assigned in such Competing Transaction.  Such information should include, among other things, the following:

(i)      contact names and numbers for verification of financing sources;

(ii)     evidence of the Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the Competing Transaction;

(iii)    the Bidder's current financial statements (audited, if they exist); and

(iv)    any such other form of financial disclosure or credit-quality support information or enhancement, acceptable to the Debtors in their sole discretion, that demonstrates such Bidder is able to close the Competing Transaction.

(h)  Contingencies:  A Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties.

(i)  Irrevocable:  A Bid must be irrevocable through the Auction and, except as provided in the Stalking Horse Agreement, if such Bid is accepted as the Successful Bid or the Backup Bid (as defined below), it must continue to remain irrevocable, subject to the terms and conditions of the Bid Procedures.

(j)  Bid Deadline:  Regardless of when a party qualifies as a Preliminarily Interested Party, all Bids must be in writing and received by the Debtors on or before 5:00 p.m. (prevailing Eastern time) on April 27, 2009 (the "Bid Deadline").

22.  Bids received from Bidders before the Bid Deadline that are determined by the Debtors to meet the above requirements shall constitute "Qualified Bids," and such Bidders shall constitute "Qualified Bidders."  Only Qualified Bidders may participate at the Auction.  The Stalking Horse Agreement shall constitute a Qualified Bid.  All rights of the Agent and the Secured Lenders under the Bankruptcy Code, orders of the Bankruptcy Court, and the loan documents for the Secured Credit Facility are expressly preserved, including, without limitation, the right of the Agent to submit a credit bid at any time at or before the Auction in accordance with Section 363(k) of the Bankruptcy Code.

**Auction**

23.  If more than one Qualified Bid (including the Stalking Horse Agreement) is received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or otherwise best Qualified Bid.  The Debtors, after consulting with the Agent, will determine the highest or otherwise best Qualified Bid in their business judgment, after taking into account any factors the Debtors, after consulting with the Agent, deem relevant, including, without limitation, the following criteria (the "Bid Assessment Criteria"): (i) the amount and nature of the consideration; (ii) the proposed assumption of any liabilities, if any; (iii) the ability

of the Qualified Bidder to close the proposed Transaction; (iv) the proposed closing date and the

likelihood, extent, and impact of any potential delays in closing; (v) any purchase price (or

similar) adjustments; (vi) the impact of the Transaction on any actual or potential litigation; and

(vii) the net after-tax consideration to be received by the Debtors' estates.  If no Qualified Bid

(other than the Stalking Horse Agreement) is received by the Bid Deadline, the Debtors may

determine not to conduct the Auction.

24.     The Auction shall take place at 10:00 a.m. (prevailing Eastern time) on April 28,

2009, at the offices of the Debtors' counsel, Ropes & Gray LLP, at 1211 Avenue of the

Americas, New York, New York 10036 or such later time on such day or other place as the

Debtors shall notify all Bidders who have submitted Qualified Bids.

25.     The Auction shall be conducted according to the following procedures:

(a)     The Debtors Shall Conduct the Auction:  The Debtors and its
professionals shall direct and preside over the Auction.  At the start of the
Auction, the Debtors shall describe the terms of the Stalking Horse
Agreement or, if a higher or otherwise better Qualified Bid is received,
such Qualified Bid (the "Auction Baseline Bid").  All Bids made
thereafter shall be Overbids (as defined below), shall be made and
received on an open basis, and all material terms of each Overbid shall be
fully disclosed to all Bidders who have submitted Qualified Bids.  The
Buyer shall be permitted to credit bid the full amount of the Breakup Fee
and Expense Reimbursement pursuant to any Overbid in connection with
each round of bidding.  The Agent shall be permitted to credit bid, on
behalf of the Secured Lenders, all or any portion of such Secured Lenders'
secured claims at any time and in connection with each round of bidding,
in accordance with Section 363(k) of the Bankruptcy Code.  The Debtors
shall maintain a transcript of all bids made and announced at the Auction,
including the Auction Baseline Bid and all Overbids.

(b)     Terms of Overbids:  An "Overbid" is any bid made at the Auction
subsequent to the Debtors' announcement of the Auction Baseline Bid.
The Buyer may, but is not required to, make an Overbid.  To submit an
Overbid for purposes of the Auction, a Bidder must comply with the
following conditions:

(i)      Minimum Overbid Increment:  Any Overbid after the Auction
Baseline Bid shall be made in $250,000 increments.  Additional

consideration in excess of the amount set forth in the Auction Baseline Bid may include only cash, the assumption of debt, marketable securities, or a credit bid under section 363(k) of the Bankruptcy Code of an allowed secured claim and, in the case of the Buyer, a credit bid of the Breakup Fee and any Expense Reimbursement, in any combination.

(ii) <u>Remaining Terms are the Same as for Qualified Bids</u>:  Except as modified in the Bid Procedures (or, with respect to the Buyer, in the Stalking Horse Agreement), an Overbid must comply with the conditions for a Qualified Bid set forth above and shall constitute a Qualified Bid; <u>provided</u>, that the Bid Deadline shall not apply. Except as set forth in the Stalking Horse Agreement, any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher or otherwise better Overbid and subject to the procedures with respect to Backup Bids (as described below). To the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid (other than any Bidder making a credit bid under section 363(k) of the Bankruptcy Code) must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement acceptable to the Debtors) demonstrating such Bidder's ability to close the Competing Transaction proposed by such Overbid.

(iii) <u>Announcing Overbids</u>:  The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid, and the resulting benefit to the Debtors' estates based on, among other things, the Bid Assessment Criteria.

(iv) <u>Consideration of Overbids</u>:  The Debtors shall have the right to declare one or more adjournments in the Auction.  The Debtors may declare adjournments to, among other things: (1) facilitate discussions between the Debtors and individual Bidders; (2) allow individual Bidders to consider how they wish to proceed; and (3) give Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors may require that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Competing Transaction at the prevailing Overbid amount.

