# EXHIBIT B

# AMENDMENT TO ASSET PURCHASE AGREEMENT

AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment (this "Amendment") to the Asset Purchase Agreement (the "Asset Purchase Agreement") by and among SILICON GRAPHICS, INC., a Delaware corporation (the "Seller") and each of the subsidiaries of the Seller listed on Schedule I thereto (together with the Seller, the "Selling Entities"), and RACKABLE SYSTEMS, INC. a Delaware corporation (the "Buyer") dated as of March 31, 2009, is being entered into as of April 30, 2009, among the Seller, the Selling Entities and the Buyer in accordance with Section 10.1 of the Asset Purchase Agreement. All capitalized terms used but not otherwise defined in this Amendment have the meanings given to them in the Asset Purchase Agreement. The Asset Purchase Agreement is hereby amended as follows:

1. Section 3.3 (Subsidiary Tax Escrow), subsection 4.3(b), Section 4.4 (License), subsection 7.6(b) and subsection 8.1(b) are deleted from the Asset Purchase Agreement and replaced with "[Reserved]."

2. The following defined term and definition shall be added to Section 1.1(a):

    " "Agent" means Wilmington Trust Corporation as agent for the Selling Entities' prepetition secured lenders."

3. Schedule 2.1(f) to the Asset Purchase Agreement is amended and restated and is attached as Exhibit 1 to this Amendment.

4. Section 2.1(j) of the Asset Purchase Agreement shall be replaced with the following:

    "(j)    all of the stock of the subsidiaries of the Selling Entities listed on Schedule 2.1(j) (the "Acquired Subsidiaries"), except as otherwise set forth on Schedule 2.1(j);"

5. Schedule 2.1(j) to the Asset Purchase Agreement is amended and restated and is attached as Exhibit 2 to this Amendment.

6. Schedule 2.2(h) to the Asset Purchase Agreement is amended and restated and is attached as Exhibit 3 to this Amendment (it being understood that the definition of "Specified IP" shall take into account the amendment and restatement of Schedule 2.2(h)).

7. Section 3.1 (Purchase Price) of the Asset Purchase Agreement shall be replaced with the following:

    "3.1 Purchase Price. In consideration for the Purchased Assets, and subject to the terms and conditions of this Agreement, and the entry and effectiveness of the Sale Order, at the Closing, the Buyer and/or (in the Buyer's sole discretion) a Buyer Affiliate shall assume the Assumed Liabilities by executing the Assumption Agreement and the Buyer shall pay to the Agent (in the manner described in the next sentence) an amount in cash equal to: (i) US$42,500,000;

minus (ii) the amount, if any, by which the aggregate amount of the unrestricted cash of the Acquired Subsidiaries and their subsidiaries as of the Closing (the "Subsidiary Closing Cash") is less than US$5,000,000 (based on the applicable exchange rate quoted in the Western Edition of the Wall Street Journal on the Business Day immediately preceding the Closing, it being understood that the amount to be subtracted from clause "(i)" pursuant to clause "(ii)" can not exceed US$5,000,000) (the amount determined by subtracting the amount described in clause "(ii)" from the amount described in clause "(i)" of this sentence, the "Purchase Price").  At the Closing, the Buyer shall: (a) pay and deliver to the Agent, by wire transfer of immediately available U.S. funds to an account designated by the Agent prior to the Closing, the Purchase Price less the Deposit (and less interest accrued on the Deposit); and (b) instruct the Escrow Holder (as defined below) to deliver the Deposit (and any interest accrued thereon) to the Agent, by wire transfer of immediately available U.S. funds to an account designated by the Agent prior to the Closing."

8. All references in the Asset Purchase Agreement to the "Base Purchase Price" shall be deemed to be references to the "Purchase Price."