(c) <u>Backup Bidder</u>:  Notwithstanding anything in the Bid Procedures to the contrary, if an Auction is conducted, the party the Debtors determine to have the next highest or otherwise best Qualified Bid at the Auction shall be required to serve as a backup bidder (the "<u>Backup Bidder</u>"); <u>provided</u>,

that the Buyer shall not be designated as the Backup Bidder absent the Buyer's written consent or agreement on the record. If the Buyer, but for the preceding clause, would otherwise be the Backup Bidder, the party the Debtors determines to have the next highest or otherwise best Qualified Bid at the Auction after the Buyer shall be required to serve as the Backup Bidder. The Backup Bidder shall be required to keep its initial Qualified Bid (or, if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern time) on the date that is (i) forty-five (45) days after the date of the Auction (the "Outside Backup Date") or (ii) the closing of the transaction with the Successful Bidder. Following the Sale Hearing, if the Successful Bidder fails to consummate an approved Transaction, because of a breach or failure to perform on the part of such Successful Bidder, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized (but not required) to consummate the Transaction proposed in such Backup Bid without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder. The deposit of the Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (a) the closing of the transaction with the Successful Bidder and (b) the Outside Backup Date.

(d)      Additional Procedures: The Debtors may announce at the Auction additional procedural rules (e.g., the amount of time to make subsequent Overbids) for conducting the Auction so long as the rules are not inconsistent with the Bid Procedures or the Stalking Horse Agreement.

(e)      Consent to Jurisdiction as Condition to Bidding: The Buyer and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the Stalking Horse Agreement, the Auction, or the construction and enforcement of any Competing Transaction Documents.

(f)      Closing the Auction: The Debtors shall continue the Auction until there is only one Qualified Bid that the Debtors determine in their sole discretion (after consultation with the Agent and the creditors committee, if any) is the highest or otherwise best Qualified Bid at the Auction (the "Successful Bid," and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors shall consider, among other things, the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity, as determined by the Debtors in their sole discretion, after consultation with the Agent, to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has

submitted fully executed transaction documents memorializing the terms of the Successful Bid.  The Debtors shall not consider any bids submitted after the conclusion of the Auction.

(g)    Sale Hearing:  The Debtors will seek a hearing (the "Sale Hearing") on or before April 29, 2009, at which the Debtors will seek approval of the Transaction with the Successful Bidder.  Any objections to the sale of the Acquired Assets to the Successful Bidder or Backup Bidder must be filed on or before 12:00 p.m. (prevailing Eastern time) on April 28, 2009, and served on the Service Parties so that they are actually received by no later than 12:00 p.m. (prevailing Eastern time) on April 28, 2009.

### Financing Commitment

(a)    The Debtors may request, in consultation with the Agent, that a Bid (other than any credit bid under Section 363(k) of the Bankruptcy Code) include a fully-funded commitment, subject to no conditions or contingencies other than selection as the Successful Bidder at the Auction, to provide the Debtors with a debtor-in-possession term loan (a "Bridge Loan"), the proceeds of which will be used by the Debtors, subject to a budget approved by the Agent and the Successful Bidder, to continue their operations pending the closing of the Sale.  The Bridge Loan will be memorialized by a note setting forth that the Bridge Loan will (i) have a term of 30 days, (ii) be secured by a lien on substantially all of the Debtors' assets junior in priority to any existing prepetition liens, including the liens under the Debtors' prepetition secured credit facility, which liens will become perfected automatically without recordation upon the issuance of the proceeds of the Bridge Loan, and (iii) be repaid through a reduction in the purchase price for the Acquired Assets on a dollar for dollar basis.  For purposes of clarification, the Buyer shall have no obligation to provide a Bridge Loan.

### Procedures for Determining Cure Amounts and
### Adequate Assurance for Counterparties to Assigned Contracts

(a)    By April 7, 2009, the Debtors shall send a notice, substantially in the form of Exhibit F,  to each counterparty to an executory contract or unexpired lease (each, a "Contract Counterparty") setting forth the Debtors' calculation of the cure amount, if any, that would be owing to such counterparty if the Debtors decided to assume or assume and assign such executory contract or unexpired lease (each, a "Cure Notice").  Any Contract Counterparty that objects to the amount set forth in the Cure Notice must file an objection (a "Cure Objection"), on or before 4:00 p.m. prevailing Eastern Time on April 21, 2009, which Cure Objection must be served on (i) counsel for the Debtors, Ropes & Gray LLP, at 1211 Avenue of the Americas, New York, New York 10036, Attn: Mark R. Somerstein; (ii) counsel to the Agent for the Secured Lenders, Kramer Levin Naftalis

& Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn: Thomas M. Mayer; (iii) counsel to the Buyer, Cooley Godward Kronish LLP, 101 California Street, 5th Floor, San Francisco, California 94111, Attn: J. Michael Kelly; and (iv) counsel to any statutory committees appointed in the Debtors' chapter 11 cases (collectively, the "Service Parties") so that it is actually received no later than 4:00 p.m. prevailing Eastern Time on April 21, 2009. If a Contract Counterparty does not timely file and serve a Cure Objection with respect to a Cure Notice, such Contract Counterparty will be forever barred from objecting to the cure amount proposed in such Cure Notice. If a Contract Counterparty files a timely Cure Objection and the parties are unable to consensually resolve the dispute, a hearing on such Cure Objection will be held at or prior to the Sale Hearing.

(b)  By April 7, 2009, the Debtors will send a notice, substantially in the form of Exhibit G, via overnight delivery to each counterparty (each, an "Assigned Counterparty") to a contract designated as an Assigned Contract in the Stalking Horse Agreement (a "Contract Assignment Notice"). The Contract Assignment Notice will contain (i) reasonable detail of the proposed Assigned Contract and (ii) information regarding adequate assurance of future performance by the Buyer. Any Assigned Counterparty that objects to the assignment of its Assigned Contract or to the adequate assurance of the Stalking Horse's ability to perform must file an objection (an "Assignment Objection") on or before 4:00 p.m. prevailing Eastern Time on April 27, 2008, which Assignment Objection must be served on the Service Parties so that it is actually received no later than 4:00 p.m. (prevailing Eastern time) on April 27, 2008. If an Assigned Counterparty does not timely file and serve an Assignment Objection, such Assigned Counterparty will be (i) forever barred from objecting to the assignment of their Assigned Contract to the Buyer; (ii) deemed to have waived all pre-closing defaults and breaches under the Assigned Agreements; (iii) forever barred from objecting to the Buyer's adequate assurance of future performance, and (iv) deemed to have consented, for all purposes, to, the assumption and assignment of their Assigned Contracts to the Buyer. If an Assigned Counterparty files a timely Assignment Objection and the parties are unable to consensually resolve the dispute, a hearing on the Assignment Objection will be held at the Sale Hearing.