9. Section 4.1 of the Asset Purchase Agreement shall be amended and restated as follows:

"Time and Place of the Closing.  Upon the terms and subject to the satisfaction of the conditions contained in Article VIII of this Agreement, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated by this Agreement (the "Closing") shall take place at the offices of Cooley Godward Kronish LLP, 3175 Hanover Street, Palo Alto, California, at 10:00 A.M. (local time) no later than the later of: (a) May 8, 2009; and (b) the second Business Day following the date on which the conditions set forth in Article VIII have been satisfied (other than the conditions with respect to actions the respective parties hereto will take at the Closing itself) or, to the extent permitted, waived by the applicable party in writing, or at such other place and time as the Buyer and the Seller may mutually agree (it being understood that if, as of the date on which all of the conditions to the Buyer's obligation to effect the purchase of the Purchased Assets set forth in Section 8.1 and Section 8.2, other than the requirement set forth in Section 8.1(c) that the Sale Order shall be a Final Order, have been satisfied, no Person has filed an appeal with respect to the Sale Order and no stay relating to the Sale Order has been issued, the Buyer shall waive the requirement in Section 8.1(c) that the Sale Order shall be a "Final Order").  The date and time at which the Closing actually occurs is herein referred to as the "Closing Date.""

10. Section 4.2.(j) of the Asset Purchase Agreement shall be amended and restated as follows:

"(j)  Except as set forth on Schedule 4.2(j) and subject to Section 7.15, stock certificates representing all of the shares in the Acquired Subsidiaries, duly

endorsed (or accompanied by duly executed stock powers) by the Selling Entity owning such shares (or other appropriate instruments necessary to transfer the Selling Entities' equity interests therein to the Buyer or a Buyer Affiliate."

11. A new Schedule 4.2(j) shall be added to the Schedules to the Asset Purchase Agreement and is attached as Exhibit 4 to this Amendment.

12. Subsection (a) of Schedule 5.3 to the Asset Purchase Agreement is amended and restated and is attached as Exhibit 5 to this Amendment.

13. The following contract shall be added to the end of the first section entitled "Patent License Agreements" of Schedule 2.1(e) and to the end of subsection (e) of Schedule 5.3 to the Asset Purchase Agreement:

| Title | Parties | Entered |
|---|---|---|
| Subcontracting Agreement, as amended by Amendment #1 dated September 2, 2004 | University of Utah and Silicon Graphics, Inc. | October 1, 2003 |

14. Schedule 5.8(d) to the Asset Purchase Agreement is amended and restated and is attached as Exhibit 6 to this Amendment.

15. The punctuation mark at the end of subsection 4.2(j) of the Asset Purchase Agreement shall be removed and replaced with "; and" and a new subsection 4.2(k) shall be added to the Asset Purchase Agreement as follows:

"a License Agreement, in the form attached as Exhibit 7 to the Amendment, dated as of April 30, 2009, to this Agreement duly executed by the Selling Entities."

16. Section 7.7(c) of the Asset Purchase Agreement shall be amended and restated as follows:

"After receipt of the list of Specified Employees described in Section 7.7(a) above, but prior to the Closing Date, the Selling Entities shall terminate, effective as of a time prior to the Closing, all Persons who would otherwise be Employees as of the Closing other than: (i) the Specified Employees; and (ii) any Employees who are not Specified Employees and whom the Selling Entities decide to retain following the Closing (including Employees identified by the Seller and agreed to by the Buyer prior to the Closing) ("Retained Employees"), and such termination shall be deemed to have been made at the request, and with the consent, of the Buyer. An Employee who satisfies the conditions described in any of clauses "(A)" through "(C)" of this sentence is referred to as a "Terminated Employee": (A) such Employee is terminated pursuant to the preceding sentence, (B) such Employee is terminated at any other time on or after the Petition Date and prior to the Closing at the direction or with the consent of the Buyer (such consent not to

be unreasonably withheld in the case of a proposed termination for "cause"); or (C) such Employee is a Specified Employee who does not become a Transferred Employee as of the Closing."

17. A new subsection 7.7(j) shall be added to the Asset Purchase Agreement as follows:

"(j) The Buyer shall indemnify the directors and officers of the Seller against: (i) any Liability imposed on them under the WARN Act with respect to employees of the Selling Entities who were terminated prior to the Petition Date; and (ii) the reasonable costs and expenses of legal counsel incurred by them in defending a claim made against them seeking to impose the Liability referred to in clause "(i)" of this Section 7.7(j); *provided, however*, that the maximum aggregate amount of indemnification payments that the Buyer may be required to make pursuant to this Section 7.7(j) shall be US$400,000."