(c)  If the Buyer is not the Successful Bidder at the Auction, then no later than five (5) business days after the Auction, the Debtors will send a subsequent Contract Assignment Notice to each counterparty to a contract designated as an Assigned Contract by the Successful Bidder or the Backup Bidder identifying the Successful Bidder and the Backup Bidder and providing information regarding adequate assurance of future performance by the Successful Bidder and the Backup Bidder. The Sale Order will address the procedures by which the Debtors will assume and

assign the Assigned Contracts to a Successful Bidder or Backup Bidder that is not the Buyer.

(d)     Nothing shall effect the rights of the Successful Bidder under the Agreement to add or remove executory contracts and unexpired leases from the list of Assigned Contracts prior to the Sale Hearing. The Debtors shall file a list of the Assigned Contracts to be assumed and assigned to the Successful Bidder at the Sale Hearing with the Court on or before the date of the Sale Hearing.

### Return of Good Faith Deposit

(b)     Except as provided in the Stalking Horse Agreement with regard to the Deposit of the Buyer, the Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors (or, with respect to the Buyer's Good Faith Deposit, in one or more accounts mutually agreed to by the Debtors and the Buyer), but shall not become property of the Debtors' estates absent further order of the Court. Except as provided in the Stalking Horse Agreement with regard to the Deposit of Buyer, the Good Faith Deposits of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of 24 hours after (i) the closing of the Transaction with the Successful Bidder and (ii) the Outside Backup Date. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its purchase price.

### Management Compensation

26.     Annex A to the Stalking Horse Agreement provides for the Buyer to enter into certain arrangements with the Debtors' CEO, Robert Ewald, and ten other members of the Debtors' management team (the "Executives") as part of a Sale pursuant to the Stalking Horse Agreement. These arrangements, as described below, will be in lieu of the CEO's and Executives' individual employment and change of control agreements with the Debtors, which are not being assumed by the Buyer.

(a)     CEO:  The Buyer will enter into a transition services agreement with the Debtors' CEO, Robert Ewald, under which Mr. Ewald will provide

transition services from the Closing (as defined in the Stalking Horse Agreement) until December 31, 2009 (the "<u>Transition Period</u>").   This agreement will provide Mr. Ewald with the following:

- 90% of his base salary and benefits under the Buyer's benefit plans, including those plans applicable to the Buyer's senior management;

- Payment of $600,000 on January 1, 2010, unless he is terminated for cause or resigns other than for good reason prior to end of the Transition Period;

- If he is terminated without cause or resignation for good reason, he will continue to receive the benefits described above regardless of such termination/resignation.

(b)      <u>Retained Executives</u>:  by no later than the date of entry of the Sale Order approving a Sale to the Buyer (the "<u>Sale Order Date</u>"), the Buyer will provide a list to the Debtors of those Executives the Buyer proposes to offer employment on a long-term basis (the "<u>Retained Executives</u>").  The Buyer will, on or prior to the Closing and subject to the approval of the Buyer's Compensation Committee, offer the Retained Executives employment at a base salary not less than 90% of their current base salary with the Debtors', and otherwise on substantially the terms and conditions provided in the Buyer's standard form of executive employment agreement.

(c)      <u>Transition Executives</u>:  On or before the date of the Sale Order Date, the Buyer will designate a list of Executives (the "<u>Transition Executives</u>") to whom the Buyer will offer executive transition agreements (the "<u>Transition Agreements</u>").  The Transition Agreements will provide as follows with respect to each such Executive:

- Executive will provide transition services to the Buyer from a defined period terminating no later than December 31, 2009 (the "<u>Service Period</u>") (with the Buyer to determine the exact period and provide notice of such period to the respective Executive no later than the Sale Order Date);

- Executive will receive, during the Service Period, 90% of the Executive's base salary and benefits under the Buyer's benefit plans, including those plans applicable to the Buyer's senior management;

- Executive will receive, at the conclusion of the Service Period, a lump sum payment equal to six months of the Executive's current salary with the Debtors, plus six

months health benefit coverage, unless the Executive has been terminated without cause or resigns for good reason prior to the end of the Service Period;

- If the Executive is terminated without cause or resignation for good reason, the Executive will continue to receive the benefits described above regardless of such termination/resignation.

(d) <u>Terminated Executives</u>:  The Executives who are not Retained Executives or Transition Executives will be terminated on or before the Closing (the "<u>Terminated Executives</u>").  These Executives will receive, upon termination, a lump sum equal to two months of such Executive's current salary with the Debtors plus applicable accrued vacation as of termination.

## Relief Requested

27.     The Debtors respectfully request the entry of (a) the Bid Procedures Order (i) approving the Bid Procedures, the Breakup Fee, and the Expense Reimbursement and (ii) authorizing the Debtors to file the Excluded Schedules under seal; (b) entry of an order setting an emergency hearing on entry of the Bid Procedures Order for Friday, April 3, 2009; and (c) the Sale Order (i) approving the sale of the Acquired Assets to the Buyer or the Successful Bidder, (ii) authorizing the sale of all or substantially all of the assets of the Debtors free and clear of all Claims and Interests, and (iii) authorizing the assumption and assignment of the Assigned Contracts to the Buyer or the Successful Bidder.

## Basis for Relief

**I.**     **The Bid Procedures Are Appropriate and in the Best Interests of the Debtors and their Estates and Creditors**

**A.**     ***The Proposed Notice of the Bid Procedures Is Appropriate***

28.     The Debtors seek to sell the Acquired Assets through a well-publicized Sale and Auction.  The Debtors and Houlihan Lokey conducted extensive prepetition marketing for the Debtors' assets and developed a list of Contact Parties who will receive a copy of the Information Package.  The list encompasses those Contact Parties the Debtors believe may be

interested in pursuing a Sale and who the Debtors reasonably believe have the financial resources to consummate a Sale. The Debtors designed the Bid Procedures to elicit bids from one or more parties and to encourage a robust auction of the Acquired Assets, maximizing the value for the Debtors' estates and creditors.