18. A new subsection 7.7(k) shall be added to the Asset Purchase Agreement as follows:

"(k) The Buyer shall provide, to the extent not paid or funded prior to the Closing Date, the funding for: (i) claims under the self-insured portion of the Seller's Group Health, Life, and Dental Plan (Plan 501), or any successor, predecessor, or related plan (the "Self-Insured Plan") that were incurred by eligible participants in such plan (or other eligible dependents) for medical, vision, and/or prescription drug expenses covered under the Self-Insured Plan and incurred on or prior to the Closing Date and not paid prior to the Closing Date (a "Self Insured Claim"); (ii) the continuation of the stop loss insurance policy related to the Self-Insured Plan (and terminal liability coverage under such policy) as in effect on the Closing Date (the "Stop Loss Policy"), and (iii) claim administration fees and expenses relating to the Self-Insured Plan pursuant to the Administrative Services Contract (and any amendments or supplements thereto) between the Seller and Aetna Life Insurance Company of Connecticut or any of its affiliates (collectively, "Aetna") (clauses (i), (ii) and (iii) hereof, the "Self-Insured Plan Costs"); *provided, however*, that: (A) the Buyer shall be obligated to provide funding for a Self Insured Claim only to the extent such Self Insured Claim is not covered by the Stop Loss Policy; and (B) the maximum aggregate amount of funding that the Buyer may be required to provide pursuant to this Section 7.7(k) shall be US$2,100,000. Unless the parties otherwise agree after consulting with Aetna, the funding of the amounts set forth in the preceding sentence shall be effected by means of a US$2,100,000 reduction in the amount of cash otherwise included in the Purchased Assets at the Closing under Section 2.1(a) (with such amount to be held by the Seller in trust (it being understood that the Seller shall not be required to form an actual trust entity) for the benefit of the eligible participants in such plan and, to the extent not utilized pursuant to this Section 7.7(k), for the benefit of the Buyer, or, if Aetna so agrees, by Aetna, in either case, with any portion of such US$2,100,000 not utilized pursuant to this Section 7.7(k) by the 180th day following the Closing Date becoming a Purchased Asset to be delivered to the Buyer on the 180th day following the Closing Date). The parties shall cause such

US$2,100,000 of funds to be used for, and only for, the purposes contemplated by this Section 7.7(k) (including the payment of Self-Insured Plan Costs) and the Seller shall use its reasonable best efforts to keep the Stop Loss Policy in effect for all relevant periods."

19. Clause "(iii)" of the second sentence of Section 7.9 of the Asset Purchase Agreement is amended and restated as follows: "(iii) the entry of an order in the form of <u>Exhibit C</u> approving this Agreement, in a form and substance reasonably acceptable to the Buyer and the Agent and not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "<u>Sale Order</u>")."

20. A new subsection 7.15 shall be added to the Asset Purchase Agreement as follows:

    "From and after the Closing, the Selling Entities will use commercially reasonable efforts (including, for avoidance of doubt, cooperate in the preparation and submission of the relevant audited financial statements to the registration authorities in Malaysia for the transfer of the shares in Silicon Graphics Sdn. Bhd.) to deliver to Buyer or Buyer Affiliate any stock certificates (or other appropriate instruments of transfer) that are not delivered to the Buyer or Buyer Affiliate at the Closing and secure the release of any Encumbrances on the common stock (or other equity interests) of any Acquired Subsidiaries that are not released as of the Closing."

21. Section 8.2(a) of the Asset Purchase Agreement is amended and restated as follows:

    "each of the Selling Entities shall have performed and complied in all material respects with the covenants contained in this Agreement which are required to be performed and complied with by it on or prior to the Closing Date (it being understood that the transfer of an aggregate amount of approximately US$293,000 from Hong Kong and Malaysia to one or more of the Selling Entities prior to April 28, 2009 shall not be taken into account in determining whether this condition has been satisfied);"