29.     Under Bankruptcy Rules 2002(a) and (c), the Debtors must notify their creditors of the proposed sale of the Acquired Assets, including a disclosure of (a) the time and place of any auction, (b) the terms and conditions of the sale, and (c) the deadline to file objections. The Debtors propose to publish the notice attached hereto as Exhibit H (the "Bid Procedures Notice") once in the National Edition of *The Wall Street Journal* within five business days after entry of the Bid Procedures Order. The Debtors will also serve notice of this Motion on the (i) the Office of the United States Trustee for the Southern District of New York; (ii) the creditors holding the 50 largest unsecured claims against the Debtors' estates (on a consolidated basis); (iii) counsel to the agent for the Debtors' prepetition secured lenders; (iv) the Internal Revenue Service; and (v) all entities who are known to possess or assert a claim against the Debtors.

30.     The foregoing procedures provide effective notice of the Bid Procedures and the Auction to interested parties and will promote the broadest possible participation in the Debtors' marketing process while minimizing costs to the estates. Accordingly, the Debtors respectfully request that the Court find that the proposed notice procedures set forth in this Motion are sufficient and that no other or further notice of the Bid Procedures or the Auction is required.

**B.     *The Bid Procedures Are Appropriate and Will Maximize Value***

31.     Appropriate bid procedures should promote "an open and fair public sale designed to maximize value for the estate." See In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998). And the paramount goal in any proposed sale of property of the estate is to maximize the proceeds from such sale, in accordance with the Debtors' "duty to maximize the value of the

estate." See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352 (1985); In re Smart World Techs., LLC, 423 F.3d 166, 175 (2d. Cir 2005); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [is] to enhance the value of the estate at hand").

32.     Indeed, procedures which promote increased competitive bidding are required for sales of estate assets, because they advance the goal of maximizing the value received by the estate by helping to "secure for the benefit of creditors the best possible bid." In re Fin. News Network Inc., 980 F.2d 165, 169 (2d. Cir 1992); see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures that "encourage bidding . . . maximize the value of the debtor's assets").

33.     The proposed Bid Procedures will ensure a competitive, open, and fair bidding process, increasing the odds of the estates receiving the most consideration possible for the Acquired Assets. The Bid Procedures will also encourage active bidding by parties with a serious interest in purchasing the Acquired Assets and financial capacity to close a Sale, and thereby generate the best and highest offer reasonably available at the Auction for the Acquired Assets.

34.     The Bid Procedures are also consistent with other procedures previously approved by courts in this and other districts and appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. See In re Lehman Bros. Holdings Inc., Case No, 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) [Docket No. 1175]; In re Dana Corp., Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. April 11, 2007) [Docket No. 5105];

In re Hines Horticulture, Inc., Case No. 08-11922 (Bankr. D. Del. December 10, 2008) [Docket No. 355].

35.     Accordingly, the Debtors submit that the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because they will maximize the value to be received by the Debtors' estates.

**C.     *The Initial Overbids and Bid Increments Are Appropriate***

36.     At the Auction, the starting Auction Baseline Bid will be either the bid by the Buyer in the Stalking Horse Agreement or a Qualified Bid which proposed as purchase price of at least $27,000,000 (the price under the Stalking Horse Agreement plus the Breakup Fee and Expense Reimbursement.  Once the Debtors determine the Auction Baseline Bid, any Overbids shall be made in $250,000 increments.

37.     These provisions for the Auction Baseline Bid and Overbids are reasonable under the circumstances and will enable the Debtors to maximize the value for the Acquired Assets while limiting any chilling effect in the marketing process.  These provisions are also consistent with the overbid increments previously approved by courts in this District.  See In re Lehman Bros. Holdings Inc., Case No, 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) [Docket No. 1175] (approving initial incremental bid of $5 million, plus additional incremental bids of $5 million); In re Dana Corp., Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. April 11, 2007) [Docket No. 5105] (approving initial incremental bid of $3.625 million, plus additional incremental bids of $500,000).

**D.     *The Breakup Fee and Expense Reimbursement
        Are Reasonable and Appropriate***

38.     The Breakup Fee and Expense Reimbursement were negotiated at arm's length and in good faith and are necessary to secure the Buyer's participation in the Debtors' sale

process.  The Buyer's participation as a stalking horse bidder sets a price floor for the Debtors' assets, which has significant benefits for driving higher bids at the Auction and provides a measure of insurance for the Debtors and all parties in interest that a fixed minimum price for the Debtors' assets will be received.  Further, the presence of the stalking horse bid will assist the Debtors in maintaining their businesses postpetition prior to the Sale, by providing comfort to the Debtors' employees and vendors that the Debtors' businesses will continue.  For these reasons, the Debtors' determined that, after consultation with the Debtors' professionals and in the Debtors' business judgment, entering into the Stalking Horse Agreement, including the provisions for the Breakup Fee and the Expense Reimbursement, were in the best interests of the Debtors, their estates, and all parties in interest.

39.  Bankruptcy courts have frequently approved similar bidding incentives, including breakup fees and expense reimbursement provisions similar to those presented here, under the business judgment rule, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  See, In re Integrated Res., 147 B.R. at 662-63 (approving termination fee plus reimbursement of expenses).  The Debtors submit that the Breakup Fee and the Expense Reimbursement are reasonable and necessary to convince the Buyer to consummate the Transaction, and granting the Breakup Fee and the Expense Reimbursement are valid exercises of the Debtors' business judgment.

**E.**   ***The Proposed Notice Procedures for the Assigned Contracts and the Identification of Related Cure Amounts Are Appropriate***

40.  The Debtors also seek authority under sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assigned Contracts to the Successful Bidder.  The Bid Procedures specify how the Debtors will serve Cure Notices and Contract Assignment Notices and how and

when counterparties to Assigned Contracts must file and serve Cure Objections and Contract Assignment Objections.

41.     Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assigned Contract, at the closing of the Sale, defaults under the Assigned Contracts that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured by (a) payment of the undisputed cure amount and/or (b) reserving amounts with respect to any disputed cure amounts.