22. Section 8.2(b) of the Asset Purchase Agreement is amended and restated as follows:

    "each of the Selling Entities' representations and warranties which are set forth in this Agreement (except for those contained in Sections 5.1 and 5.10) shall be true and correct in all respects as of the date of this Agreement and as of the date the Sale Order is entered by the Bankruptcy Court (the "<u>Sale Order Date</u>') as though made at and as of the Sale Order Date (except to the extent that any such representation or warranty speaks as of a particular date in which case such representation or warranty shall be true and correct in all respects as of such date); *provided, however*, that in determining the accuracy of such representations and warranties for purposes of this Section 8.2(b): (i) all materiality qualifications that are contained in such representations and warranties and that limit the scope of such representations and warranties shall be disregarded; and (ii) any inaccuracies

in such representations and warranties shall be disregarded if the circumstances giving rise to all such inaccuracies (considered collectively) do not constitute, and would not reasonably be expected to have or result in, a Material Adverse Effect;"

23. Section 8.2(g) of the Asset Purchase Agreement is amended and restated as follows:

    "between the date of this Agreement and the Sale Order Date, there shall have not have occurred any Material Adverse Effect, and no events, developments or effects shall have occurred (and no circumstances or conditions shall have come into existence) between the date of this Agreement and the Sale Order Date that would reasonably be expected to have or result in a Material Adverse Effect."

24. Any action that may be taken by the Seller or any of the Selling Entities pursuant to Section 9.1(a), Section 9.3 or Section 10.1 of the Asset Purchase Agreement shall not be taken without the consent of the Agent, not to be unreasonably withheld, conditioned or delayed.

25. The language in the second bullet point of Annex A to the Asset Purchase Agreement that reads "by no later than the date of the entry of the Sale Order (as defined in the Agreement) (the "Sale Order Date")" shall be replaced with the following: "by no later than the later of the entry of the Sale Order (as defined in the Agreement) or May 1, 2009 (such later date being referred to as the "Sale Order Date")".

26. All other provisions of the Asset Purchase Agreement shall continue in full force and effect. The provisions in Article X of the Asset Purchase Agreement and Section 1.2 shall apply to this Amendment as if included in this Amendment.

[Remainder of this page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the date first above written by their respective officers thereunto duly authorized.

**RACKABLE SYSTEMS, INC.**

By: */s/ James Wheat*
   Name:   James Wheat
   Title:    Senior Vice President and Chief Financial Officer

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed as of the date first above written by their respective officers thereunto duly authorized.

**SILICON GRAPHICS, INC.**

By: _/s/ Gregory S. Wood_
    Name: Gregory S. Wood
    Title: Chief Financial Officer

**SILICON GRAPHICS REAL ESTATE, INC.**

By: _/s/ Gregory S. Wood_
    Name: Gregory S. Wood
    Title: Chief Financial Officer

**SILICON GRAPHICS WORLD TRADE CORPORATION**

By: _/s/ Gregory S. Wood_
    Name: Gregory S. Wood
    Title: Chief Financial Officer

**SILICON GRAPHICS FEDERAL, INC.**

By: _/s/ Kent Randolph_
    Name: Kent Randolph
    Title: Secretary

**PARAGRAPH INTERNATIONAL, INC.**

By: _/s/ Gregory S. Wood_
    Name: Gregory S. Wood
    Title: Chief Financial Officer

**WTI DEVELOPMENT, INC.**

By: _/s/ Gregory S. Wood_
    Name: Gregory S. Wood
    Title: Chief Financial Officer

**SILICON STUDIO, INC.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:    Chief Financial Officer

**SILICON GRAPHICS OF MANHATTAN, INC.**

By: _/s/ Diane Gibson_____
    Name: Diane Gibson
    Title:    President

**CRAY RESEARCH, L.L.C.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:    Chief Financial Officer

**CRAY FINANCIAL CORP.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:    Chief Financial Officer

**CRAY RESEARCH AMERICA LATINA LTD.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:    Chief Financial Officer

**CRAY RESEARCH (EASTERN EUROPE) LTD.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:    Chief Financial Officer

**CRAY RESEARCH (INDIA) LTD.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:    Chief Financial Officer

**CRAY ASIA/PACIFIC, INC.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:   Chief Financial Officer

**CRAY RESEARCH INTERNATIONAL INC.**

By: _/s/ Gregory S. Wood_____
    Name:  Gregory S. Wood
    Title:   Chief Financial Officer