**F.      *The Excluded Schedules Contain Confidential Commercial Information, and Therefore Authorization to File the Excluded Schedules Under Seal Is Appropriate***

42.     The Debtors have withheld or redacted certain schedules to the Stalking Horse Agreement (the "Excluded Schedules").  The Excluded Schedules are:

- Schedule 2.1(e) "Assumed Agreements":  The excluded portions of this Schedule list customer service contracts, reseller contracts, and certain other key customer agreements.

- Schedule 5.3(e) "Title to Assets; Intellectual Property":  The excluded portions of this Schedule list certain key customer agreements relating to intellectual property.

- Schedule 5.7 "Accounts Receivable":  This schedule lists the Debtors' customers with accounts receivable outstanding on the Petition Date and the amounts they owe to the Debtors.

43.     The Excluded Schedules contain lists of the Debtors' customers and resellers and agreements with those customers and resellers.  This information is highly-sensitive commercial information which, if made publicly available, could be used by the Debtors' competitors to their advantage and to the detriment of the Debtors' businesses.  Further, in certain instances, the Excluded Schedules list important contracts with key customers that are subject to confidentiality restrictions that could be violated by public disclosure of the Excluded Schedules.  Keeping the

information in the Excluded Schedules secret, therefore, is in the best interests of the Debtors' estates, creditors, and all parties in interest.

44.     Section 107(b) of the Bankruptcy Code empowers the Court to issue orders to protect the Debtors, or other entities, from potential harm resulting from the disclosure of confidential or highly-sensitive commercial information. Section 107(b) provides:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may –
>
> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information.

11 U.S.C. § 107(b).

45.     Bankruptcy Rule 9018 provides:

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . .

Fed. R. Bankr. P. 9018.

46.     When a bankruptcy court issues a protective order pursuant to section 107(b), "[t]he court determines whether the subject documents fall within the provisions of § 107(b) and the appropriate remedy if they do." In re Barney's, Inc., 201 B.R. 703, 707 (Bankr. S.D.N.Y. 1996). If the court determines that the documents in question fall within the parameters of section 107(b), "the court is *required* to protect a requesting interested party and has no discretion to deny the application." Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27 (2d Cir. 1994) (emphasis in original). A party seeking the sealing of information need only show that the information is "'confidential' and 'commercial' in nature." Id. Further, commercial information need not rise to the level of a trade secret to be entitled to protection. Id. at 28. In determining what sort of information section 107(b) protects,

the District Court has recognized that the term "commercial information" is broad and includes information that, if put in certain creditors' hands, could have "the ability to affect the market in which [creditors] might sell their claims, by what they disclose about the negotiations, and have a chilling effect on negotiations, ultimately affecting the viability of the Debtors." In re Lomas Fin. Corp., No. 90 Civ. 7827 (LLS), 1991 U.S. Dist. LEXIS 1589, at *5 (S.D.N.Y. Feb. 11, 1991); accord Barney's, 201 B.R. at 707-708.

47.     The Debtors submit that the information on the Excluded Schedules is the type of highly-sensitive commercial information intended to be protected by section 107(b) and Bankruptcy Rule 9018. The Debtors therefore seek authority to submit the Excluded Schedules under seal. The Debtors propose that they will provide copies of the Excluded Schedules to the Court, the Office of the United States Trustee, and those persons, approved by the Debtors, who execute a non-disclosure agreement acceptable to the Debtors.

## II.     An Expedited Hearing to Approve the Bid Procedures is Appropriate

48.     The Debtors further seek an expedited hearing on the Bid Procedures. Pursuant to Bankruptcy Rule 9006(d), the Court may reduce the notice period normally required for motions. The Debtors have only six weeks of cash on hand to fund business operations, run the Auction, and close and consummate the Sale. Further, if the Successful Bidder is not the Buyer, following the Auction the Debtors will need time to complete any required waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended (the "HSR Act") and provide notice to counterparties to executory contracts and unexpired leases the Successful Bidder proposes to assume. To ensure adequate time for marketing of the Debtors' businesses, bidder diligence, and the Auction, and closing the Sale within those six weeks, the Debtors must commence the sale process under the Bid Procedures as quickly as possible. Lack of adequate

time will impair the Auction, suppress bidding, and reduce the ultimate recovery at the Sale,

causing irreparable harm to the Debtors' estates, creditors, and all parties in interest.

49.     Courts in this District have granted similar relief in order to preserve the value of

assets to be sold.  See, e.g. In re Lehman Bros. Holdings Inc., Case No, 08-13555 (JMP) (Bankr.

S.D.N.Y. Sept. 17, 2008).  Accordingly, the Debtors request that this Court set a hearing date of

Friday, April 3, 2009, for consideration of the Bid Procedures.

**III.     Approval of the Proposed Sale Transaction Is**
**Approval and in the Best Interests of the Estates**

   **A.     *The Sale of the Acquired Assets is Authorized by Section 363 of the***
   ***Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment***

50.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate."  11 U.S.C. §  363(b).  When determining whether a proposed sale and bid procedures are

appropriate pursuant to section 363, courts apply the business judgment standard.  See Licensing

By Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 387 (2d Cir. 1997) (debtors may sell assets

pursuant to bidding procedures and an auction "if a good business reason exists to support it");

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir.

1983) (for a bankruptcy court to approve the sale pursuant to bidding procedures and an auction

there must be "some articulated business justification"); In re Global Crossing Ltd., 295 B.R.

726, 744-46 (Bankr. S.D.N.Y. 2003) (where board of directors, after careful consideration,

rejects alternate offers after agreeing to a purchase agreement, court will not second-guess

board's judgment); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989)

(same).  Under this standard, if the Debtors "articulate[] a reasonable basis for its business

decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not

entertain objections to the debtor's conduct."  Comm. of Asbestos-Related Litigants and/or

Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Res., 147 B.R. at 656 (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)). And courts generally apply significant deference to a debtor's business decisions when applying the business judgment standard, so long as the debtor's decision was not "taken in bad faith or in gross abuse of the [debtor's] retained discretion." See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.), No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. 1989).

51. In determining whether a proposed sale satisfies the business judgment standard, courts typically consider whether: (a) there is a sound business justification for the sale; (b) interested parties received adequate and reasonable notice of the sale; (c) the sale will produce a fair and reasonable price for the property; and (d) the parties have acted in good faith. See In re Betty Owens Sch., Inc., No. 96 Civ. 3576 (PKL), 1997 U.S. Dist. Lexis 5877 at *12-13 (S.D.N.Y. 1997) (stating these factors and noting sale met these factors); accord In re Delaware and Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (approving auction sale that met these factors); In re Decora Indus., Inc., Case No. 00-4459, 2002 WL 32332749 at *2-3 (Bankr. D. Del. May 20, 2002) (same).

52. One sound business purpose for the sale of a debtor's assets outside the ordinary course of business is where such a sale is necessary to preserve the value of assets for the estate and its creditors and interest holders. See In re Lionel Corp., 722 F.2d at 1071; In re Thomson McKinnon Securities, Inc., 120 B.R. 301, 308 (Bankr. S.D.N.Y. 1990) (approving auction sale in short timeframe where key contracts were about to expire).

53.     The Auction, conducted under the Bid Procedures, will test the value of the Acquired Assets in the best possible manner – by exposing them to the market through an open and fair auction.  The Auction process itself will demonstrate that the consideration offered by the Successful Bidder for the Acquired Assets is fair and reasonable.  Accordingly, the Agreement with the Successful Bidder will constitute the highest and best offer for the Acquired Assets and will provide a greater recovery for the Debtors' estates than would any other available alternative.  As such, the Debtors exercised sound business judgment in determining to sell the Acquired Assets through an Auction process and, in the future, entering into the Agreement with the Successful Bidder.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.  Therefore, the Debtors request that the Court make a finding that the proposed sale of the Acquired Assets through the Auction is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.      *The Sale of the Acquired Assets Free and Clear of Claims and Interests Is Authorized by Section 363(f) of the Bankruptcy Code***

54.     The Acquired Assets should be sold free and clear of all Claims and Interests, pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Acquired Assets, as and to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(a)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(d)     such interest is in bona fide dispute; or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

55.     Section 105(a) of the Bankruptcy Code supplements this provision by providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

56.     Because "[s]ection 363(f) is in the disjunctive, the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."  In re Dundee Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (noting that the court may approve the sale "free and clear" provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

57.     At the very least, section 363(f)(2) of the Bankruptcy Code will be met in the Sale because each of the parties holding liens on the Acquired Assets, if any, will consent, or absent any objection to this Motion, will be deemed to have consented to, the sale and transfer of the Acquired Assets.

58.     Any creditors that hold liens in the Acquired Assets will also receive adequate protection in the Sale.  Such liens, if any, will attach to the sale proceeds the Debtors receive for the sale of the Acquired Assets to the Successful Bidder.  Those liens will attach in the same order of priority, with the same validity, force, and effect that such creditor had prior to such sale, and subject to any claims and defenses the Debtors and their estates may possess with

32

respect thereto.  Accordingly, section 363(f) of the Bankruptcy Code authorizes the Sale of the Acquired Assets free and clear of any such Claims and Interests.

**C.**   ***The Acquired Assets and Assigned Contracts***
      ***Should Be Sold Free and Clear of Successor Liability***

59.    Under the terms of any Agreement, the Successful Bidder likely will not be liable for any of the Debtors' liabilities as a successor to the Debtors' businesses or otherwise, unless expressly assumed.  Significant precedent exists demonstrating that claims against a winning bidder are directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against a buyer.

60.    Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," but the term "any interest" is not defined anywhere in the Bankruptcy Code.  In re Downtown Athletic Club of N.Y. City, 2000 U.S. Dist. LEXIS 7917 at *9 (S.D.N.Y. June 9, 2000) (approving sale free and clear of leasehold interests).  Courts in this district construe the term "interest" in line with its plain meaning to include interests other than simply liens, and courts give a "generally broad interpretation of 'any interest' as utilized under § 363(f)."  Id. at *11 (citing In re Lady H Coal Co., Inc., 193 B.R. 233, 246 (Bankr. S.D.W. Va. 1996)).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996), the scope of section 363(f) is not limited to *in rem* interests.  Thus, Leckie held that debtors could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under a federal statute. Id.; accord Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 258 (3rd Cir. 2000).

61.    Courts consistently hold that buyers in section 363 sales takes free from successor liability resulting from pre-existing claims.  See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds

consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); The

Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996)

(stating that a bankruptcy court has the power to sell assets free and clear of any interest that

could be brought against the bankruptcy estate during the bankruptcy); In re New England Fish

Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale

included free and clear of Title VII employment discrimination and civil rights claims of debtor's

employees); In re Hoffman, 53 B.R. 874, 876-77 (Bankr. D.R.I. 1985) (transfer of liquor license

free and clear of any interest permissible even though the estate had unpaid taxes); Am. Living

Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986)

(product liability claims precluded on successor doctrine in a sale of assets free and clear); WBQ

P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBQ P'ship), 189 B.R. 97, 104-05

(Bankr E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an

"interest" as used in section 363(f)).[2]

62.     An order purporting to authorize the sale of the Acquired Assets free and clear of

any interests would be thwarted if claimants could later use that sale to assert claims against the

Successful Bidder.  Under section 363(f) of the Bankruptcy Code, the Successful Bidder is

entitled to know that the Acquired Assets are not infected with latent claims that will be asserted

against the Successful Bidder after the proposed transaction is completed.

---

[2]     Further, courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have found that section 105(a) of the Bankruptcy Code provides the requisite authority.  See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of liens does not prevent such a sale, as the court's authority to permit such a sale is implicit in the court's equitable power when necessary to carry out the provisions of title 11).

63.     Accordingly, the Sale Order should provide that the Successful Bidder is not

liable as a successor under any theory of successor liability for Claims or Interests that encumber

or relate to the Acquired Assets.

**D.      *The Successful Bidder Will Be a Good Faith Purchaser and Will Be Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Transfer and Sale of the Acquired Assets Will Not Violate Section 363(n) of the Bankruptcy Code***

64.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," the Second

Circuit Court of Appeals in In re Gucci held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made.  A purchaser's good faith is lost by "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."

126 F.3d at 390 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1197-98 (7th Cir. 1978)

(interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code));

see also Evergreen Int'l Airlines Inc. v. Pan Am Corp. (In re Pam Am Corp.), Nos. 91 Civ. 8319

(LMM) to 91 Civ. 8324 (LMM), 1992 WL 154200, at *4 (S.D.N.Y. June 18, 1992); In re Sasson

Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988).

65.     As such, a party would have to show "fraud, collusion between the [Successful

Bidder] and other bidders or the [Debtors,] or an attempt to take grossly unfair advantage of

other bidders" to demonstrate a lack of good faith.  Kabro Assocs. of West Islip, LLC v. Colony

Hill Assocs. (In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) (rejecting good faith challenge by prospective bidder at sale hearing); see also In re Angelika Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997) (finding a proposed lease assignment to be in bad faith); In re Bakalis, 220 B.R. 525, 537-38 (Bankr. E.D.N.Y. 1998) (rejecting good faith challenge by prospective bidder at public auction).

66.     By the time of execution of the Agreement, the Debtors and the Successful Bidder will have engaged in thorough arm's-length negotiations over the terms of the Agreement.  In addition, any Successful Bidder must comply with the terms and conditions of the Bid Procedures Order.  Further, the Debtors will carefully monitor the Auction and any bidders to ensure that there will be no fraud or improper insider dealing of any kind.  The Debtors will also ensure that the Agreement does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code.  Thus, the Successful Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.

67.     The Debtors request that the Court make a finding at the Sale Hearing that the Agreement reached with the Successful Bidder was negotiated at arm's-length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.

**E.**     ***Assumption and Assignment of the Assigned Contracts***
        ***Is Authorized by Section 365 of the Bankruptcy Code***

68.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession, "subject to the court's approval," to "assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code lists the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such

contract or lease unless, at the time of assumption of such contract or lease, the trustee —

(A)     cures or provides adequate assurance that the trustee will promptly cure, such default . . .;

(B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

69.     In the Second Circuit, courts apply the business judgment standard to determine if a debtor may assume an executory contract or unexpired lease, which "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject." Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1098 (2d Cir. 1993); see also In re Penn Traffic Co., 524 F.3d 373, 378 (2d Cir. 2008); NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

70.     In the present case, the Debtors' assumption and assignment of the Assigned Contracts to the Successful Bidder will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code.  As discussed above, the transactions contemplated by the Agreement will provide significant benefits to the Debtors' estates.  The Debtors cannot obtain these benefits without the assumption and assignment of the Assigned Contracts, which are a material part of the Acquired Assets to be sold.  Accordingly, assuming the Assigned Contracts is a sound exercise of the Debtors' business judgment.

71.     Further, the Debtors may assign an executory contract or an unexpired lease, whether or not there has been a default under the agreement, so long as it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee.  See 11 U.S.C. § 365(f)(2).  And an assignee may provide adequate assurance by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating performance is "adequately assured" when the assignee has "financial resources" and has "expressed willingness to devote sufficient funding" to the business to provide a "strong likelihood of succeeding").  What is required to provide "adequate assurance of future performance" depends on the facts and circumstances at issue, but should be given "practical, pragmatic construction."  EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

72.     Pursuant to the Bid Procedures, the Debtors will require potential Bidders to provide information sufficient to prove adequate assurance of future performance.  The Debtors will provide this information to counterparties to Assigned Contracts in the Contract Assignment Notices.  Moreover, counterparties to Assigned Contracts will have the opportunity object to adequate assurance of future performance by the Successful Bidder.  Accordingly, the assumption and assignment of the Assigned Contracts as set forth herein should be approved.

73.     Further, to assist in the Sale, the Debtors request that the Sale Order provide that (a) anti-assignment provisions in the Assigned Contracts shall not restrict, limit, or prohibit the

assumption, assignment, and sale of the Assigned Contracts and (b) such anti-assignment

provisions are unenforceable pursuant to section 365(f) of the Bankruptcy Code.

74.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired

leases and contracts free from such anti-assignment restrictions.  Section 365(f)(1) provides, in

pertinent part, that:

> [N]otwithstanding a provision in an executory contract or
> unexpired lease of the debtor, or in applicable law, that prohibits,
> restricts, or conditions the assignment of such contract or lease, the
> trustee may assign such contract or lease under paragraph (2) of
> this subsection . . .

11 U.S.C. § 365(f)(1).  Section 365(f)(1) thus invalidates contractual provisions that prohibit,

restrict, or condition assignment of an executory contract or unexpired lease.  See, e.g., Coleman

Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 911 (9th Cir. 1997)

("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to

extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the

purposes of section 365") cert. denied, 522 U.S. 1148 (1998).  And Section 365(f)(3) prohibits

enforcement of contractual provisions that would bar assignment by creating a right to modify or

terminate the contract or lease upon proposed assumption or assignment.  See, e.g., In re

Jamesway Corp., 201 B.R. 73, 78 (Bankr. S.D.N.Y. 1996) (all lease provisions, not merely those

entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

**F.      *Authorization to Enter Into A Bridge Loan with
          the Successful Bidder is Necessary and Appropriate***

75.     The Debtors intend to close the Sale promptly upon entry of the Sale Order.  The

closing may be delayed, however, due to, among other things, (i) any waiting periods under the

HSR Act, to the extent applicable, and (ii) if the Successful Bidder is not the Buyer, a delay to

provide counterparties to the Assigned Contracts with notice and an opportunity to object to the

proposed assignments. Based on the Debtors' projections, if the closing of the Sale is delayed by more than a few days after the anticipated Sale Hearing on April 29, 2009, the Debtors will begin to run a significant risk of exhausting their cash reserves prior to the closing. Such an event could force the Debtors to halt their business operations and would jeopardize the Sale, placing the estates at great risk of loss.

76.     Accordingly, the Bid Procedures provide that the Debtors may request that a Bid include a commitment by the Bidder to provide a Bridge Loan to be used, subject to a budget agreed to by the Successful Bidder and the Agent, to operate the Debtors' businesses pending the closing of the Sale with the Successful Bidder. The Bridge Loan would reduce the purchase price for the Successful Bidder on a dollar for dollar basis.

77.     The Debtors propose that the Bridge Loan will be memorialized by a note and will (i) have a term of 30 days, (ii) be secured by a lien on substantially all of the Debtors' assets junior in priority to any existing prepetition liens, including the liens under the Secured Credit Facility, which liens will become perfected automatically without recordation upon the issuance of the proceeds of the Bridge Loan, and (iii) be repaid through a reduction in the purchase price for the Acquired Assets on a dollar for dollar basis.

78.     Section 364(c) of the Bankruptcy Code provides that:

> If the [debtor] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject
> to a lien.

11 U.S.C. § 364(c).  Courts engage in a three-part inquiry to determine whether a debtor is

entitled to section 364(c) financing.  Specifically, courts look to whether:

> (a)     the debtor is unable to obtain unsecured credit under section 364(a)
> or (b), i.e., by allowing a lender an administrative claim only;
>
> (b)     the credit transaction benefits and is necessary to preserve the
> assets of the estate; and
>
> (c)     the terms of the credit transaction are fair, reasonable, and
> adequate given the circumstances of the debtor and the proposed
> lender.

See In re Ames Dept. Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).  Section 364

"does not require the debtor to seek alternate financing from every possible lender."  In re 495

Central Park Avenue Corp., 136 B.R. 626, 630-31 (Bankr. S.D.N.Y. 1992) (discussing whether

section 364(d) had been satisfied); see also In re Snowshoe, Inc., 789 F.2d 1085, 1088 (4th Cir.

1986)  (Section 364 "imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable.")  Instead, a debtor must demonstrate "by a good faith

effort that credit was not available" absent the requested protections.  Id.  Further, when

reviewing a debtor's business decision with respect to debtor-in-possession financing,

bankruptcy courts defer to the debtor's business judgment, so long as the decision was "made in

good faith, upon a reasonable basis, and within the scope of [such debtor's] authority under the

[Bankruptcy] Code."  In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981);

see also Frostbaum v. Ochs, 277 B.R. 470, 475-76 (E.D.N.Y. 2002).

79.     The Debtors submit that, if a Bridge Loan is necessary, credit will only be

available from the Successful Bidder on the terms provided for the Bridge Loan.  The Secured

Lenders' hold liens against substantially all of the Debtors' assets, and the Secured Lenders'

claims are believed to be significantly under-secured.  The Secured Lenders have indicated that they are unwilling to provide the Debtors with debtor-in-possession financing and also unwilling to consent to a third-party lender priming the Agent's liens pursuant to section 364(d) of the Bankruptcy Code.  Given the circumstances of these cases, the Debtors submit that, absent a decision by the Secured Lenders to agree to provide debtor-in-possession financing, only the Successful Bidder would be willing to provide debtor-in-possession financing, and only on the terms set forth above for the Bridge Loan.

80.     The Debtors cannot, at this point, determine whether the Bridge Loan will be necessary.  Accordingly, the Debtors have reserved the right to determine whether to enter into the Bridge Loan and what amount is appropriate.  If the Debtors determine the Bridge Loan is necessary to ensure the closing of the Sale, the Debtors will seek authority at the Sale Hearing to enter into the Bridge Loan and will submit appropriate evidence in support thereof.

### G.     *Relief Under Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate*

81.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  And Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign and executory contract or unexpired lease . . . is stayed until the expiration of 10 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Court waive these ten-day stays and provide for the Sale Order to be effective immediately upon entry on the docket.

82.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the ten-day stay period, a leading treatise suggests that courts should eliminate the ten-day stay to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Alan N. Resnick, et al., <u>Collier on Bankruptcy</u> ¶ 6004.10 (15th rev. ed. 2008). Further, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the court may reduce the stay to the amount of time actually necessary to file such an appeal. <u>Id.</u>

83.     To maximize the value received for the Acquired Assets, the Debtors seek to close the Transaction as soon as possible after the Sale Hearing. Accordingly, the Debtors respectfully request that the Court waive the ten-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## **Memorandum of Law**

84.     The Motion includes citations to the applicable authorities and does not raise any novel issues of law. Accordingly, the Debtors submit that no separate memorandum of law is required pursuant to Rule 9013-1 of the Local Bankruptcy Rules.

## **Notice**

85.     No trustee, examiner, or creditors' committee has been appointed in these chapter 11 cases. The Debtors have served notice of the Motion on (i) the Office of the United States Trustee for the Southern District of New York; (ii) counsel to the Agent for the Secured Lenders; (iii) counsel to the Buyer; and (iv) the creditors holding the 50 largest unsecured claims against the Debtors' estates (on a consolidated basis). In light of the nature of the relief requested, the Debtors submit that no other or further notice need be provided.

## **No Prior Request**

86.     No prior request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request that this Court: (a) enter the Bid Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, (i) approving the Bid Procedures provided in <u>Exhibit B</u>, certain notice procedures for the Auction, certain bid protections for the Buyer, and (ii) authorizing the Debtors to file the Excluded Schedules under seal; (b) enter an order, substantially in the form attached hereto as <u>Exhibit C</u>, approving an emergency hearing on April 3, 2009, to consider entry of the Bid Procedures Order; and (c) enter the Sale Order, substantially in the form attached hereto as <u>Exhibit D</u>, (i) approving the Agreement for the sale of all of the assets of the Debtors to the Buyer or to the Successful Bidder to be identified at the Auction, (ii) authorizing the sale of all or substantially all of the assets of the Debtors free and clear of the Claims and Interests, (iii) authorizing the assumption and assignment of certain executory contracts and unexpired leases to the Buyer or the Successful Bidder, and (iv) authorizing the Debtors to obtain postpetition financing; and (d) granting such other and further relief as is just and proper.

Dated: New York, New York
      April 1, 2009

Respectfully submitted,

ROPES & GRAY LLP

*/s/ Mark R. Somerstein*
Mark I. Bane (MB 4883)
Mark R. Somerstein (MS 9721)
Shuba Satyaprasad (SS 5875)
James A. Wright III (JW 3007)
1211 Avenue of the Americas
New York, NY 10036
Tel: 212-596-9000
Fax: 212-596-9090

Proposed Attorneys for the Debtors
and Debtors in Possession