THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |
|---|---|
| : |  |
| **In re** : | **Chapter 11** |
| : |  |
| **GRAPHICS PROPERTIES HOLDINGS,** : | **Case No. 09-11701 (MG)** |
| **INC. (f/k/a SILICON GRAPHICS, INC.),** : |  |
| *et al.*, : | **(Jointly Administered)** |
| : |  |
| **Debtors.** |  |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DISCLOSURE STATEMENT FOR
### DEBTORS' JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel: 212-596-9000
Fax: 212-596-9090
Mark I. Bane (MB 4883)
Mark R. Somerstein (MS 9721)
Shuba Satyaprasad (SS 5875)
Patricia I. Chen (*admitted pro hac vice*)

Attorneys for the Debtors and
Debtors in Possession

Dated: August 17, 2009

**TABLE OF CONTENTS**

**Page**

ARTICLE I IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ... 1

ARTICLE II QUESTIONS AND ANSWERS REGARDING  THIS DISCLOSURE STATEMENT AND THE PLAN ................................................................. 3

ARTICLE III OUR HISTORY AND OUR CHAPTER 11 CASES ........................ 9

    A.    History ................................................................................................ 9

    B.    2006 Reorganization ........................................................................ 10

    C.    Prepetition Credit Facility ................................................................ 10

    D.    Common Stock ................................................................................ 11

    E.    Key Events Leading to the Commencement of the Chapter 11 Cases ... 11

        1.    Burdensome Cost Structure and Hardware Commoditization ...... 11

        2.    Competition and Reduced Market Share ..................................... 11

        3.    Delays in New Technology ......................................................... 12

    F.    Turnaround Efforts .......................................................................... 12

        1.    Cost Reduction Measures ............................................................ 12

        2.    Consideration of Alternative Transactions .................................. 12

    G.    Commencement of the Chapter 11 Cases ......................................... 13

    H.    Events During Bankruptcy ............................................................... 14

        1.    First Day Relief .......................................................................... 14

        2.    Cash Collateral Stipulation ........................................................ 14

        3.    The Sale of Substantially All of the Debtors' Assets ................... 14

        4.    Change in Name and Dismissal of the SGI Federal Case ........... 15

        5.    Retention of Restructuring and Other Professionals ................... 15

ARTICLE IV THE PLAN OF REORGANIZATION ...................................... 15

    A.    INTRODUCTION ........................................................................... 15

    B.    CLASSIFICATION OF CLAIMS AND OLD COMMON INTERESTS, IMPAIRMENT AND VOTING ........................................................ 16

        1.    Substantive Consolidation of the Debtors .................................. 16

        2.    Class Identification .................................................................... 16

    C.    TREATMENT OF CLAIMS AND EQUITY INTERESTS ................. 16

|  | 1. | Secured Tax Claims (Class 1) | 16 |
|  | 2. | Other Secured Claims (Class 2) | 17 |
|  | 3. | Priority Tax Claims (Class 3) | 17 |
|  | 4. | Priority Claims (Class 4) | 17 |
|  | 5. | Prepetition Credit Agreement Secured Claims (Class 5) | 18 |
|  | 6. | General Unsecured Claims (Class 6) | 18 |
|  | 7. | Old Common Interests (Class 7) | 18 |
| D. | | PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, 503(B)(9) ADMINISTRATIVE EXPENSE CLAIMS, BUYER ASSUMED LIABILITIES, AND PROFESSIONAL FEE CLAIMS | 18 |
|  | 1. | Administrative Expense Claims | 18 |
|  | 2. | 503(b)(9) Administrative Claims | 19 |
|  | 3. | Buyer Assumed Liabilities | 19 |
|  | 4. | Professional Fee Claims | 20 |
|  | 5. | Post-Effective Date Fees and Expenses | 21 |
| E. | | MEANS OF IMPLEMENTATION | 21 |
|  | 1. | Substantive Consolidation | 21 |
|  | 2. | Compromise of Controversies | 22 |
|  | 3. | Settlement of Claims | 22 |
|  | 4. | Cancellation of Existing Securities and Agreements | 22 |
|  | 5. | Issuance of New Common Stock | 22 |
|  | 6. | The Liquidating Trust | 23 |
|  | 7. | Vesting of Assets in the Reorganized Debtors | 25 |
|  | 8. | Corporate Action | 25 |
|  | 9. | Directors and Officers of the Reorganized Debtors | 26 |
|  | 10. | Effectuating Documents; Further Transactions | 26 |
|  | 11. | Operations of the Debtors Between the Confirmation Date and the Effective Date | 26 |
|  | 12. | Terms of Injunctions or Stays | 26 |
| F. | | PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS | 26 |
|  | 1. | Voting of Claims | 26 |
|  | 2. | Allowance of Prepetition Credit Agreement Claims | 27 |
|  | 3. | Nonconsensual Confirmation | 27 |

4.     Timing and Calculation of Amounts to Be Distributed ...............................27

5.     Disbursing Agent .......................................................................................27

6.     Distributions on Account of Claims Allowed After the Effective Date ........28

7.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ....30

8.     Compliance with Tax Requirements and Allocations....................................31

9.     Manner of Payment....................................................................................31

10.   Setoffs and Recoupment .............................................................................32

11.   Release of Liens ..........................................................................................32

12.   Claims Paid or Payable by Third Parties ....................................................32

13.   Allocation of Plan Distributions Between Principal and Interest .................33

G.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND
DISPUTED CLAIMS ............................................................................................33

1.     Objections ...................................................................................................33

2.     No Distributions Pending Allowance .........................................................33

3.     Allowance of Claims and Interests .............................................................33

4.     Estimation of Claims...................................................................................34

5.     Interest........................................................................................................34

H.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...............................34

1.     Assumption or Rejection of Executory Contracts and Unexpired Leases .....34

2.     Approval of Assumption or Rejection of Executory Contracts and Unexpired
Leases.........................................................................................................34

3.     Cure of Defaults .........................................................................................35

4.     Claims Relating to Executory Contracts and Unexpired Leases Rejected
Pursuant to the Plan....................................................................................35

5.     Modifications, Amendments, Supplements, Restatements or Other
Agreements .................................................................................................35

6.     Indemnification Obligations .......................................................................35

7.     Insurance Policies .......................................................................................36

8.     Reservation of Rights .................................................................................36

I.     CORPORATE GOVERNANCE AND MANAGEMENT OF THE
REORGANIZED DEBTORS.................................................................................36

1.     General .......................................................................................................36

2.     New Organizational Documents .................................................................36

3.     New Board of the Reorganized Debtors ......................................................36

    4.    Officers of the Reorganized Debtors.............................................................37

J.    CONDITIONS PRECEDENT TO  CONFIRMATION AND CONSUMMATION
    OF THE PLAN .......................................................................................37

    1.    Conditions Precedent to Confirmation..............................................37

    2.    Conditions Precedent to the Effective Date ......................................37

    3.    Waiver of Conditions .......................................................................38

    4.    Satisfaction of Conditions ................................................................38

K.    EFFECT OF CONFIRMATION OF THE PLAN.........................................38

    1.    Binding Effect ..................................................................................38

    2.    Discharge of Claims and Termination of Old Common Interests .................38

    3.    Discharge .........................................................................................39

    4.    Injunction or Stay ............................................................................39

    5.    Injunction Against Interference with the Plan ...............................39

    6.    Terms of Injunction or Stay .............................................................40

    7.    Exculpation or Limitation on Liability .............................................40

    8.    Releases ...........................................................................................40

    9.    Avoidance Actions and Objections ...................................................41

L.    RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT..............41

M.    MISCELLANEOUS PROVISIONS ...........................................................42

    1.    Immediate Binding Effect .................................................................42

    2.    Additional Documents ......................................................................43

    3.    Preservation of Causes of Action ....................................................43

    4.    Preservation of Avoidance Actions ..................................................44

    5.    Section 1145 Exemption ...................................................................44

    6.    Section 1146 Exemption ...................................................................44

    7.    Payment of Statutory Fees ...............................................................44

    8.    Reservation of Rights.......................................................................44

    9.    Modifications and Amendments ........................................................45

    10.    Effect of Confirmation on Modifications..........................................45

    11.    Successors and Assigns....................................................................45

    12.    Service of Documents .......................................................................45

    13.    Entire Agreement .............................................................................45

    14.    Exhibits ...........................................................................................46

15. Nonseverability of Plan Provisions ................................................................. 46

16. Votes Solicited in Good Faith ....................................................................... 46

17. Closing of Chapter 11 Cases ......................................................................... 46

18. Waiver or Estoppel ........................................................................................ 46

19. Conflicts ........................................................................................................ 47

20. Post-Confirmation Reporting ........................................................................ 47

ARTICLE V CONFIRMATION OF THE PLAN OF REORGANIZATION ........................... 47

A. The Confirmation Hearing ............................................................................ 47

B. Deadline To Object To Confirmation ........................................................... 47

C. Requirements For Confirmation  Of The Plan under the Bankruptcy Code .......... 47

1. Requirements of Section 1129(a) of the Bankruptcy Code ........................ 47

2. Best Interests of Creditors ............................................................................ 49

3. Feasibility ...................................................................................................... 50

4. Acceptance by Impaired Classes ................................................................. 51

5. Requirements of Section 1129(b) of the Bankruptcy Code ........................ 51

ARTICLE VI SUMMARY OF LEGAL PROCEEDINGS ............................................. 52

A. Legal Proceedings in the Bankruptcy Court ................................................ 53

1. Avoidance Actions ........................................................................................ 53

2. Preference Actions ........................................................................................ 53

3. Fraudulent Transfer and Conveyance Actions ............................................. 53

B. Pending Legal Proceedings outside the Bankruptcy Court ......................... 54

1. ATI Litigation ................................................................................................ 54

2. Other Legal Proceedings ............................................................................... 54

ARTICLE VII RISK FACTORS .......................................................................... 55

ARTICLE VIII IMPORTANT SECURITIES LAW DISCLOSURE ................................ 58

ARTICLE IX SPECIAL VOTING INSTRUCTIONS ................................................ 60

ARTICLE X CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN 61

A. Tax Consequences to the Company ............................................................... 62

1. Cancellation of Debt Income ........................................................................ 63

2. Section 382 Limitation .................................................................................. 63

3. Transfer of Asset to the Liquidating Trust ................................................... 64

    4.    Alternative Minimum Tax ................................................................65

B.    Tax Consequences to Holders of Claims ...............................................65

    1.    Exchange of Priority Tax Claims, Other Priority Claim, and General Unsecured Claims for Beneficial Interests....................................65

    2.    Exchange of the Prepetition Credit Agreement Claims for New Common Stock and Beneficial Interests..................................................................66

    3.    Allocation of Plan Distributions between Principal and Interest..................68

C.    Disputed Claims Reserve......................................................................68

D.    Backup Withholding ............................................................................68

## EXHIBITS

EXHIBIT A        Plan of Reorganization

EXHIBIT B        Disclosure Statement Order

EXHIBIT C        Sources and Uses of Cash on the Effective Date

EXHIBIT D        Liquidation Analysis

EXHIBIT E        List of Potential Defendants to Avoidance Actions

# ARTICLE I

## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan of Reorganization that Graphics Properties Holdings, Inc. (f/k/a Silicon Graphics, Inc.) ("Graphics Properties") and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") are seeking to have confirmed by the Bankruptcy Court. The Debtors believe that the Plan is in the best interests of all creditors and urge all creditors entitled to vote on the Plan to vote in favor of the Plan.

**References to the "Plan" and the "Plan of Reorganization" are to the Plan of Reorganization attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.**

**References to "New Common Stock" in this Disclosure Statement are to the new common stock that the reorganized Graphics Properties Holdings, Inc. (as defined in the Plan, "Reorganized GPH") will issue upon emergence as described in this Disclosure Statement and in accordance with the Plan.**

**References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the Southern District of New York, the court in which the Debtors filed voluntary petitions for relief under the provisions of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101, *et. seq.* (the "Bankruptcy Code"). References to the "Commencement Date" are to April 1, 2009.**

**Unless the context requires otherwise, references to "the Debtors," "our," and "us" are to Graphics Properties Holdings, Inc. and its affiliated debtors and debtors-in-possession.**

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is attached as Exhibit A hereto, and the section entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summaries of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement are fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement,

including, but not limited to, the Plan, or otherwise incorporated herein by reference, are qualified in their entirety by reference to that financial information and those documents. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning the Debtors or the value of the Debtors' property have been authorized by the Debtors other than as set forth in this Disclosure Statement. Any information, representations or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission ("SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by the Debtors' independent auditors unless explicitly provided otherwise.

The shares of New Common Stock described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code.

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- the Debtors' budgeted or expected future financial position, liquidity, results of operations, profitability and cash flows;
- projected dividends;
- effectiveness of the Debtors' financing plans;
- the Debtors' future competitive position;
- success of the Debtors' business strategy;
- projected cost reductions;

- projected recovery on Allowed Claims;
- projected and estimated liability costs;
- results of litigation;
- impact of any disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- projected general market conditions; and
- effect of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement. These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- potential inaccuracies in the estimates of Claims;

- the inability to have claims discharged or settled during the chapter 11 proceedings;

- general economic, business and market conditions;

- currency and interest rate fluctuations;

- the results of litigation;

- the ability to divest assets;

- the tax consequences of the Plan;

- the liquidity of the trading market in the New Common Stock;

- the terms of the Debtors' respective charters and bylaws;

- the control over the Reorganized Debtors' operations exerted by holders of secured claims;

- availability of federal income tax net operating loss carryforwards;

- adverse tax changes;

- limited access to capital resources;

- changes in domestic and foreign laws and regulations;

- natural disasters; and

- geopolitical instability.

# ARTICLE II

## QUESTIONS AND ANSWERS REGARDING
## THIS DISCLOSURE STATEMENT AND THE PLAN

**Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval for their Plan. Prior to soliciting acceptances of the proposed Plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan? What will I receive from the Debtors if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of claim or interest you hold. The classes of claims and interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Designation | Impairment | Entitled to Vote | Recovery Under Plan[1] | Recovery in Liquidation |
|-------|-------------|------------|------------------|------------------------|-------------------------|
| 1 | Secured Tax Claims | Unimpaired | No (Deemed to Accept) | 100% | 0% |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) | 100% | 0% |
| 3 | Priority Tax Claims | Impaired | Yes | N/A | 0% |
| 4 | Priority Claims | Impaired | Yes | N/A | 0% |
| 5 | Prepetition Credit Agreement Secured Claims | Impaired | Yes | [●]% | [●]% |
| 6 | General Unsecured Claims | Impaired | Yes | N/A | 0% |
| 7 | Old Common Interests | Impaired | No (Deemed to Reject) | 0% | N/A |

For more information about the treatment of claims and interests, see "Treatment of Claims and Old Common Interests," which begins on page 16.

**What happens to my recovery if the Plan is not confirmed, or does not become effective?**

In the event that the Plan is not confirmed, the Debtors will be forced to liquidate all assets and distribute the proceeds to the holders of Prepetition Credit Agreement Secured Claims. There would be a significantly reduced recovery for the holders of Prepetition Credit Agreement Secured Claims, as compared to the recovery shown on page 4 above, and no recovery for holders of Priority Tax Claims, Priority Claims, and General Unsecured Claims. For more information on the consequences of a liquidation scenario, see "Best Interests of Creditors," which begins on page 49, and the Liquidation Analysis attached as Exhibit D hereto.

---

[1]  The sole source of potential recoveries for holders of Priority Tax Claims in Class 3, Priority Claims in Class 4, and General Unsecured Claims in Class 6 is their pro rata share of the Liquidating Trust (as described in the Plan), which will include certain Avoidance Actions. For a further discussion of the Liquidating Trust, see "The Liquidating Trust," which begins on page 23.

**If the Plan provides that I get a distribution, do I get the distribution upon confirmation or when the Plan goes effective, and what do you mean when you refer to "confirmation," "effective date" and "consummation"?**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After the Bankruptcy Court confirms the Plan, there are conditions that must be satisfied or waived before the Plan can be consummated and become effective. Distributions will only be made after consummation of the Plan. References to the "effective date" mean the date that all conditions to the Plan have been satisfied or waived and the Plan has been fully consummated. See "Conditions Precedent to Confirmation and Consummation of the Plan," which begins on page 37, for a discussion of the conditions to consummation.

**What is the Liquidating Trust, and will the interests in the Liquidating Trust be freely transferable?[2]**

The Liquidating Trust will hold assets set forth on Schedule I to the Plan, which includes the rights to Avoidance Actions currently held by the Debtors, and be entitled to the proceeds of such assets (net of costs). The Liquidating Trust will issue beneficial interests in the trust to the holders of Prepetition Credit Agreement Secured Claims, Priority Tax Claims, Priority Claims, and General Unsecured Claims. Beneficial interests in the Liquidating Trust will only be transferable in limited circumstances. See "The Liquidating Trust," which begins on page 23.

**Where is the cash required to fund the Plan coming from?**

The Debtors obtained the Cash from cash collateral which the Debtors currently hold, and which the Agent under the Secured Credit Facility and the Secured Lenders (as defined below) have agreed to allow the Debtors to use to fund the Plan.

**Are there risks to owning an interest in the Debtors or in the Liquidating Trust upon emergence from bankruptcy?**

Yes. Please see "Risk Factors," which begins on page 55.

**Is there potential litigation related to the Plan?**

Yes, in the event that it becomes necessary to confirm the Plan over the rejection of Classes 3 to 6, the Debtors anticipate litigation being necessary, and possibly significant. If the Debtors are unable to confirm the Plan over such rejections, the Debtors will proceed immediately to a liquidation.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

In accordance with the terms of the order of the Bankruptcy Court approving this Disclosure Statement, all parties in interest will receive the notice of the hearing on the confirmation of the Plan.

---

[2]   The Debtors reserve the right to use an alternative means of distributing the assets proposed to be held by the Liquidating Trust, or proceeds thereof to holders of Priority Tax Claims, Priority Claims, and General Unsecured Claims; provided, that the method of distribution so used shall not have a material adverse impact on the amount of consideration, if any, provided to such holders when compared to a trust structure.

Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials, including, as applicable, Ballots.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan, and all of the exhibits thereto are available for viewing by any party at the Debtors' case website at www.donlinrecano.com/sgi.

**Will the Debtors continue filing reports with the SEC?**

Upon emergence, the Debtors do not expect to continue filing reports with the SEC, as the Debtors do not expect to be subject to the public reporting requirements of the Securities Exchange Act of 1934 (as amended, the "Exchange Act"), or the regulations promulgated thereunder.

**What rights will the Debtors' new stockholders have?**

Each holder of New Common Stock issued under the Plan will be entitled to one vote per share of New Common Stock on all matters subject to a vote of common stockholders of Reorganized GPH under applicable state law and will be entitled to a pro-rata share of any dividends that are declared by Reorganized GPH's board of directors. The New Common Stock shall be the sole class of voting stock of Reorganized GPH.

Holders who own in excess of 5% of New Common Stock of Reorganized GPH may be parties to a shareholders agreement, if any. It is anticipated that if the parties agree to a shareholders agreement, such agreement may include customary provisions with respect to voting, drag-along and tag-along rights, share transfers, and information rights. On the effective date of the Plan, Reorganized GPH shall authorize and issue an amount of shares of New Common Stock sufficient to satisfy its obligations under the Plan.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes. Please see "Releases," which begins on page 40.

**What is the deadline to vote on the Plan?**

The deadline is **[●], 2009, at 5:00 p.m. (Prevailing Eastern Time)**.

**How do I vote for or against the Plan?**

Holders of Claims entitled to vote on the Plan shall receive one or more Ballots to be used for voting on the Plan. If you are a holder of a Claim in Class 3, 4, 5, or 6, you may vote for or against the Plan by completing the Ballot(s) and returning the Ballot(s) in the envelope(s) provided.

The Debtors have engaged Donlin, Recano & Company, Inc. ("Donlin" or the "Voting Agent") to serve as the voting agent to answer questions, provide additional copies of this Disclosure Statement and other materials, and oversee the voting process. Donlin will also process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

For your vote to be counted, your Ballot must be completed, signed, and received by **[●], 2009, at 5:00 p.m. (Prevailing Eastern Time)** by the Voting Agent at the applicable address indicated below. If you received an envelope addressed to your Nominee, please allow enough time when you return your

ballot for your Nominee to cast your vote on a Master Ballot before the voting deadline. For information regarding voting by Nominees, see "Special Voting Instructions," which begins on page 60.

| BALLOTS |
|---|
| Ballots and Master Ballots must be actually received by Donlin by the voting deadline on **[●], 2009, at 5:00 p.m.** (Prevailing Eastern Time) at the following address:<br><br>**If by regular mail, send to:**<br>Donlin, Recano & Company, Inc.<br>Re: Graphics Properties Holdings, Inc., *et al.*<br>P.O. Box 2074, Murray Hill Station<br>New York, NY 10156<br>Attn: Voting Department<br><br>**If by Hand Delivery or Overnight Courier, send to:**<br>Donlin, Recano & Company, Inc.<br>Re: Graphics Properties Holdings, Inc., *et al.*<br>419 Park Avenue South, Suite 1206<br>New York, NY 10016<br>Attn: Voting Department<br><br>If you have any questions on the procedure for voting on the Plan, please call the voting agent at the following telephone number:<br><br>**212-771-1128** |

Any ballot that does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, even if properly executed by the holder of a Claim, shall not be counted.

Each holder of a Claim may cast only one Ballot per each such Claim held. By signing and returning a Ballot, each holder of a Claim in Class 3, 4, 5, or 6 will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such class of Claims, such earlier Ballots are thereby superseded and revoked.

More detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims entitled to vote on the Plan. It is important to follow the specific instructions provided on each Ballot. All Ballots are accompanied by return envelopes.

**Why is the Bankruptcy Court holding a confirmation hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

**When is the confirmation hearing set to occur?**

The Bankruptcy Court has scheduled the confirmation hearing (the "Confirmation Hearing") for **[●], 2009, at 10:00 a.m. (Prevailing Eastern Time)** before the Honorable Martin Glenn, United States

Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made in open court at the Bankruptcy Court or as indicated in a notice of agenda filed with the Bankruptcy Court.

Objections to confirmation of the Plan must be filed and served on the Debtors and certain other parties, so as to be received no later than **[●], 2009, at 5:00 p.m. (Prevailing Eastern Time)**, in accordance with the notice of the Confirmation Hearing that accompanies this Disclosure Statement. Unless such objections are timely served and filed in compliance with such notice, they may not be considered by the Bankruptcy Court.

The Debtors will publish the notice of the Confirmation Hearing, which will contain the deadline for objections to the Plan and the date and time of the Confirmation Hearing, in the national edition of the New York Times to provide notice to those persons who may not receive notice by mail.

**What is the purpose of the Confirmation Hearing?**

The principal objective of a chapter 11 case is the plan of reorganization. Subject to certain limited exceptions, the order by the Bankruptcy Court confirming a plan (i) discharges a debtor from any debt that arose prior to the date of confirmation, (ii) substitutes for such debt the obligations specified by the plan, and (iii) binds the debtor, its creditors, its equity interest holders, any issuer of securities under the plan, and any person acquiring property under the plan.

**What role does the Bankruptcy Court play after the Confirmation Hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any claims or interests arising under the Chapter 11 cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of Claims against the Debtors are accomplished pursuant to the Plan. For a further description of the matters over which the Bankruptcy Court will retain jurisdiction following the confirmation of the Plan, see "Retention of Jurisdiction by the Bankruptcy Court," which begins on page 41.

**What is the effect of the Plan on the Debtors' ongoing business?**

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the confirmation of the Plan means that the Debtors will not be liquidated or forced to go out of business. The Debtors will restructure and operate their businesses going forward as a licensing company for certain intellectual property related to high performance computing and storage products and services.

**Will Any Party Have Significant Influence Over the Corporate Governance and Operations of the Reorganized Debtors?**

Possibly. Under the Plan, holders of the Prepetition Credit Agreement Secured Claims will own all of the New Common Stock. As a result of this concentration of equity, the Reorganized Debtors will become a closely held private company. These holders will exercise a controlling influence over the business and affairs of the Reorganized Debtors, and all matters requiring the vote or approval of holders of any of such securities, including the power to elect directors and approve significant mergers, other material corporate transactions, or the sale of all or substantially all of the assets of the Reorganized Debtors.

**Do the Debtors recommend voting in favor of the Plan?**

Yes.  In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code.  However,  if the Debtors are unable to confirm the Plan, the Debtors will immediately proceed with a liquidation of their assets.  In the event of a liquidation, the recovery for holders of Prepetition Credit Agreement Secured Claims will be significantly reduced, if not eliminated, and no recovery is expected for holders of Priority Tax Claims, Priority Claims, and General Unsecured Claims.  Confirmation of the Plan will also allow the Debtors to restructure and operate their businesses going forward as a licensing company for certain intellectual property related to high performance computing and storage products and services.  Accordingly, the Debtors recommend that holders of claims who are entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

## ARTICLE III

## OUR HISTORY AND OUR CHAPTER 11 CASES

**A.      HISTORY**

Founded in 1981, the Debtors began as manufacturers of graphics display terminals based on proprietary software and hardware.  Over the next 25 years, the Debtors grew into a leader in high performance computing and data management.  Their products and services were targeted toward the scientific, technical, and business communities, which required significant computing power and fast and efficient data movement both within the systems and to and from large-scale data storage to solve challenging data-intensive computing, data management, and visualization problems.  The Debtors sold solutions that consisted of a combination of their clustered computing servers, shared memory servers, data storage products, and visualization systems, integrated with a choice of software, customer support services, and professional services.  These solutions allowed end users to access, analyze, transform, manage, visualize, and store very large amounts of data in real time or near real time.

The Debtors served markets such as defense and strategic systems, weather and climate, physical sciences, life sciences, energy (including oil and gas), aerospace, automotive, general manufacturing, media and entertainment, and business intelligence and data analytics.  Customers used the Debtors' systems to simulate global climate changes, accelerate the engineering of new automotive designs, support homeland security initiatives, manage video content archives, and gain business intelligence through data-mining

The Debtors operated through two business segments:  Products (the "Products Segment") and Global Services (the "Global Services Segment").

> a.      Products Segment.  The Products Segment was comprised of the Debtors' core products ("Core Products") and legacy systems ("Legacy Systems"), which allowed customers to run data-intensive applications rapidly and to store and visualize their data.  This segment included (i) a broad line of products designed to address the demands of high-performance computing and data management applications, such as the Debtors' high-performance computing systems, storage products, and visualization systems, (ii) legacy systems which are no longer actively marketed to new customers,  and (iii) software to increase the efficiency, performance, and manageability of the Core Products and Legacy Systems and to assist in visualization and storage management.

b.    Global Services Segment.  The Global Services Segment, which included customer support and professional services, offered services (i) to support the Debtors' computing systems, software, and storage products, and (ii) to assist the Debtors' customers in developing solutions to meet their business objectives and maximize the return on their technology investment.

Headquartered in Sunnyvale, California, the Debtors had direct sales and distributions in over a dozen countries, including Australia, Belgium, France, Germany, Israel, the Netherlands, Spain, and the United Kingdom.  To enhance their direct sales force, the Debtors used indirect channels, including resellers and authorized distributors, in all countries in which they had a presence and more than twenty additional countries.

## B.    2006 REORGANIZATION

On May 8, 2006, Silicon Graphics, Inc.[3] and its affiliated debtors and debtors in possession (the "2006 Debtors") commenced voluntary chapter 11 bankruptcy proceedings (the "2006 Reorganization") in the United States Bankruptcy Court for the Southern District of New York to adjust the 2006 Debtors' costs and capital structure to better reflect their corporate size and needs.  Pursuant to the plan for the 2006 Reorganization, the 2006 Debtors delevered their balance sheets by (i) equitizing their senior notes; (ii) paying a 27.66% recovery to the general unsecured creditors; and (iii) paying all other claims in full. During the 2006 Reorganization, and in response to market pressures and changes within the computing industry, the 2006 Debtors developed a road map to transition from a boutique for specialized, high-performance machines into a strong competitor with more diversified products and services and increased market reach.  Thus, the 2006 Debtors emerged from bankruptcy protection on October 17, 2006, with an improved capital structure, fewer legacy costs, and a new, more competitive business model.

## C.    PREPETITION CREDIT FACILITY

The exit facility issued upon the 2006 Debtors' emergence from the 2006 Reorganization is the Debtors' current debt facility, which is governed by that certain Senior Secured Credit Agreement (as amended, modified, or supplemented from time to time, the "Secured Credit Facility"), dated as of October 17, 2006, by and among Graphics Properties, Silicon Graphics Federal, Inc., and GPH World Trade Corporation (f/k/a Silicon Graphics World Trade Corporation), as Borrowers, the lenders party thereto, and Wilmington Trust FSB (the "Agent"), as Administrative Agent and Collateral Agent (as successor to Morgan Stanley Senior Funding, Inc. and Morgan Stanley & Co. Incorporated).  The current lenders under the Secured Credit Facility are affiliates of Watershed Capital Partners, Monarch Alternative Capital LP, Whippoorwill Associates, Inc., D.E. Shaw & Company, Symphony Asset Management, Southpaw Asset Management, Lampe Conway & Co. LLC, Wellpoint, Inc., the President and Fellows of Harvard College, Quadrangle Master Funding Ltd., and Lehman Commercial Paper, Inc. (the "Secured Lenders").

The Secured Credit Facility was secured by substantially all of the Debtors' assets and the assets of their domestic subsidiaries and was due to mature on October 17, 2011.  As of March 27, 2009, there was approximately $141.5 million in principal outstanding under the term loan and approximately $20.7 million in principal outstanding under the revolver.

---

[3]    The entity formerly known as Silicon Graphics, Inc. is now known as Graphics Properties Holdings, Inc.

D.     **COMMON STOCK**

Graphics Properties is a reporting company under section 12(b) of the Exchange Act, but is not current on certain reports required to be filed with the Securities and Exchange Commission. Its common stock was previously publicly traded on NASDAQ under the symbol "SGIC." As of March 6, 2009, there were 11,658,356 shares of Graphics Properties' common stock outstanding. On March 12, 2009, NASDAQ suspended trading of Graphics' Properties common stock for failure to comply with the market value of publicly held shares requirement for continued listing. On April 22, 2009, NASDAQ delisted Graphics Properties' common stock.

E.     **KEY EVENTS LEADING TO THE**
       **COMMENCEMENT OF THE CHAPTER 11 CASES**

After the 2006 Reorganization, the Debtors faced a number of challenges in their transition to their new business model, which, taken together, have negatively impacted the the Debtors' overall financial performance. The challenges related partly to legacy problems continuing from before the 2006 Reorganization, such as a burdensome cost structure, hardware commoditization, increased competition, and delays in the introduction of new technology. In addition, the Debtors based their projections on their ability to grow into their cost structure, increase sales and market capture for their new cluster computing products, software, and service offerings, and implement a new solution-based selling approach. While the Debtors realized some success, they fell short of this plan to penetrate new markets and capture a greater share of existing markets. Combined, these factors caused decreased revenues, net losses, and a decline in the Debtors' available cash position.

       1.     **Burdensome Cost Structure and Hardware Commoditization**

While the Debtors undertook aggressive measures to bring their operating costs in line with lower revenues, their legacy overhead, which was based on a larger, multi-billion dollar corporate structure, continued to be a drag on profit margins. Moreover, the Debtors had high sales costs compared with their competitors. Because their business had been built around customized hardware, the Debtors' marketing model was based on direct sales, so that their sales force could interface directly with customers to design products to meet the customer's particular needs. The shift to standardization in the computing industry, however, favored companies with high-volume sales through resellers and channel partners. Further, the Debtors' sales operations in many countries generated only small revenues or less and their costs were high in relation to their size.

The Debtors were also burdened by fixed costs relating to the extensive reporting responsibilities of a publicly-traded company, a long-tenured, highly-paid workforce, a large research and development program, and under-utilized manufacturing facilities. In addition, as discussed above, the Debtors were saddled with a heavy debt structure that could not be supported by their revenue levels. The Debtors' historical focus on specialized, high-performance machines and smaller customer base limited the Debtors' ability to spread these costs across product volumes.

       2.     **Competition and Reduced Market Share**

The market for customized hardware, from which the Debtors derived the majority of their business, eroded faster than projected. One reason for the decline in demand was that current software applications failed to take full advantage of the features offered by the high-performance computers produced by the Debtors, thus reducing demand for new high-performance systems. Further, although the Debtors had been aggressively focusing on their new solutions-focused business model, this transition took longer than expected and did not produce the projected revenue increases. In addition, because the

Debtors had higher fixed costs and lower product volumes than most of their competitors, the Debtors faced significant pricing pressure from competitors who target the larger enterprise computing market and are better positioned to spread costs across higher volumes, such as IBM, Hewlett-Packard, Dell, and Sun. Most of the Debtors' competitors also had greater technical, marketing, and financial resources and brand recognition, and a larger installed base of customers.

### 3. Delays in New Technology

The Debtors' transition to a business model emphasizing the Core Products was dependent on their ability to develop new products and enhance existing ones. However, delays and unanticipated costs in the Debtors' technology development slowed the Debtors' ability to introduce next-generation Core Products, triggering lost sales and customer concerns, which contributed further to the decline in the Debtors' revenues.

## F. TURNAROUND EFFORTS

The Debtors' businesses held significant value and strategic resources and assets that would be difficult to replicate. Through their highly skilled workforce, the Debtors made considerable advances in the fields of supercomputing, high-performance systems, scalable processing, and data storage. Prior to the sale of substantially all of their assets (which is described below), the Debtors held or applied for over 700 patents, as well as valuable domestic and foreign intellectual property and trademarks. In addition, the Debtors served multiple governmental agencies and derived significant revenue from projects critical to such agencies.

### 1. Cost Reduction Measures

In response to the Debtors' deteriorating financial performance, the Debtors' management took significant steps to adapt the Debtors' operations for the increasingly competitive computer industry and reduce their overall cost structure. The Debtors developed and implemented several plans to improve operational efficiency and reduce costs, including steps to reduce its global workforce and associated expenses, as well as finance, administrative, marketing, manufacturing, and material-source costs, and to reorganize their sales, service, and marketing organizations.

### 2. Consideration of Alternative Transactions

Prior to the Commencement Date, the Debtors and their advisors explored multiple restructuring alternatives, including the sale of all or portions of the Debtors' operations, new debt or equity capital infusions, reorganizations of the Debtors' operations, and a comprehensive restructuring of the Debtors' balance sheet.

As part of this process, in June 2008, the Debtors retained Houlihan Lokey Howard & Zukin ("Houlihan Lokey") as their financial advisor to provide assistance with evaluating these strategic alternatives. The Debtors also began routine meetings with the Secured Lenders to discuss various restructuring options and the Debtors' financial situation.

To investigate the opportunities for a sale of the Debtors' businesses outside of bankruptcy as a going concern, Houlihan Lokey reached out to approximately 150 potentially interested parties, including strategic and financial groups in the United States and around the world. Houlihan Lokey also examined different deal structures, including a sale of the Debtors as a whole or in portions to parties in different regions, and explored the possibility of various stand-alone reorganization scenarios. Initially, this process generated significant interest in the Debtors' businesses, and a number of parties conducted due

diligence into the Debtors and expressed interest in potentially purchasing all or part of the Debtors' businesses.

Despite these indications of interest, the Debtors were unable to reach agreement on a sale or other restructuring in 2008, partly due to the ongoing credit crisis in the United States and related distress in the equity markets. Mindful of their deteriorating cash position, the Debtors began a another push to re-explore the possibility of a sale or other restructuring in early 2009. Through Houlihan Lokey, the Debtors approached all potentially interested parties whom they had previously contacted to determine if any of these parties would be interested in a transaction with the Debtors. At the same time, the Debtors and Houlihan Lokey continued to consider options with the Secured Lenders for a possible debt-for-equity exchange and a reorganization on a stand-alone basis; however, these discussions with the Secured Lenders did not lead to any such transactions. The Debtors ultimately set a deadline of early March 2009 for firm bids, and received indications of interest for all or a portion of their business from three potential buyers, including Silicon Graphics International Corp. (f/k/a Rackable Systems, Inc.) ("New SGI"). Upon careful consideration of the bids, the Debtors concluded that a transaction with New SGI was their only viable sale option.

After extensive negotiations, New SGI and the Debtors agreed on the terms of an asset purchase agreement under which an affiliate of New SGI would serve as a stalking horse bidder for a sale (a "Sale") of substantially all of the Debtors' assets through an auction in chapter 11 pursuant to section 363 of the Bankruptcy Code. To facilitate the Sale, on March 31, 2009, the Debtors entered into a cash collateral stipulation (the "Cash Collateral Stipulation") with the Agent under the Secured Credit Facility and the Secured Lenders to permit the Debtors to use cash collateral, in accordance with a budget negotiated with the Secured Lenders, to complete the Sale.

After carefully considering all alternatives, the Debtors determined that the Sale was the best way to maximize the value of the Debtors' businesses and in the best interests of the Debtors' estates, creditors, and all parties-in-interest. Moreover, the Sale preserved jobs for the many employees of the Debtors who were retained by the Buyer. The Debtors believed that the Sale was critical to the ability of the Debtors to survive as a viable enterprise that produces world-class computing solutions.

## G.    COMMENCEMENT OF THE CHAPTER 11 CASES

On April 1, 2009, Graphics Properties and certain of its subsidiaries filed voluntary petitions with the United States Bankruptcy Court for the Southern District of New York for relief under chapter 11 of the Bankruptcy Code.[4] The Chapter 11 Cases are being jointly administered under the caption In re Graphics Properties Holdings, Inc., et al., Case No. 09-11701 (MG). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

---

[4]    Silicon Graphics Federal, Inc. ("SGI Federal"), a former subsidiary of Graphics Properties, also filed for bankruptcy on April 1, 2009. Because the stock of SGI Federal was sold to a designee of New SGI, Inc. as part of the sale of substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, the chapter 11 case of SGI Federal was dismissed by order of the Bankruptcy Court on June 3, 2009.

## H.    EVENTS DURING BANKRUPTCY

### 1.    First Day Relief

On the Commencement Date, the Debtors sought and obtained a series of "first day" orders from the Bankruptcy Court designed to minimize any disruption of business operations and to facilitate their sale and reorganization.  Among other things, the orders authorized the Debtors to:  (i) satisfy certain prepetition obligations, including those relating to wages, compensation, and employee benefits, sales and use taxes, and claims of foreign creditors, common carriers, and custom brokers; (ii) continue customer service programs; (iii) maintain workers' compensation and other insurance policies; and (iv) use their prepetition cash management system, bank accounts, checks, and other business forms.

The Debtors also sought and obtained an order from the Bankruptcy Court to protect  their valuable tax credits and attributes, including net operating loss ("NOL") carryforwards of at least $1.3 billion (collectively with the NOLs, the "Tax Attributes") by establishing (a) notice and hearing procedures regarding the trading of equity securities of Graphics Properties, which must be complied with before such trades or transfers become effective, and (b) notice and sell-down procedures regarding Claims against the Debtors (collectively, the "Procedures").  The Procedures are intended to preserve, to the fullest extent possible, the ability of the Debtors to maximize the availability and use of the Tax Attributes.

### 2.    Cash Collateral Stipulation

To enable the continued operation of their businesses prior to the Sale, avoid short-term liquidity concerns, and preserve the going-concern value of their estates, the Debtors negotiated and entered into the Cash Collateral Stipulation on March 31, 2009, with the Agent under the Secured Credit Facility and the Secured Lenders.

On April 2, 2009, the Bankruptcy Court approved the Cash Collateral Stipulation, which (i) authorized the Debtors to use their cash collateral, and (ii) as adequate protection against any diminution in the Agent's prepetition collateral, granted superpriority administrative expense claims and first priority, priming, replacement liens to the Agent, subject to a "carve-out" for specified professional fees and other costs and expenses, in substantially all of the Debtors' assets.  The Cash Collateral Stipulation terminated by its terms on May 15, 2009.

After the closing of the Sale and the termination of the Cash Collateral Stipulation, the Debtors continue to use the cash collateral with the Secured Lenders' consent in order to proceed with the Debtors' plan of reorganization.

### 3.    The Sale of Substantially All of the Debtors' Assets

On the Commencement Date, the Debtors filed a motion for entry of an order to (i) approve bidding and notice procedures for the Sale of substantially all of the Debtors' assets through an auction in chapter 11 pursuant to section 363 of the Bankruptcy Code; (ii) approve an Asset Purchase Agreement, dated as of March 31, 2009, by and among the Debtors, SGI Federal, and New SGI (the "Stalking Horse Agreement"), or such other purchase agreement(s) between the Debtors and the successful bidder; (iii) authorize the sale of substantially all of the assets of the Debtors free and clear of all liens, claims, encumbrances, and other interests; and (iv) authorize the assumption of certain executory contracts and unexpired leases in connection with the Sale.  New SGI served as a stalking horse bidder for the Sale.

In the weeks leading up to the auction, interested bidders were provided access to the Debtors' management, financial advisors, and data records to perform due diligence with respect to the Debtors' businesses. The auction was held on April 28, 2009. At the end of the auction, an affiliate of New SGI was declared the successful bidder with a revised bid, which included an increased purchase price of $42.5 million.

On April 30, 2009, the Bankruptcy Court entered an order (the "Sale Order"), which approved (a) the Sale of substantially all of the Debtors' assets, including the stock of SGI Federal, to a designee of New SGI, SGI International, Inc. (the "Buyer"), an entity that is a wholly owned subsidiary of New SGI, and (b) the Stalking Horse Agreement, as amended by the Amendment to the Asset Purchase Agreement, dated as of April 30, 2009 (collectively, the "Asset Purchase Agreement"). Under the Asset Purchase Agreement, the Buyer, among other things, paid a purchase price of $42.5 million and assumed certain liabilities of the Debtors, including administrative expense claims under section 503(b)(9) of the Bankruptcy Code. The Sale closed on May 8, 2009.

4.      **Change in Name and Dismissal of the SGI Federal Case**

Under the Asset Purchase Agreement, the Debtors agreed to change their names to names bearing no resemblance to Silicon Graphics, SGI, or any variation thereof, promptly after Closing, so that the Buyer could use and benefit from the Silicon Graphics name. In addition, pursuant to the Asset Purchase Agreement and the Sale Order, the Buyer exercised its option to purchase the stock of SGI Federal. Accordingly, the Debtors and New SGI sought and obtained authorization from the Bankruptcy Court to (i) dismiss the Chapter 11 Case of SGI Federal, effective as of the closing of the Sale, and (ii) change the name of Silicon Graphics, Inc. to Graphics Properties Holdings, Inc.

5.      **Retention of Restructuring and Other Professionals**

To assist the Debtors in fulfilling their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, the Debtors retained, as of the Commencement Date, with authorization from the Bankruptcy Court, the law firm of Ropes & Gray LLP ("Ropes & Gray") as their restructuring attorneys; AlixPartners, LLP as restructuring advisors; Houlihan as financial advisors; and Donlin as claims, noticing, and voting agent.

After the closing of the Sale, the employees and senior management of the Debtors were no longer employed by the Debtors. To assist and guide the Debtors through the remainder of the Chapter 11 Cases and the plan process, the Debtors retained Barry J. Weinert (former general counsel of Graphics Properties), as President and Chief Restructuring Officer; and Diane Gibson and Gregory S. Wood (both former officers of Graphics Properties), as consultants. The Debtors also employed attorneys and other professionals to provide services in the ordinary course of the Debtors' business in matters unrelated to the Chapter 11 Cases.

## ARTICLE IV

## THE PLAN OF REORGANIZATION

A.      **INTRODUCTION**

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to restructure and operate its businesses going forward as a viable going concern.

The Plan is attached as Exhibit A hereto and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan. Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

**B.     CLASSIFICATION OF CLAIMS AND OLD COMMON INTERESTS, IMPAIRMENT AND VOTING**

**1.      Substantive Consolidation of the Debtors**

Pursuant to Article V of the Plan, the Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation.  As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate identification of the Debtors.

**2.      Class Identification**

The following table designates the classes of Claims against and Equity Interests in the Debtors and specifies which of those classes are impaired or unimpaired by the Plan and entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code or deemed to reject the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| 1 | Secured Tax Claims | Unimpaired | No (Deemed to Accept) |
| 2 | Other Secured Claims | Unimpaired | No (Deemed to Accept) |
| 3 | Priority Tax Claims | Impaired | Yes |
| 4 | Priority Claims | Impaired | Yes |
| 5 | Prepetition Credit Agreement Secured Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7 | Old Common Interests | Impaired | No (Deemed to Reject) |

**C.     TREATMENT OF CLAIMS AND EQUITY INTERESTS**

**1.      Secured Tax Claims (Class 1)**

(a)     Impairment and Voting.  Class 1 is unimpaired by the Plan.  Each holder of an Allowed Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a different treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Secured Tax Claim or (b)

commencing on the Effective Date and continuing over a period not exceeding five (5) years from and after the Commencement Date, equal semi-annual Cash payments in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable rate under non-bankruptcy law, subject to the sole option of the Debtors or Reorganized Debtors to prepay the entire amount of the Allowed Secured Tax Claim.

2.      <u>**Other Secured Claims (Class 2)**</u>

(a)      <u>Impairment and Voting</u>.  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)      <u>Distributions</u>.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment, at the sole option of the Debtors or the Reorganized Debtors, (a) each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable or (b) each holder of an Allowed Other Secured Claim shall receive the Collateral securing its Allowed Other Secured Claim in full and complete satisfaction of such Allowed Other Secured Claim on the later of the Effective Date and the date such Allowed Other Secured Claim becomes an Allowed Other Secured Claim, or as soon thereafter as is practicable.

3.      <u>**Priority Tax Claims (Class 3)**</u>

(a)      <u>Impairment and Voting</u>.  Class 3 is impaired by the Plan.  Each holder of an Allowed Priority Tax Claim is entitled to vote to accept or reject the Plan.

(b)      <u>Distributions</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the Priority Tax Claim Trust Interests.

4.      <u>**Priority Claims (Class 4)**</u>

(a)      <u>Impairment and Voting</u>.  Class 4 is impaired by the Plan.  Each holder of an Allowed Priority Claim is entitled to vote to accept or reject the Plan.

(b)      <u>Distributions</u>.  Except to the extent that a holder of an Allowed Priority Claim agrees to a different treatment, each holder of an Allowed Priority Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the Priority Claim Trust Interests.

**5.**      **Prepetition Credit Agreement Secured Claims (Class 5)**

     (a)      <u>Impairment and Voting</u>. Class 5 is impaired by the Plan. Each holder of a Prepetition Credit Agreement Secured Claim is entitled to vote to accept or reject the Plan.

     (b)      <u>Distributions</u>. Each holder of an Allowed Prepetition Credit Agreement Secured Claim shall receive, on the Effective Date or as soon as thereafter is practicable, its Pro Rata share of the New Common Stock and the Secured Creditor Trust Interests.

**6.**      **General Unsecured Claims (Class 6)**

     (a)      <u>Impairment and Voting</u>. Class 6 is impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

     (b)      <u>Distributions</u>. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a different treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata share of the General Unsecured Claim Trust Interests.

**7.**      **Old Common Interests (Class 7)**

     (a)      <u>Impairment and Voting</u>. Class 7 is impaired by the Plan. Each holder of an Old Common Interest is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan.

     (b)      <u>Distributions</u>. On the Effective Date, the Old Common Interests shall be cancelled, extinguished and discharged and the holders of Old Common Interests shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Old Common Interests under the Plan.

**D.**      **PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS, 503(B)(9) ADMINISTRATIVE EXPENSE CLAIMS, BUYER ASSUMED LIABILITIES, AND PROFESSIONAL FEE CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, 503(b)(9) Administrative Claims, Buyer Assumed Liabilities, and Professional Fee Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III to the Plan.

**1.**      **Administrative Expense Claims**

Except to the extent that any entity entitled to payment of any Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid in full and performed by the Debtors or Reorganized Debtors, as the case may be, in the ordinary

course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

**2.      503(b)(9) Administrative Claims**

All 503(b)(9) Administrative Claims shall be paid in full by Buyer pursuant to the Asset Purchase Agreement and the Sale Order.

**3.      Buyer Assumed Liabilities**

All Claims assumed by Buyer pursuant to Section 2.3 of the Asset Purchase Agreement shall be paid in full by Buyer, pursuant to the Asset Purchase Agreement and the Sale Order, which Buyer Assumed Liabilities shall include:

(a)      the trade accounts payable (whether or not invoiced) that: (i) existed as of March 27, 2009 (the date as of which Schedule 2.3 to the Asset Purchase Agreement was created) and are identified or otherwise reflected in the amounts set forth on Schedule 2.3 of the Asset Purchase Agreement; or (ii) were incurred by the Selling Entities[5] or invoiced to the Selling Entities between March 27, 2009 and the Closing in the ordinary course of business other than fees and disbursements for Professional Fee Clams;

(b)      the obligations of the Selling Entities under the Assumed Agreements to the extent such obligations: (i) arise after the Closing; (ii) do not arise from or relate to any breach by the Selling Entities of any provision of any of such Assumed Agreements; (iii) do not arise from or relate to any event, circumstance or condition occurring or existing on or prior to the Closing Date that, with notice or lapse of time, would constitute or result in a breach of any of such Assumed Agreements; and (iv) are ascertainable (in nature and amount) solely by reference to the express terms of such Assumed Agreements;

(c)      the accounts payable (or other amounts payable) and other intercompany obligations of the Selling Entities owed to the Acquired Subsidiaries (and the subsidiaries of the Acquired Subsidiaries);

(d)      the liabilities to be assumed by the Buyer pursuant to Section 7.7 of the Asset Purchase Agreement;

(e)      all Cure Payments;

(f)      Transfer Taxes and other Taxes payable by the Buyer pursuant to Section 7.8 of the Asset Purchase Agreement;

(g)      Goods Payables; and

---

[5]      All terms not otherwise defined in this Section D.3 shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

(h)     any Services Payable, to the extent the aggregate amount of all Services Payables that are Assumed Liabilities is less than $3,000,000 or if the incurring of such Services Payable is approved by the Buyer), in each case by providing written notice of such designation to the Seller.

4.     **Professional Fee Claims**[6]

(a)     Final Fee Applications

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on Reorganized GPH no later than 60 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)     Payment of Interim Amounts

Subject to the Holdback Amount, on the Effective Date, the Debtors or Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts payable relating to prior periods through the Effective Date. To receive payment on the Effective Date for unbilled fees and expenses incurred through such date, the Professionals shall reasonably estimate fees and expenses due for periods that will not have been billed as of the Effective Date and shall deliver such estimate to the Debtors and the United States Trustee prior to the Effective Date. The Debtors or Reorganized Debtors, as applicable, shall pay the Professionals' reasonably estimated amount of such fees and expenses as soon as reasonably practicable after receiving the estimate, but in no event prior to the Effective Date. Within forty-five (45) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order. If the estimated payment received by any Professional exceeds the actual fees and expenses for such period, as ultimately approved by the Bankruptcy Court in connection with the relevant final fee application, such excess amount will be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional within 10 days after the issuance of the Order approving the relevant final fee application. If the estimated payment received by any Professional is lower than the actual fees and expenses for such period as ultimately approved by the Bankruptcy Court in connection with the relevant final fee application, the difference between the amount approved and the estimated payment shall promptly be paid to such Professional.

(c)     Holdback Amount

On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals. The Reorganized Debtors shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom

---

[6]     On August 12, 2009, the Bankruptcy Court entered an Omnibus Order Granting Applications of Certain Retained Professionals for First Interim Allowance of Compensation and Reimbursement of Expenses [Docket No. 604], which granted an interim allowance for professional fees and expenses in the total amount of $1,693,738.10. The Debtors estimate that the amounts that will be incurred, going forward, for professional fees and expenses through the Effective Date to be approximately $2,833,736, as set forth in the Sources and Uses of Cash, attached as Exhibit C hereto.

fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Debtors, or the Reorganized Debtors. The remaining Holdback Amount owing to each Professional shall be paid to such Professional by Reorganized GPH from the Holdback Escrow Account and to the extent that such Professional's Professional Fee Claim is finally approved by the Bankruptcy Court. When all approved Professional Fee Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be released from the Holdback Escrow Account.

### 5. Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

## E. MEANS OF IMPLEMENTATION

### 1. Substantive Consolidation

On the Effective Date, the Debtors, for Plan purposes only, shall be deemed merged into Graphics Properties, and (i) all assets and all liabilities of the Debtors shall be deemed merged into Graphics Properties, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and canceled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, and (v) each General Unsecured Claim filed in the Chapter 11 Cases of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

Entry of the Confirmation Order will constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases for purposes of voting on, confirmation of, and distribution under the Plan.

In addition, on the Effective Date each Debtor that holds an Intercompany Claim against a direct subsidiary shall contribute such Intercompany Claim to the capital of such direct subsidiary. In the event the obligor under the Intercompany Claim is an indirect subsidiary, the holder shall contribute such Intercompany Claim to the capital of the direct subsidiary through which such holder indirectly controls such obligor. Such direct subsidiary (and, to the extent applicable, each of its direct or indirect subsidiaries to which the Intercompany Claim is then contributed) shall, in turn, be treated as the holder of such Intercompany Claim and shall contribute such Intercompany Claim to the capital of its direct subsidiaries in accordance with the immediately preceding two sentences. An Intercompany Claim shall continue to be contributed to the capital of subsidiaries until it is contributed to the capital of the subsidiary that is the obligor under such Claim, thereby eliminating such Intercompany Claim. On the Effective Date, all other Intercompany Claims (including without limitation Intercompany Claims that a Debtor holds against a direct or indirect parent corporation) shall be eliminated and discharged. In no event shall Distributions be made hereunder on account of any Intercompany Claims.

Notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only) shall not (other than for purposes related to funding distributions under the Plan) affect (w) the legal and organizational structure of the Debtors, (x) pre- and post-Commencement Date guaranties, liens, and security interests that were required to be maintained, pursuant to the Plan, (y) distributions out of any insurance policies or proceeds of such policies, and (z) the tax treatment of the Debtors. Furthermore, notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only), shall not affect the statutory obligation of each and every Debtor to pay quarterly fees to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and Article XIII of the Plan.

In the event that the Bankruptcy Court authorizes the Debtors to substantively consolidate less than all of the Debtors' Estates: (a) the Plan shall be treated as a separate plan of reorganization for each Debtor not substantively consolidated; and (b) the Debtors shall not be required to re-solicit votes with respect to the Plan.

## 2. **Compromise of Controversies**

In consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved under the Plan, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under Bankruptcy Rule 9019.

## 3. **Settlement of Claims**

All Plan distributions made to creditors holding Allowed Claims in any class are intended to be and shall be final, and no Plan distribution to the holder of a Claim in one class shall be subject to being shared with or reallocated to the holders of any Claim in another class by virtue of any prepetition collateral trust agreement, shared collateral agreement, subordination agreement, other similar inter-creditor arrangement or deficiency Claim.

## 4. **Cancellation of Existing Securities and Agreements**

Except (a) as otherwise expressly provided in the Plan; (b) with respect to executory contracts or unexpired leases that have been assumed by the Debtors; (c) for purposes of evidencing a right to distributions under the Plan; or (d) with respect to any Claim that is reinstated and rendered unimpaired under the Plan, on the Effective Date, the Prepetition Credit Agreement, all Old Common Interests and other instruments evidencing any Claims against or Old Common Interests in the Debtors shall be deemed automatically cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors thereunder shall be discharged.

## 5. **Issuance of New Common Stock**

The issuance of the New Common Stock by Reorganized GPH is authorized without the need for any further corporate action or without further action by a Holder of Claims or Equity Interests. The total number of shares of capital stock authorized under the New Certificate of Incorporation of Reorganized

GPH shall be [●] shares.  On the Effective Date, shares of New Common Stock shall be issued and distributed to the Holders of Claims in Class 5 on a Pro Rata basis.[7]

All of the shares of New Common Stock issued pursuant to the Plan shall be issued to the Holders of Claims in Class 5 and shall be duly authorized, validly issued, fully paid and non-assessable.  Each distribution and issuance referred to in Article V of the Plan shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance, which terms and conditions shall bind each Entity receiving such issuance or distribution.

Upon the Effective Date, in the event the holders of the Prepetition Credit Agreement Secured Claims determine that a Registration Rights Agreement and/or a Shareholders Agreement are advisable, then Reorganized GPH shall enter into such agreements with each entity that is to be a counter-party thereto or such agreements shall be deemed to be valid, binding and enforceable in accordance with their respective terms and each holder of New Common Stock shall be bound thereby, in each case without the need for execution by any party thereto other than Reorganized GPH.  Notwithstanding the foregoing, holders of New Common Stock may be permitted to be signatories to the Shareholders Agreement and Registration Rights Agreement (if any) if they so desire.

6.    **The Liquidating Trust[8]**

(a)    Formation

The Liquidating Trust shall be formed as a Delaware trust to:  (i) prosecute certain Avoidance Actions originally owned by the Debtors, and, if any of the prosecutions are successful or are settled in a manner that derives economic benefit to the Liquidating Trust, to distribute to the holders of Beneficial Interests the net proceeds of such causes of action as provided below and as set forth in the Liquidating Trust Agreement; and (ii) as applicable, investigate, enforce, abandon, prosecute, resolve, defend against, compromise and settle Disputed Priority Tax Claims, Disputed Priority Claims and Disputed General Unsecured Claims.  The Liquidating Trust will continue in existence for a period of three years or until the distribution of all of its property, whichever occurs first, except that if the supervisors of the Liquidating Trust determine that it is necessary to extend the duration of the Liquidating Trust to accomplish the Liquidating Trust's purposes, they may make an application to do so to the Bankruptcy Court prior to the expiration of the third year of the Liquidating Trust.  The Bankruptcy Court shall retain jurisdiction regarding the Liquidating Trust's operations.

(b)    Funding

On the Effective Date, the Debtors shall capitalize the Liquidating Trust with the Trust Cash, and the remainder of the Liquidating Trust Assets shall vest automatically in the Liquidating Trust.  The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.  The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made for the benefit

---

[7]    Following the Debtors' emergence from bankruptcy, Reorganized GPH expects to have [●] shares of New Common Stock outstanding.

[8]    The Debtors reserve the right to use an alternative means of distributing the assets proposed to be held by the Liquidating Trust, or proceeds thereof to holders of Priority Tax Claims, Priority Claims, and General Unsecured Claims; provided, that the method of distribution so used shall not have a material adverse impact on the amount of consideration, if any, provided to such holders when compared to a trust structure.

and on behalf of the Beneficiaries. The assets comprising the Liquidating Trust Assets will be treated for tax purposes as being transferred by the Debtors to the Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Beneficiaries to the Liquidating Trust in exchange for the Beneficial Interest in the Liquidating Trust. The Liquidating Trust shall be treated as a grantor trust for federal income tax purposes, and the Beneficiaries shall be treated as the grantors and owners of the Liquidating Trust. Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' rights, title and interest in the Liquidating Trust Assets, and the Debtors will have no further interest in or with respect to the Liquidating Trust Assets. The Liquidating Trustee shall value the Liquidating Trust Assets as of the Effective Date and shall notify in writing the Beneficiaries of such valuations. Each of the Liquidating Trust, the Liquidating Trustee and the Beneficiaries shall be required to use such valuations for all applicable reporting purposes, including for federal income tax purposes.

(c)     Assets

The Liquidating Trust will own those assets set forth on Schedule I to the Plan, which includes the rights to Avoidance Actions currently held by the Debtors, and the proceeds, net of costs, thereof. The causes of action held by the Liquidating Trust may not be successful and there is no guarantee that the Liquidating Trust will ever make distributions.

(d)     Fees and Expenses

Except as otherwise ordered by the Court, the expenses incurred by the Liquidating Trust on or after the Effective Date may be paid by the Liquidating Trust in accordance with the Liquidating Trust Agreement, without further order of the Bankruptcy Court.

(e)     Ownership

Ownership in the Liquidating Trust will be evidenced by book entries. The Beneficial Interests will be non-voting and will not confer any rights as shareholders. The Beneficial Interests will not be transferable by a Holder except: (i) to any relative, spouse, or relative of the spouse of the Holder, (ii) to any trust or estate in which such Holder has more than a 50% interest of the beneficial interest (excluding contingent interests), (iii) to any corporation, partnership, or other organization in which such Holder is the beneficial owner of more than 50% of the equity securities (excluding directors qualifying shares) so long as the transferor and transferee certify that there is no current intention of changing the direct and indirect ownership of the transferee, (iv) to any person or entity that holds directly or indirectly, more than 50% of the voting securities of such Holder, or (v) upon the death of such Holder in accordance with the operation of law. The Liquidating Trustee will take reasonable actions to prohibit the formation of an active trading market in the Beneficial Interests and otherwise to prevent transfers of Beneficial Interests that could cause the Liquidating Trust to be treated as a publicly traded partnership if the Liquidating Trust were treated as a partnership rather than a trust for federal income tax purposes.

(f)     Priority of Distributions

The Liquidating Trustee shall distribute periodically to Beneficiaries from the Liquidating Trust Assets the Available Cash by allocating (i) the Secured Creditor Share of the Available Cash on account of the Secured Creditor Trust Interests and disbursing such allocated share of the Available Cash on a pro rata basis to the holders of the Secured Creditor Trust Interests and (ii) the Unsecured Creditor Share of Available Cash on account of the Unsecured Trust Interests, and disbursing such allocated share of the Available Cash to the holders of the Unsecured Trust Interests in the order and reflecting the priorities set forth below:

FIRST, pro rata, to the beneficial holders of Priority Claim Trust Interests, until all Allowed Priority Claims are paid in full;

SECOND, pro rata, to the beneficial holders of Priority Tax Claim Trust Interests, until all Allowed Priority Tax Claims are paid in full;

THIRD, pro rata, to the beneficial holders of General Unsecured Claim Trust Interests, until all Allowed General Unsecured Claims are paid in full; and

FOURTH, to a charity chosen by the Liquidating Trustee in its sole discretion.

(g)     Management

The Liquidating Trust will be managed by a liquidating trustee and two supervisors, all of whom shall be selected by the holders of the Allowed Prepetition Credit Agreement Secured Claims.  Generally, the Liquidating Trustee will have the authority to manage, dispose of, and invest the assets of the Liquidating Trust but will be required to obtain the consent of the supervisors to take certain actions, including early termination of the Liquidating Trust, entering into contracts involving amounts greater than $15,000, borrowing of funds, and making distributions.

(h)     Trust Reporting

The Liquidating Trust Agreement will require that the Liquidating Trust distribute quarterly and annual reports containing unaudited financial information reflecting the activities of the Liquidating Trust with respect to its assets and distributions, as well as current reports promptly following the occurrence of any events sufficiently material to mandate the issuance of such a report.  Such reports shall be distributed in a manner, including by electronic mail or by posting to a secure website, as deemed appropriate by the Liquidating Trustee.

**7.      Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in the Estates of the Debtors, all Causes of Action (other than the Avoidance Actions to be vested in the Liquidating Trust), and any property acquired by the Debtors pursuant to the Plan shall vest in the Reorganized Debtors, free and clear of all Liens, Claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire or dispose of property and compromise or settle any Claims, Interests, or Causes of Action (other than the Avoidance Actions that are included in the Liquidating Trust) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**8.      Corporate Action**

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) selection of directors, (ii) the issuance and distribution of the New Common Stock, and (iii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors, the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors or officer of the Debtors, the Reorganized Debtors.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the

Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of Reorganized GPH. The authorizations and approvals contemplated by Section 5.9 of the Plan shall be effective notwithstanding any requirement under nonbankruptcy law. The issuance of the New Common Stock and Beneficial Interests shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

9. **Directors and Officers of the Reorganized Debtors**

As of the Effective Date, the term of each of the current members of the boards of directors of each of the Debtors shall expire, and the initial board of directors and officers of Reorganized GPH shall be appointed in accordance with its New Certificate of Incorporation and New By-Laws, and the initial boards of directors and officers of each of the other Reorganized Debtors shall be appointed in accordance with their certificates of incorporation and by-laws. The New Board of Reorganized GPH shall consist of [●] members, as set forth on Exhibit E to the Plan or as designated by the Prepetition Lenders at or prior to the Confirmation Hearing.

10. **Effectuating Documents; Further Transactions**

On and after the Effective Date, the Reorganized Debtors and their officers and directors are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations or consents except those expressly required pursuant to the Plan.

11. **Operations of the Debtors Between the Confirmation Date and the Effective Date**

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date.

12. **Terms of Injunctions or Stays**

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed.

F. **PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS**

1. **Voting of Claims**

Each holder of an Allowed Claim in an impaired class of Claims as of the Voting Record Date that is entitled to vote on the Plan pursuant to Article III and Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan.

2.       **Allowance of Prepetition Credit Agreement Claims**

The Prepetition Credit Agreement Claims are hereby Allowed in an aggregate amount equal to $[●] of principal and $[●] of interest, $[●] of which shall be an Allowed Prepetition Credit Agreement Secured Claim, and $[●] of which shall be a Prepetition Credit Agreement Unsecured Claim.

3.       **Nonconsensual Confirmation**

If any impaired class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Article XIII of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to the class of Old Common Interests, which is deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

4.       **Timing and Calculation of Amounts to Be Distributed**

Unless otherwise provided in the Plan, on the Initial Distribution Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the first Distribution Date that is after the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in the Plan on or as soon as reasonably practicable after the next Distribution Date that is at least 20 calendar days after the Allowance of each such Claim.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

5.       **Disbursing Agent**

All distributions under the Plan shall be made by the Debtors, the Reorganized Debtors, or the Liquidating Trustee, as the case may be in each case as Disbursing Agent, or such other Entity designated by the Debtors or the Reorganized Debtors as a Disbursing Agent on the Effective Date.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

(a)       Rights and Powers of Disbursing Agent

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)      Expenses of the Disbursing Agent

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Disbursing Agent (including, without limitation, taxes and reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Liquidating Trust in the ordinary course of business.

**6.      Distributions on Account of Claims Allowed After the Effective Date**

(a)      Payments and Distributions on Disputed Claims

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan to the holder of any Disputed Claim on account of the Disputed Claim, unless and until such Claim becomes an Allowed Claim, and any distributions made by the Liquidating Trust in respect of any Beneficial Interests held in the Disputed Claims Reserve shall be retained in the Disputed Claims Reserve until such time as such Beneficial Interests are distributed pursuant to Section 6.8(d) of the Plan.  Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

(b)      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties:  (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claims have been Allowed.

(c)      Disputed Claims Reserves

Subject to the receipt of any definitive guidance of the IRS or the Bankruptcy Court, the Disputed Claims Reserve is intended to qualify and to be treated as a disputed ownership fund pursuant to Treasury Regulation Section 1.468B-9.  As such, the Disputed Claims Reserve shall be treated for federal income tax purposes as a separate entity taxable as a "C corporation" and, therefore, shall report and pay any taxes on its income.

(d)      Deposit of Beneficial Interests on the Effective Date

The Disputed Claims Reserve shall be comprised of the Disputed Priority Tax Claims Reserve, the Disputed Priority Claims Reserve, and the Disputed General Unsecured Claims Reserve.  On the Effective Date (or as soon thereafter as is reasonably practicable), the Reorganized Debtors shall deposit from the Liquidating Trust into the:

- Disputed Priority Tax Claims Reserve the Priority Tax Claim Trust Interests that would have been distributed to the Holders of Disputed Priority Tax Claims if such Disputed Priority Tax Claims had been Allowed Priority Tax Claims on the Effective Date to ensure that the Holders of Allowed Priority Tax Claims receive the same percentage recovery from the Liquidating Trust on account of their individual Claims at all times.  The amount of Priority Tax Claim Trust Interests to be deposited in the Disputed Priority Tax Claims Reserve will be determined based on the lesser of (a) the asserted amount of the Disputed Priority Tax Claim filed with the Bankruptcy

Court or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Debtors and the Holder of such Disputed Priority Tax Claims.

- Disputed Priority Claims Reserve the Priority Claims Trust Interests that would have been distributed to the Holders of Disputed Priority Claims if such Disputed Priority Claims had been Allowed Priority Claims on the Effective Date to ensure that the Holders of Allowed Priority Claims receive the same percentage recovery from the Liquidating Trust on account of their individual Claims at all times. The amount of Priority Claims Trust Interests to be deposited in the Disputed Priority Claims Reserve will be determined based on the lesser of (a) the asserted amount of the Disputed Priority Claim filed with the Bankruptcy Court or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Debtors and the Holder of such Disputed Priority Claim.

- Disputed General Unsecured Claims Reserve the General Unsecured Claim Trust Interests that would have been distributed to the Holders of Disputed General Unsecured Claims if such Disputed General Unsecured Claims had been Allowed General Unsecured Claims on the Effective Date to ensure that the Holders of Allowed General Unsecured Claims receive the same percentage recovery from the Liquidating Trust on account of their individual Claims at all times. The amount of General Unsecured Claim Trust Interests to be deposited in the Disputed General Unsecured Claims Reserve will be determined based on the lesser of (a) the asserted amount of the Disputed General Unsecured Claim filed with the Bankruptcy Court or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Debtors and the Holder of such Disputed General Unsecured Claims.

*(i)* *Distributions After Allowance*

- The Liquidating Trustee shall distribute from the Disputed Priority Tax Claims Reserve to the Holder of any Disputed Priority Tax Claim that has become an Allowed Priority Tax Claim, no later than the next Interim Distribution Date that is at least 20 calendar days after the date on which such Disputed Priority Tax Claim becomes an Allowed Priority Tax Claim, Priority Tax Claim Trust Interests in an amount equal to the Pro Rata share of the Priority Tax Claim Trust Interests in the Liquidating Trust that such Holder would have received on account of such Claim if such Claim had been an Allowed Priority Tax Claim on the Effective Date.

- The Liquidating Trustee shall distribute from the Disputed Priority Claims Reserve to the Holder of any Disputed Priority Claim that has become an Allowed Priority Claim, no later than the date arising after the next Interim Distribution Date that is at least 20 calendar days after the date on which such Disputed Priority Claim becomes an Allowed Priority Claim, Priority Claim Trust Interests in an amount equal to the Pro Rata share of the Priority Claim Trust Interests in the Liquidating Trust that such Holder would have received on account of such Claim if such Claim had been an Allowed Priority Claim on the Effective Date.

- The Liquidating Trustee shall distribute from the Disputed General Unsecured Claims Reserve to the Holder of any Disputed General Unsecured Claim that has become an Allowed General Unsecured Claim, no later than the date arising after the next Interim Distribution Date that is at least 20 calendar days after the date on which such Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, General Unsecured Claim Trust Interests in an amount equal to the Pro Rata share of the General Unsecured Claim Trust Interests in the Liquidating

Trust that such Holder would have received on account of such Claim if such Claim had been an Allowed General Unsecured Claim on the Effective Date.

*(ii)*     *Distributions After Disallowance*

- If a Disputed Priority Tax Claim is disallowed, in whole or in part, the Liquidating Trustee shall on or as soon as reasonably practicable after the next Interim Distribution Date that is at least 20 calendar days after such disallowance distribute the Priority Tax Claim Trust Interests, reserved in respect of such disallowed Disputed Priority Tax Claim from the Liquidating Trust to Holders of Allowed Priority Tax Claims in a manner designed to ensure that the Holders of Allowed Priority Tax Claims receive the same Pro Rata share of beneficial interests in the Liquidating Trust as they would have received if the Disputed Priority Tax Claim had been disallowed on or before the Effective Date.

- If a Disputed Priority Claim is disallowed, in whole or in part, the Liquidating Trustee shall on or as soon as reasonably practicable after the Interim Distribution Date that is at least 20 calendar days after such disallowance distribute the Priority Claim Trust Interests, reserved in respect of such disallowed Disputed Priority Claim from the Liquidating Trust to Holders of Allowed Priority Claims in a manner designed to ensure that the Holders of Allowed Priority Claims receive the same Pro Rata share of beneficial interests in the Liquidating Trust as they would have received if the Disputed Priority Claim had been disallowed on or before the Effective Date.

- If a Disputed General Unsecured Claim is disallowed, in whole or in part, the Liquidating Trustee shall on or as soon as reasonably practicable after the Interim Distribution Date that is at least 20 calendar days after such disallowance distribute the General Unsecured Claim Trust Interests, reserved in respect of such disallowed Disputed General Unsecured Claim from the Liquidating Trust to Holders of Allowed General Unsecured Claims in a manner designed to ensure that the Holders of Allowed General Unsecured Claims receive the same Pro Rata share of beneficial interests in the Liquidating Trust as they would have received if the Disputed General Unsecured Claim had been disallowed on or before the Effective Date.

Distributions of Unsecured Trust Interests to Holders of Claims following the allowance or disallowance of Disputed Claims pursuant to Section 6.8(d)(ii) or Section 6.8(d)(iii) of the Plan shall include any proceeds previously received by the Disputed Claims Reserve in respect of such Unsecured Trust Interests, and shall be net of any taxes paid or payable by the Disputed Claims Reserve as a result of having held such Unsecured Trust Interests.

### 7.     **Delivery of Distributions and Undeliverable or Unclaimed Distributions**

(a)     Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim filed by that Holder, or if no Proof of Claim was filed, in the Schedules.

(b)     Minimum Distributions

No fractional shares of New Common Stock or Beneficial Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan

on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock or Beneficial Interests that is not a whole number, the actual distribution of shares of New Common Stock or Beneficial Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore.  The total number of authorized shares of New Common Stock and Beneficial Interests to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not have any obligation to make any distributions under the Plan with a value of less than $50, unless a written request therefor is received by the Liquidating Trustee from the relevant recipient at the address set forth in the Liquidating Trust Agreement.

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not have any obligation to make any distribution to any holder of an Allowed Claim on a particular Interim Distribution Date if the aggregate economic value of all distributions authorized to be made to all holders of Allowed Claims on such Interim Distribution Date is less than $20,000.

(c)     <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further Order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in property shall be discharged and forever barred.

**8.**     **<u>Compliance with Tax Requirements and Allocations</u>**

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors and Disbursing Agent reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

**9.**     **<u>Manner of Payment</u>**

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

10. **Setoffs and Recoupment**

The Debtors may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or Reorganized Debtors of any such Claim it may have against such claimant. In no event shall any Holder of Claims or Equity Interests be entitled to recoup any Claim or Equity Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Equity Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

11. **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

12. **Claims Paid or Payable by Third Parties**

(a)     Claims Paid by Third Parties

The Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Reorganized Debtors or the Liquidating Trustee. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a payment or distribution on account of such Claim from a party that is not a Debtor or the Reorganized Debtors or the Liquidating Trustee, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the Reorganized Debtors, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

(b)     Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court. Further, distributions to be made on account of an Allowed 503(b)(9) Administrative Claim and Buyer Assumed Liabilities shall be made, and are payable, by Buyer

pursuant to the Asset Purchase Agreement and the Sale Order. To the extent that Buyer satisfies in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)      <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**13.      Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**G.      PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS**

**1.      Objections**

On and after the Confirmation Date, the Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable (a) shall have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims and (b) shall be permitted to settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**2.      No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan, if any portion of an Administrative Expense Claim or Claim is Disputed, no payment or distribution provided hereunder shall be made on account of such Administrative Expense Claim or Claim unless and until such Disputed Claim or Disputed Administrative Expense Claim becomes Allowed.

**3.      Allowance of Claims and Interests**

Except as expressly provided herein or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date or any date thereafter. All Claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

4. **Estimation of Claims**

The Debtors, the Reorganized Debtors or the Liquidating Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any Contingent Claim, Unliquidated Claim or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or the Reorganized Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Contingent Claim, Unliquidated Claim or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors or the Liquidating Trustee may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

5. **Interest**

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest thereon.

## H.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1. **Assumption or Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that are (1) to be assumed pursuant to the terms of Article VIII of the Plan, (2) identified on the Assumed Executory Contract and Unexpired Lease List, (3) the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Effective Date, or (4) subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections and the assumption of the Executory Contracts or Unexpired Leases listed on the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Section 8.1 of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

2. **Approval of Assumption or Rejection of
Executory Contracts and Unexpired Leases**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the

assumption of the executory contracts and unexpired leases assumed pursuant to Section 8.1 of the Plan and (b) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Section 8.1 of the Plan.

**3.**      <u>**Cure of Defaults**</u>

Any monetary amount by which any executory contract or unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, in accordance with section 365(b)(1) of the Bankruptcy Code, by payment of such amount in Cash, on the Effective Date, or upon such other terms as the parties to such executory contract or unexpired lease may otherwise agree. If a dispute arises regarding (a) the amount of any cure payments required under section 365(b)(1) of the Bankruptcy Code, (b) the ability of the Reorganized Debtor or any assignee thereof to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), the cure payments required under section 365(b)(1) of the Bankruptcy Code, if any, shall be made following the entry of a Final Order resolving such dispute.

**4.**      **Claims Relating to Executory Contracts and**
              <u>**Unexpired Leases Rejected Pursuant to the Plan**</u>

Proofs of Claim for damages arising out of the rejection of an executory contract or unexpired lease must be filed with the Bankruptcy Court and served upon the attorneys for the Debtors on or before the date that is thirty (30) days after the later of (a) the date of service of notice of the Confirmation Date; or (b) the date of service of notice of such later rejection date that occurs as a result of a dispute concerning amounts necessary to cure any defaults (solely with respect to the party directly affected by such rejection). In the event that the rejection of an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their properties or interests in property as agents, successors or assigns.

**5.**      **Modifications, Amendments,**
              <u>**Supplements, Restatements or Other Agreements**</u>

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or rejected shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**6.**      <u>**Indemnification Obligations**</u>

Subject to the occurrence of the Effective Date, the obligations of the Debtors as of the Commencement Date to indemnify, defend, reimburse or limit the liability of directors, officers or employees who are directors, officers or employees of the Debtors on or after the Confirmation Date, respectively, against any claims or causes of action as provided in the Debtors' certificates of

incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, remain unaffected thereby and not be discharged, irrespective of whether such indemnification, defense, reimbursement or limitation is owed in connection with an event occurring before or after the Commencement Date.

## 7. Insurance Policies

Notwithstanding anything contained in the Plan to the contrary, unless specifically rejected by order of the Bankruptcy Court, all of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are continued. Nothing contained in this section shall constitute or be deemed a waiver of any cause of action that the Debtors may hold against any entity, including, without limitation, the insurer, under any of the Debtors' policies of insurance.

## 8. Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contract or Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtors has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## I. CORPORATE GOVERNANCE AND MANAGEMENT OF THE REORGANIZED DEBTORS

### 1. General

On the Effective Date, the management, control and operation of the Reorganized Debtors shall become the general responsibility of the New Board of Reorganized GPH.

### 2. New Organizational Documents

Reorganized GPH shall be deemed to have adopted its New Organizational Documents effective as of the Effective Date. On the Effective Date, or as soon thereafter as practicable, Reorganized GPH shall file its New Organizational Documents, as required or deemed appropriate, with the appropriate Persons in their respective jurisdictions of incorporation or establishment. The New Organizational Documents, to the extent applicable, shall prohibit the issuance of nonvoting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

### 3. New Board of the Reorganized Debtors

On the Effective Date, the operation of Reorganized GPH shall become the general responsibility of the New Board, subject to, and in accordance with, the New Organizational Document. The initial New Board of Reorganized GPH shall consist of [●] members. The initial members of the New Board of Reorganized GPH shall be set forth on Exhibit E to the Plan or as designated by the Prepetition Lenders at or prior to the Confirmation Hearing.

### 4. Officers of the Reorganized Debtors

The initial officers of Reorganized GPH on and after the Effective Date will be identified at or prior to the Confirmation Hearing. Such officers shall serve in accordance with applicable non-bankruptcy law, any employment agreement entered into with Reorganized GPH on or after the Effective Date and the New Organizational Documents.

## J. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### 1. Conditions Precedent to Confirmation

It shall be a condition to the Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X of the Plan:

- The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Prepetition Lenders.

- The Confirmation Order shall:

  - authorize the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan;

  - decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependant;

  - authorize Reorganized GPH to issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements;

  - decree that the Confirmation Order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order;

  - authorize implementation of the Plan in accordance with its terms; and

  - provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the plan of reorganization, including any deeds, bills of sale or assignments executed in connection with any disposition or transfer of assets contemplated by the plan, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

### 2. Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X of the Plan:

- The Confirmation Order, in form and substance acceptable to the Debtors and the Prepetition Lenders, shall have been entered and is a Final Order.

- All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors and the Prepetition Lenders.

- The Debtors shall have received all authorizations, consents and regulatory approvals, if any, that are necessary to implement and effectuate the Plan.

### 3.  Waiver of Conditions

Each of the conditions precedent in Section 10.1 and Section 10.2 of the Plan may be waived, in whole or in part, by the Debtors.  Any such waivers may be effected at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

### 4.  Satisfaction of Conditions

Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  In the event that one or more of the conditions specified in section 10.2 of the Plan have not occurred or otherwise have not been waived pursuant to section 10.3 of the Plan, (a) the Confirmation Order shall be vacated; (b) the Debtors and all holders of Claims and Equity Interests including any Old Common Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred and (c) the Debtors' obligations with respect to Claims, Liens, and Equity Interests shall remain unchanged and nothing contained herein shall constitute or be deemed a waiver or release of any Claims, Liens, or Equity Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## K.  EFFECT OF CONFIRMATION OF THE PLAN

### 1.  Binding Effect

Subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Old Common Interest in, the Debtors and such holder's respective successors and assigns, whether or not the Claim or Old Common Interests including any Old Common Interest of such holder is impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a distribution under the Plan.

### 2.  Discharge of Claims and Termination of Old Common Interests

Except as provided in the Plan, the rights afforded in and the payments and distributions to be made under the Plan shall terminate all Old Common Interests and discharge all existing debts and Claims of any kind, nature or description whatsoever against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and Old Common Interests shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Old Common Interests shall be precluded and enjoined from asserting against the Reorganized Debtors, their successors or assignees or any of their assets or properties, any other or further Claim or Old Common Interest based upon any act or omission, transaction or other activity of any kind or nature that occurred

prior to the Effective Date, whether or not such holder has filed a proof of Claim or proof of Old Common Interest and whether or not the facts or legal bases therefore were known or existed prior to the Effective Date.

### 3. Discharge

Upon the Effective Date, in consideration of the distributions to be made under the Plan and except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Old Common Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Old Common Interests, rights and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Old Common Interest in the Debtors.

### 4. Injunction or Stay

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN OR IN THE CONFIRMATION ORDER, ALL PERSONS OR ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR OLD COMMON INTERESTS IN GRAPHICS PROPERTIES AND ALL OTHER PARTIES IN INTEREST IN THE CHAPTER 11 CASES, ALONG WITH THEIR RESPECTIVE CURRENT AND FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS AND AFFILIATES, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM, IN EACH CASE IN RESPECT OF SUCH CLAIMS OR OLD COMMON INTERESTS (A) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY OF THE REORGANIZED DEBTORS; (B) THE ENFORCEMENT, ATTACHMENT, COLLECTION OR RECOVERY BY ANY MANNER OR MEANS OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST ANY DEBTOR OR REORGANIZED DEBTOR; (C) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST ANY DEBTOR OR REORGANIZED DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF ANY DEBTOR OR REORGANIZED DEBTOR; (D) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE TO ANY DEBTOR OR REORGANIZED DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF ANY REORGANIZED DEBTOR AND (E) PURSUING ANY CLAIM RELEASED PURSUANT TO ARTICLE XI OF THE PLAN, *PROVIDED, HOWEVER*, THAT NOTHING CONTAINED HEREIN SHALL PRECLUDE SUCH ENTITIES FROM EXERCISING THEIR RIGHTS PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN AND THE TERMS OF THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED UNDER OR IN CONNECTION WITH THE PLAN.**

### 5. Injunction Against Interference with the Plan

**UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS AND THEIR RESPECTIVE CURRENT AND FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS AND AFFILIATES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN. EACH HOLDER OF AN ALLOWED CLAIM, BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, SHALL BE DEEMED TO HAVE**

CONSENTED TO THE INJUNCTION PROVISIONS SET FORTH IN SECTION 11.4, SECTION 11.6, AND SECTION 11.7 OF THE PLAN.

6. **Terms of Injunction or Stay**

UNLESS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, ALL INJUNCTIONS OR STAYS IN EFFECT IN THE CHAPTER 11 CASES PURSUANT TO SECTIONS 105 OR 362 OF THE BANKRUPTCY CODE OR ANY ORDER OF THE BANKRUPTCY COURT, AND EXTANT ON THE CONFIRMATION DATE (EXCLUDING ANY INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER) SHALL REMAIN IN FULL FORCE AND EFFECT UNTIL THE EFFECTIVE DATE. ALL INJUNCTIONS OR STAYS CONTAINED IN THE PLAN OR THE CONFIRMATION ORDER SHALL REMAIN IN FULL FORCE AND EFFECT IN ACCORDANCE WITH THEIR TERMS.

7. **Exculpation or Limitation on Liability**

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, AS OF THE EFFECTIVE DATE, NONE OF THE DEBTORS, THE REORGANIZED DEBTORS, THE PREPETITION LENDERS, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, MEMBERS, EMPLOYEES, ACCOUNTANTS, FINANCIAL ADVISORS, INVESTMENT BANKERS, AGENTS, RESTRUCTURING ADVISORS AND ATTORNEYS AND REPRESENTATIVES (BUT SOLELY IN THEIR CAPACITIES AS SUCH) SHALL HAVE OR INCUR ANY LIABILITY FOR ANY CLAIM, CAUSE OF ACTION OR OTHER ASSERTION OF LIABILITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR ARISING OUT OF, THE CHAPTER 11 CASES, THE FORMULATION, DISSEMINATION, CONFIRMATION, CONSUMMATION OR ADMINISTRATION OF THE PLAN, PROPERTY TO BE DISTRIBUTED UNDER THE PLAN OR ANY OTHER ACT OR OMISSION IN CONNECTION WITH THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT OR ANY CONTRACT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT RELATED THERETO; PROVIDED, HOWEVER, THAT THE FOREGOING SHALL NOT AFFECT THE LIABILITY OF ANY PERSON THAT OTHERWISE WOULD RESULT FROM ANY SUCH ACT OR OMISSION TO THE EXTENT SUCH ACT OR OMISSION IS DETERMINED BY A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE DEBTORS AND THE REORGANIZED DEBTORS SHALL, IN ALL RESPECTS, BE ENTITLED TO RELY REASONABLY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN. NOTHING IN SECTION 11.7 OF THE PLAN SHALL LIMIT THE LIABILITY OF THE PROFESSIONAL TO THEIR RESPECTIVE CLIENTS PURSUANT TO THE APPLICABLE ETHICAL RULES.

8. **Releases**

EFFECTIVE AS OF THE CONFIRMATION DATE BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, AND IN CONSIDERATION OF THE SERVICES OF THE PRESENT DIRECTORS, OFFICERS, MEMBERS, EMPLOYEES, AFFILIATES, AGENTS, FINANCIAL ADVISORS, RESTRUCTURING ADVISORS, ATTORNEYS AND REPRESENTATIVES OF OR TO THE DEBTORS WHO ACTED IN SUCH CAPACITIES AFTER THE COMMENCEMENT DATE; (X) THE DEBTORS; (Y) EACH HOLDER OF A CLAIM THAT VOTES TO ACCEPT THE PLAN (OR IS DEEMED TO ACCEPT THE PLAN);

AND (Z) TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AS SUCH LAW MAY BE EXTENDED OR INTEGRATED AFTER THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM THAT DOES NOT VOTE TO ACCEPT THE PLAN, SHALL RELEASE UNCONDITIONALLY AND FOREVER EACH PRESENT DIRECTOR, OFFICER, MEMBER, EMPLOYEE, AFFILIATE, AGENT, FINANCIAL ADVISOR, RESTRUCTURING ADVISOR, ATTORNEY AND REPRESENTATIVE (AND THEIR RESPECTIVE AFFILIATES) OF THE DEBTORS WHO ACTED IN SUCH CAPACITY AFTER THE COMMENCEMENT DATE FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION WHATSOEVER IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF THE CHAPTER 11 CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION THEREOF, THE ADMINISTRATION THEREOF OR THE PROPERTY TO BE DISTRIBUTED THEREUNDER; *PROVIDED*, *HOWEVER*, THAT THE FOREGOING SHALL NOT OPERATE AS A WAIVER OF OR RELEASE FROM ANY CAUSES OF ACTION ARISING OUT OF THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF ANY SUCH PERSON OR ENTITY.

### 9. Avoidance Actions and Objections

Other than any releases granted herein, by the Confirmation Order and by Final Order of the Bankruptcy Court, as applicable, from and after the Effective Date, the Liquidating Trustee shall have the right to prosecute any and all avoidance actions, recovery causes of action and objections to Claims under sections 105, 502, 510, 542 through 551, and 553 of the Bankruptcy Code that belong to the Debtors or Debtors in Possession.

## L. RETENTION OF JURISDICTION BY THE BANKRUPTCY COURT

The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code, including, without limitation, to:

- hear and determine pending applications for the assumption or rejection of Executory Contracts or Unexpired Leases, the allowance of Claims and Administrative Expense Claims resulting therefrom and any disputes with respect to Executory Contracts or Unexpired Leases relating to facts and circumstances arising out of or relating to the Chapter 11 Cases;

- determine any and all adversary proceedings, applications and contested matters;

- hear and determine all applications for compensation and reimbursement of expenses under sections 330, 331 and 503(b) of the Bankruptcy Code;

- hear and determine any timely objections to, or requests for estimation of Disputed Administrative Expense Claims and Disputed Claims, in whole or in part;

- resolve disputes as to the ownership of any Administrative Expense Claim, Claim, or Old Common Interest;

- enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

- issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

- consider any amendments to or modifications of the Plan or to cure any defect or omission, or reconcile any inconsistency, in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

- hear and determine disputes or issues arising in connection with the interpretation, implementation or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated hereby, any agreement, instrument, or other document governing or relating to any of the foregoing or any settlement approved by the Bankruptcy Court;

- hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtors prior to the Effective Date or request by the Reorganized Debtors or the Liquidating Trustee after the Effective Date for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

- hear and determine all disputes involving the existence, scope, nature or otherwise of the discharges, releases, injunctions and exculpations granted under the Plan, the Confirmation Order or the Bankruptcy Code;

- issue injunctions and effect any other actions that may be necessary or appropriate to restrain interference by any person or entity with the consummation, implementation or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

- determine such other matters and for such other purposes as may be provided in the Confirmation Order;

- hear and determine any rights, Claims, or causes of action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal or state statute or legal theory;

- recover all assets of the Debtors and property of the Debtors' estates, wherever located;

- enter a final decree closing the Chapter 11 Cases; and

- hear any other matter not inconsistent with the Bankruptcy Code.

This list of matters over which the Bankruptcy Court will retain exclusive jurisdiction following the confirmation is not exhaustive.

## M.  MISCELLANEOUS PROVISIONS

### 1.  Immediate Binding Effect

Subject to Article X of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

## 2. **Additional Documents**

On or before the Effective Date, the Debtors or the Reorganized Debtors, with the consent of the Prepetition Lenders, may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Equity Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

## 3. **Preservation of Causes of Action**

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article XIII of the Plan and to the extent that such Avoidance Actions are not transferred to the Liquidating Trust and contributed to the Liquidating Trust, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including Avoidance Actions and the ATI Litigation, whether arising before or after the Commencement Date, including any actions specifically enumerated in Exhibit B to the Plan, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action, including the ATI Litigation, against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors or the Liquidating Trust, as applicable, reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, or the Liquidating Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

Attached as Exhibit E hereto is a list of the potential defendants to the Avoidance Actions. This list is being provided for purposes of disclosure only, and may not include all potential defendants against which the Debtors may bring an Avoidance Action (as defined in the Plan), and may not reflect the actual amounts that the Debtors may seek to recover from such potential defendants.

4.      **Preservation of Avoidance Actions**

On and after the Effective Date, any and all Avoidance Actions shall be preserved and retained by the Reorganized Debtors or the Liquidating Trust to the extent an Avoidance Action is transferred by the Debtors thereto, as applicable, which shall have the exclusive right, as applicable, to enforce, settle, release, abandon, or prosecute any such Avoidance Actions.  Any recovery received on account of an Avoidance Action transferred to the Liquidating Trust will be the sole property of the Liquidating Trust and is subject to the terms and conditions of the Liquidating Trust Agreement.  Reorganized GPH may offset any claim supporting an Avoidance Action against any payment or Distribution due to any Holder of a Claim under the Plan.  In addition, if a Distribution is made in error, the Reorganized Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such Distribution.

5.      **Section 1145 Exemption**

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the: (i) New Common Stock as contemplated by Section 4.5 of the Plan to Class 5; (ii) Beneficial Interests as contemplated by Article IV of the Plan to Classes 3, 4, 5, and 6, respectively, shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  In addition, under section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable by the recipients thereof, subject to  the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the Shareholders Agreement, and any restrictions that may be set forth in the New Organizational Documents.

6.      **Section 1146 Exemption**

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

7.      **Payment of Statutory Fees**

All fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Liquidating Trust in accordance therewith until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

8.      **Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan or the Disclosure Statement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

9.     **Modifications and Amendments**

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Prepetition Lenders, reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, with the consent of the Prepetition Lenders, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, with the consent of the Prepetition Lenders, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article XIII.

10.     **Effect of Confirmation on Modifications**

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

11.     **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of such Entity.

12.     **Service of Documents**

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

Graphics Properties Holdings, Inc.
**[Notice Information]**
Attn: [counsel]

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

13.     **Entire Agreement**

Except as otherwise indicated, the Plan shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

14.  **Exhibits**

All exhibits and documents attached hereto are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims, and balloting agent, Donlin Recano, or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

15.  **Nonseverability of Plan Provisions**

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

16.  **Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

17.  **Closing of Chapter 11 Cases**

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

18.  **Waiver or Estoppel**

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, the Agent or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers filed with the Bankruptcy Court prior to the Confirmation Date.

19. **Conflicts**

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

20. **Post-Confirmation Reporting**

The Reorganized Debtors shall file reports of their respective activities and financial affairs with the Bankruptcy Court on a quarterly basis, within thirty (30) days after the conclusion of each such period. Any such reports shall be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and U.S. Trustee guidelines for such matters.

ARTICLE V

**CONFIRMATION OF THE PLAN OF REORGANIZATION**

A. **THE CONFIRMATION HEARING**

The Confirmation Hearing will be held on **[●], 2009, at 10:00 a.m.** (Prevailing Eastern Time) before the Honorable Martin Glenn, Room 501, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton House, One Bowling Green, New York, New York 10004, pursuant to section 1128(a) of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made in open court at the Bankruptcy Court or as indicated in a notice of agenda filed with the Bankruptcy Court.

B. **DEADLINE TO OBJECT TO CONFIRMATION**

Any party-in-interest may object to the confirmation of the Plan pursuant to section 1128(b) of the Bankruptcy Code. Objections must be filed and served so as to be actually received on or before **[●], 2009, at 5:00 p.m. (Prevailing Eastern Time)** in accordance with the notice of the confirmation hearing that accompanies this Disclosure Statement. **UNLESS OBJECTIONS TO CONFIRMATION OF THE PLAN ARE TIMELY SERVED AND FILED, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

C. **REQUIREMENTS FOR CONFIRMATION
OF THE PLAN UNDER THE BANKRUPTCY CODE**

Among the requirements for the confirmation of the Plan are that the Plan (i) is accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (ii) is feasible, and (iii) is in the "best interests" of holders of claims and equity interests that are impaired under the Plan.

1. **Requirements of Section 1129(a) of the Bankruptcy Code**

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization:

- The plan and the proponents of the plan comply with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

- The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

- With respect to each Holder within an impaired class of claims or equity interests —

  - each such Holder (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such Holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

  - if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class due to its election to retain a lien, each Holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such Holder's interest in the Estate's interest in the property that secures such claims.

- With respect to each class of claims or equity interests, such class (i) has accepted the plan; or (ii) is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the Holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

  - with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the Holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim, unless otherwise agreed;

  - with respect to a class of claim of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of the Bankruptcy Code, each Holder of a claim of such class will receive (i) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

  - with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the Holder of such claim will receive on account of such claim regular

installment payments in cash, over a period ending not later than five years after the petition date, of a total value, as of the effective date of the plan, equal to the allowed amount of such claim.

- If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any "insider," as defined in section 101 of the Bankruptcy Code.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(i)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

## 2.        Best Interests of Creditors

To confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a claim or interest in any impaired class that has not voted to accept the Plan, notwithstanding the acceptance of the Plan by such impaired class. Accordingly, if an impaired class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides each member of such impaired class with a recovery on account of the member's claim or equity interest that has a value, as of the effective date of the Plan, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired class would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each Chapter 11 Case was converted to a chapter 7 case under the Bankruptcy Code and each Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to holders of priority tax claims, priority claims, general unsecured claims, and equity interests would be reduced by, among other things: (a) claims of secured creditors to the extent of the value of their collateral; (b) costs, fees, and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases; (c) unpaid administrative expense claims of the Chapter 11 Cases; and (d) additional priority claims and priority tax claims.

Based on the Liquidation Analysis set forth in Exhibit D attached hereto, the Debtors believe that Holders of Claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a chapter 7 liquidation. Moreover, in an actual liquidation of the Debtors, distributions to Holders of Claims would be made substantially later than the Effective Date designated in the Plan. This delay would materially reduce the amount determined on a present value basis available

for distribution to Holders of Claims. The hypothetical chapter 7 liquidations of the Debtors, for purposes of determination of the Debtors' Liquidation Value, are assumed to commence on [●], 2009.

In summary, the Debtors and their management believe that chapter 7 liquidations of the Debtors would result in substantial diminution in the value to be realized by Holders of Claims entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- the increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee;

- additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation of the Debtor;

- the erosion of the value of the Debtors' assets in the context of an expedited liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail;

- the cost and expense attributable to the time value of money resulting from a potentially more protracted chapter 7 proceeding than the estimated length of the Chapter 11 Cases; and

- the application of the rule of absolute priority under the Bankruptcy Code to distributions made in a chapter 7 liquidation.

Consequently, the Debtors and their management believe that confirmation of the Plan will provide a substantially greater return to Holders of Claims than a chapter 7 liquidation.

If the Plan is not confirmed, the Debtors may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, the Debtors' assets may be sold in an orderly fashion over a more extended period of time than in liquidations under chapter 7, providing for larger potential recoveries. However, any distribution to Holders of Claims under a chapter 11 liquidating plan would likely be substantially delayed, resulting in lower present values received and higher administrative costs. Because a chapter 11 case does not require the appointment of a trustee, expenses for professional fees could be lower than in a chapter 7 case, in which a chapter 7 trustee must be appointed. Accordingly, the Debtors believe that a chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

**3.**     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires the Bankruptcy Court to find that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtors, or any successor to the debtors under the plan (unless such liquidation or reorganization is proposed in the plan).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Sources and Uses of Cash on the Effective Date, as set forth in Exhibit C hereto. Upon emergence from the Plan, the Reorganized Debtors will have a de-leveraged capital structure with virtually no debt obligations, and should therefore have sufficient cash flow and availability to fund their operations. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements of the Bankruptcy Code.

4.      **Acceptance by Impaired Classes**

Section 1126(c) of the Bankruptcy Code provides that an impaired class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.

5.      **Requirements of Section 1129(b) of the Bankruptcy Code**

The Bankruptcy Code permits a plan of reorganization to be confirmed, even if it is not accepted by each impaired class, so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation; (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class; and (c) the plan of reorganization is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted such plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

(a)      "Fair and Equitable"

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors, and equity interest Holders as follows:

(i)      *Secured Creditors*

A plan is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (i) that each Holder of a secured claim in the rejecting class (A) retains the liens securing its claim, to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such Holder's interest in the Estate's interest in such property; (ii) that each Holder of a secured claim in the rejecting class realizes the "indubitable equivalent" of such claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claim, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

(ii)      *Unsecured Creditors*

A plan is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that: (i) each Holder of an unsecured claim in the rejecting class receives or retains on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the Holders of claims and equity interests that are junior to the unsecured claims in the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

(iii)      *Holders of Equity Interests*

A plan is fair and equitable as to an impaired class of equity interests that rejects the plan if the plan provides that: (i) each Holder of an equity interest in the rejecting class receives or retains on account of such interest property of a value, as of the effective date of the plan of reorganization, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such Holder is entitled, (B) any fixed redemption price to which such Holder is entitled, or (C) the value of the equity

interest; or (ii) the Holder of any equity interest that is junior to the equity interests in the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe the Plan is fair and equitable as to Holders of Claims or Old Common Interests in Classes that vote to reject the Plan, or that are deemed to reject the Plan, because the Plan provides that such Holders will receive their entitlements under the "absolute priority" rule of the Bankruptcy Code. Holders of Old Common Interests will not receive or retain any property under the Plan on account of such Old Common Interests, and there are no Classes junior to the Holders of Old Common Interests.

        (b)    "Unfair Discrimination"

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or equity interests.

The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## ARTICLE VI

## SUMMARY OF LEGAL PROCEEDINGS[9]

Because of the size and nature of the Debtors' businesses prior to the Sale, the Debtors are party to numerous legal proceedings. Most of these legal proceedings arose in the ordinary course of the Debtors' businesses and involve claims for money damages. Whether these claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the claims and the debt arising therefrom.

In general, if the Debtors incurred the debt underlying such claims prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the claim is liquidated and resolved before or after the Effective Date. Claims arising from conduct occurring after the Effective Date, unless provided for under the Plan, are typically not dischargeable through bankruptcy, and will be handled by the Debtors in the ordinary course of their businesses after emergence.

---

[9] This summary is not intended as an exhaustive description of all pending legal matters or proceedings in which the Debtors are involved. Certain legal proceedings may be subject to appeal in or outside the Bankruptcy Court. Nothing in this discussion is deemed to be an admission by the Debtors of any liability or wrongdoing. Please consult the Debtors' Schedule of Liabilities and Statement of Financial Affairs, which were filed with the Bankruptcy Court on April 21, 2009, for additional information.

## A.    LEGAL PROCEEDINGS IN THE BANKRUPTCY COURT

### 1.    Avoidance Actions

A number of transactions occurred prior to the Commencement Date that may have given rise to claims or causes of action, including, without limitation, preference actions, fraudulent transfer and conveyance actions, and rights of setoff under sections 510, 544, 545, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law (collectively, the "Avoidance Actions").  Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on April 1, 2011, *i.e.,* two years after the Petition Date.

### 2.    Preference Actions

Under sections 547 and 550 of the Bankruptcy Code, a debtor in possession may seek to avoid and recover certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under chapter 7 of the Bankruptcy Code where the transfer had not been made.  Generally, transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions only if the payment was made within 90 days prior to the filing of the petition under chapter 11 of the Bankruptcy Code (the "Preference Period").

Under section 547 of the Bankruptcy Code, certain defenses are available to a creditor from which a preference recovery is sought.  For example, a debtor may not recover a payment (i) to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not, among other things, make an otherwise unavoidable transfer to or for the benefit of the creditor; (ii) to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor; and (iii) if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor.  The debtor has the initial burden of proof to establish the elements of a preference and is presumed to be insolvent during the Preference Period, while the creditor has the initial burden of proof as to its defenses.

### 3.    Fraudulent Transfer and Conveyance Actions

Generally, a conveyance or transfer is fraudulent if (i) it was made with the actual intent to hinder, delay or defraud a creditor (*i.e.*, an intentional fraudulent conveyance); or (ii) the transferee did not receive reasonably equivalent value in exchange for the transfer and the debtor was insolvent at the time of the transfer, was rendered insolvent as a result of the transfer, or was left with insufficient capitalization as a result of the transfer (*i.e.*, a constructive fraudulent conveyance).  Two primary sources of fraudulent conveyance law exist in a chapter 11 case.

### (a)    Section 548 of the Bankruptcy Code

The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code, under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers made or incurred on or within one year before the date that a bankruptcy case is filed.

### (b)    Section 544 of the Bankruptcy Code

The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code—the so-called "strong-arm provision"—under which a debtor in possession (or creditors with the permission of the Bankruptcy Court) is given the rights of a creditor under state law to avoid transfers as fraudulent. Generally, state fraudulent conveyance laws are applicable in a bankruptcy proceeding if the state statute of limitations (which are usually longer than one year) with respect to a transfer has not expired prior to the filing of the bankruptcy case. If such statute of limitations has not expired, the debtor in possession (or creditors with permission of the Bankruptcy Court) may bring an action for fraudulent conveyance within the time period permitted by section 546 of the Bankruptcy Code, notwithstanding whether the state statute of limitations period expires prior to the expiration of such time.

**B.     PENDING LEGAL PROCEEDINGS OUTSIDE THE BANKRUPTCY COURT**

**1.     ATI Litigation**

On October 23, 2006, Graphics Properties filed a patent infringement lawsuit against ATI Technologies, Inc. ("ATI") in the United States District Court, Western District of Wisconsin. In the complaint, which was subsequently amended, Graphics Properties asserted that ATI's line of Radeon® products infringed its U.S. Patent No. 6,650,327. The complaint sought unspecified damages and a court ordered injunction against future infringement by ATI.

In late 2006, Advanced Micro Devices, Inc. ("AMD") announced the completion of its acquisition of ATI. On November 30, 2006, Graphics Properties filed an amended complaint to add (i) counts against ATI for infringing two additional patents, U.S. Patent No. 6,292,200 and U.S. Patent No. 6,885,376, and (ii) ATI Technologies ULC and Advanced Micro Devices, Inc. as defendants (collectively with ATI, the "ATI Defendants"). The ATI Defendants filed answers to the complaint on December 1, 2006, and to the amended complaint on December 14, 2006. On January 30, 2008, the Court granted certain parts of the ATI Defendants' motion for summary judgment, and, on February 8, 2008, a jury entered its verdict on the remaining issues. The net result was a finding that the contested patent was valid, but that Graphics Properties was not entitled to recovery from the ATI Defendants for infringement on any of the claims.

Although the period to appeal has been stayed pending decision on post-trial motions, the ATI Defendants filed a protective Notice of Appeal on April 24, 2008. On May 2, 2008, Graphics Properties also filed a protective Notice of Appeal. On August 12, 2009, the Bankruptcy Court lifted the automatic stay pursuant to section 362 of the Bankruptcy Code to allow both the appeals by Graphics Properties and the ATI Defendants to move forward in the ordinary course. The Debtors are currently waiting for oral arguments to be scheduled in the United States Court of Appeals for the Federal Circuit.

**2.     Other Legal Proceedings**

The Debtors are involved in various claims and legal actions arising in the ordinary course of business. However, the Debtors do not believe that the ultimate disposition of these ordinary course claims and legal actions will have a material adverse effect on the Debtors' consolidated financial position or confirmation of the Plan. For additional information regarding pending claims and legal actions, see Graphics Properties' Schedule of Liabilities and Statement of Financial Affairs, which were filed with the Bankruptcy Court on April 21, 2009.

## ARTICLE VII

## RISK FACTORS

*Holders of claims and interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to, or incorporated by reference herein, prior to voting to accept or reject the Plan. These risk factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

**There is a risk that that not all Classes will vote to accept the Plan, and the Debtors' ability to confirm the Plan will depend on meeting the "cram-down" standard of section 1129(b) of the Bankruptcy Code.**

The Plan provides treatment for each Class as described in "Treatment of Claims and Equity Interests in the Debtors," which begins on page 16. Each Class entitled to vote must vote on the plan. In the event a class of Claims does not agree to the treatment provided in the Plan, the Debtors will seek to confirm the Plan over their objection pursuant to section 1129(b) of the Bankruptcy Code. The Bankruptcy Court determines whether or not the Debtors meet the requirements of section 1129(b) for purposes of confirmation of the Plan.

The Plan provides that Holders of Priority Claims and Priority Tax Claims will receive, respectively, their pro rata shares of Priority Claim Trust Interests and Priority Tax Claim Trust Interests, because the Debtors lack sufficient funds to pay all Priority Claims and Priority Tax Claims in accordance with section 1129(a)(9) of the Bankruptcy Code. Pursuant to the Disclosure Statement Order, each Holder of a Priority Claim and Priority Tax Claim shall be deemed to consent to the treatment of its Claim under the Plan, unless such Holder submits a Ballot and opts out of such treatment on such Ballot (an "Opt Out Holder"). If an overly large number of holders of Priority Claims and Priority Tax Claims choose to opt out of their treatment under the Plan, and the Debtors are unable to pay each Opt Out Holder in accordance with section 1129(a)(9) of the Bankruptcy Code, the Debtors may be unable to confirm the Plan.

**The conditions precedent to the confirmation and consummation of the plan may not occur.**

As more fully set forth in the Plan, the confirmation of the Plan and the Effective Date of the Plan are each subject to a number of conditions precedent. If the conditions precedent to confirmation are not met or waived, the Plan will not be confirmed; and if the conditions precedent to the Effective Date are not met or waived, the Effective Date will not take place.

In the event that the Plan is not confirmed or does not become effective, the Debtors will be forced to liquidate all assets and distribute the proceeds to the holders of Prepetition Credit Agreement Secured Claims. There would be a significantly reduced recovery for the holders of Prepetition Credit Agreement Secured Claims, as compared to the recovery shown on page 4, and no recovery for holders of Priority Tax Claims, Priority Claims, and General Unsecured Claims. For more information on the consequences of a liquidation scenario, see "Best Interests of Creditors," which begins on page 49, and the Liquidation Analysis attached as Exhibit D hereto.

**The actual amount of Allowed Claims may differ from the estimated Claims set forth in this Disclosure Statement and adversely affect the percentage recovery of Claims.**

The estimated Claims set forth in the Disclosure Statement are based on various assumptions, and actual amount of Allowed Claims may differ significantly from these estimates. Such differences may materially and adversely affect, among other things: the percentage recoveries to holders of Allowed Claims under the Plan, and the Debtors' need to incur additional debt or enter into other financing.

The Bar Date for all non-governmental creditors to file prepetition Claims against the Debtors was June 23, 2009, and for government entities is September 28, 2009. As of June 23, 2009, the Debtors have received over 300 proofs of claim. The Debtors estimate that, for each of Classes 3, 4, 5, and 6, the aggregate asserted value of Claims, number of proofs of claim filed in unliquidated amounts, and number of proofs of claim are as follows:[10]

| Class | Designation | Aggregate Asserted Value of Claims[11] | Number of Unliquidated Claims | Number of Proofs of Claim[12,13] |
|-------|-------------|----------------------------------------|-------------------------------|----------------------------------|
| 3 | Priority Tax Claims | $1,176,313 | 3 | 22[14] |
| 4 | Priority Claims | $1,194,013 | 1 | 116 |
| 5 | Prepetition Credit Agreement Secured Claims | $[●] | 0 | 1 |
| 6 | General Unsecured Claims | $101,207,476 | 7 | 469 |

The Debtors have begun to review and analyze the claims and have and will file appropriate objections in due course in an attempt to reduce the total amount of Priority Tax Claims, Priority Claims, and General Unsecured Claims. There can be no assurance that the Debtors will be able to do so. In addition, because holders of Claims in Classes 3, 4, 5, and 6 share pro rata in the Liquidating Trust (as described in the Plan), such holders could have their recoveries diluted in the event that Disputed Claims

---

[10] Excluded from this chart are claims disallowed and expunged pursuant to the Order Granting Debtors' First Omnibus Objection to Certain Proofs of Claim, dated August 12, 2009 [Docket No. 601] or withdrawn. Proofs of claim subject to a settlement were included in the settled amounts.

[11] For purposes of the disclosure in this chart only, the aggregate asserted values of claims include the estimated values of unliquidated claims.

[12] For purposes of the disclosure in this chart only, each Proof of Claim that asserted (i) an amount entitled to priority status and (ii) an amount entitled to unsecured status was counted as two separate Proofs of Claim: one asserting the priority amount and a second asserting the unsecured amount.

[13] On August 14, 2009, the Debtors filed their Second Omnibus Objection to Certain Proofs of Claim [Docket No. 609] (the "Second Omnibus Objection"), which is scheduled to be heard at the omnibus hearing on September 15, 2009. The disposition by the Bankruptcy Court of the Second Omnibus Objection may affect the total amount and number of Proofs of Claim.

[14] Because the Bar Date for governmental entities has not yet passed, the number of Proofs of Claim in this category may be subject to change.

or Claims currently asserted in contingent unliquidated amounts become Allowed Claims in excess of the amounts estimated by the Debtors in calculating the estimated recoveries described herein.

**A liquid trading market for the New Common Stock is unlikely to develop.**

A liquid trading market for the New Common Stock is unlikely to develop. As of the Effective Date of the Plan, the New Common Stock will not be listed for trading on any stock exchange or other trading system and Reorganized GPH will not file any reports with the SEC. Consequently, the liquidity of the New Common Stock will be limited. The future liquidity of the trading market for the New Common Stock will depend, among other things, upon the number of stockholders, whether the stock is listed for trading on an exchange, and whether Reorganized GPH becomes a public reporting company at some later date.

**Holders of Prepetition Credit Agreement Secured Claims will acquire control of the Reorganized Debtors upon Consummation of the Plan.**

Under the Plan, holders of the Prepetition Credit Agreement Secured Claims will own all of the New Common Stock. As a result of this concentration of equity, the Reorganized Debtors will become a closely held private company. These holders will exercise a controlling influence over the business and affairs of the Reorganized Debtors, and all matters requiring the vote or approval of holders of any of such securities, including the power to elect directors and approve significant mergers, other material corporate transactions, or the sale of all or substantially all of the assets of the Reorganized Debtors.

**Certain tax consequences of the Plan raise unsettled and complex legal issues and involve various factual determinations.**

Certain material consequences of the Plan regarding United States federal income taxes are summarized under "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 61. Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. No ruling from the U.S. Internal Revenue Service ("IRS") or opinion of counsel has been or will be sought by the Debtors regarding the tax consequences described in this Disclosure Statement. The IRS may object to or challenge the various positions that the Debtors have taken, or intend to take, with respect to their tax treatment, and a court may sustain such a challenge or objection.

**The ability of the Debtors to utilize their federal tax net operating loss carryforwards following the reorganization may be subject to significant limitations, and transfers of the Debtors' equity or any issuances of equity after the reorganization may impair the Debtors' ability to utilize their federal income tax net operating loss carryforwards in the future.**

As discussed further under "Certain U.S. Federal Income Tax Consequences of the Plan," which begins on page 61, it is anticipated that the issuance of the New Common Stock pursuant to the Plan will result in an ownership change of the Company within the meaning of Section 382 of the Tax Code. An ownership change generally will result in an annual limitation on a corporation's ability to use its net operating loss carryforwards and certain other tax attributes. In general, the annual limitation for a corporation that undergoes an ownership change pursuant to a plan of reorganization in a title 11 case would be equal to the product of (i) the value of the loss corporation's outstanding stock immediately after the ownership change (taking into account any increase in the value of the corporation resulting from any surrender or cancellation of creditors' claims and possibly certain other adjustments) and (ii) the "long-term tax exempt rate" published by the IRS for the month in which the ownership change occurs (although if the loss corporation fails to continue its historic business or to use a significant portion of its

business assets in a business for two years after the ownership change, the annual limitation would be zero). However, there is an exception pursuant to Section 382(l)(5) of the Tax Code under which no annual limitation will apply when shareholders and qualified creditors of the debtor receive at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed title 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but are reduced by the amount of any interest deductions claimed during the three taxable years prior to and including the reorganization in respect of the debt that is converted into stock of the corporation.

The Debtors have not determined whether they will be eligible for, and will choose to be governed by, the Section 382(l)(5) exception. Moreover, even if the Section 382(l)(5) would otherwise apply, the Debtors will not be able to avail themselves of the exception to use their net operating loss carryforwards following the reorganization if they fail to qualify as carrying on more than an insignificant amount of an active trade or business during and subsequent to the title 11 case. Finally, if the Section 382(l)(5) exception does apply, any further ownership change of the debtor within a two-year period will not be eligible for Section 382(l)(5) of the Tax Code, and the annual Section 382 limitation for the Debtors utilization of any pre-change loss carryforwards at the time of the subsequent ownership change against future taxable income will be zero.

**No distributions may be made from the Liquidating Trust if the Debtors or the Liquidating Trustee are not successful in the applicable litigation.**

The causes of action held by the Liquidating Trust or to which the Liquidating Trust is entitled to the proceeds therefrom, may not be successful and there is no guarantee that the trust will ever make distributions to the holders. Because interests in the Liquidation Trust are the only consideration being distributed to holders of Priority Tax Claims, Priority Claims, and General Unsecured Claims, there is a possibility that such holders will not receive any recovery.

## ARTICLE VIII

## IMPORTANT SECURITIES LAW DISCLOSURE

**Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Pursuant to Exemptions under the Securities Act of 1933, as Amended**

Under the Plan, shares of New Common Stock will be distributed to holders of Prepetition Credit Agreement Secured Claims.[15] The Debtors will rely on section 1145 of the Bankruptcy Code to exempt the offer and distribution of New Common Stock from the registration requirements of the Securities Act and state securities laws, as contemplated by Section 13.5 of the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of a security of a debtor under a plan of reorganization from registration under section 5 of the Securities Act and state or local laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash.

---

[15] Interests in the Liquidating Trust will be credited to holders of Priority Tax Claims, Priority Claims, and General Unsecured Claims. The Debtors do not believe such interests are securities as defined under applicable securities law; however, to the extent that such interests are viewed to be securities for distribution purposes, then the Debtors would also rely on Section 1145(a)(1) of the Bankruptcy Code for the purpose of distributing the interests in the Liquidating Trust.

In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan for the holders of such securities;

- offers to buy securities offered or sold under the plan from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

- is an "issuer" with respect to the securities, as such term is defined in section 2(a)(11) of the Securities Act.

Under section 2(a)(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive New Common Stock are deemed to be "underwriters," resales by such persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell New Common Stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below, or any other applicable exemption from the registration requirements under the Securities Act.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

Under certain circumstances, holders of New Common Stock who are deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions require (i) current public information with respect to the issuer to be available, (ii) a limitation as to the amount of securities that may be sold, (iii) the securities to be sold in a "brokers transaction" or in a transaction directly with a "market maker," and (iv) notice of the resale to be filed with the SEC. As noted in this Disclosure Statement, it is not contemplated that Reorganized GPH will be a public reporting company and, therefore, it is unlikely in the period initially following the Effective Date that current public information will be available to permit resales pursuant to Rule 144.

Whether or not any particular person would be deemed to be an "underwriter" with respect to New Common Stock to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving New Common Stock under the Plan would be an "underwriter" with respect to such New Common Stock.

Given the complex and subjective nature of the question of whether a particular holder may be an underwriter, the Debtors make no representation concerning the right of any person to trade in New Common Stock. The Debtors recommend that potential recipients of New Common Stock consult their own counsel concerning whether they may freely trade the New Common Stock without compliance with the Securities Act, the Exchange Act, or similar state or federal laws.

## ARTICLE IX

## SPECIAL VOTING INSTRUCTIONS

With respect to the Prepetition Credit Agreement Claims, the Debtors will deliver ballots to Nominees (as defined in the Disclosure Statement Order attached as <u>Exhibit B</u> hereto), who shall deliver the ballot and other documents relating to the Plan, including this Disclosure Statement, to each Beneficial Holder (as defined in the Disclosure Statement Order) for which they serve as Nominee.

A Nominee has two options with respect to voting. Under the first option, the Nominee will forward the solicitation package, including the ballot, to each Beneficial Holder for voting within three (3) Business Days after its receipt of such materials, including a return envelope provided by and addressed to the Nominee so that the Beneficial Holder may submit the completed Beneficial Holder ballot to the Nominee. Upon receipt of the ballots, the Nominee will summarize the individual votes of its respective Beneficial Holders on the appropriate Master Ballot (as defined in the Disclosure Statement Order) and then return the Master Ballot to the Voting Agent on or before the voting deadline on **[●], 2009, at 5:00 p.m. (Prevailing Eastern Time)**.

Under the second option, if the Nominee elects to "prevalidate" ballots:

- the Nominee shall forward the (a) solicitation package, (b) an individual ballot that has been prevalidated as described below, and (c) a return envelope provided by and addressed to the Voting Agent to the Beneficial Holder within three (3) business days of the receipt by such Nominee of the solicitation package;

- to "prevalidate" a ballot, the Nominee shall complete and execute the ballot (other than items 1 and 3) and indicate on the ballot the name of the registered Holder, the amount of the Prepetition Credit Agreement Claims held by the Nominee for the Beneficial Holder, and the account number(s) for the account(s) in which such securities are held by the Nominee; and

- for its vote to be counted, the Beneficial Holder shall return the prevalidated ballot to the Voting Agent on or before the voting deadline on [●], 2009, at 5:00 p.m. (Prevailing Eastern Time).

If a Master Ballot is received after the voting deadline, the votes and elections on such Master Ballot will not be counted. The method of delivery of a Master Ballot to be sent to the Voting Agent is at the election and risk of the Nominee. Except as otherwise provided in this Disclosure Statement, the Master Ballot must actually received by the Voting Agent to be deemed delivered. It is recommended that such entities use an overnight or hand delivery service and sufficient time be allowed to assure timely delivery. No ballot should be sent to the Debtors or their financial or legal advisors, but only to the Voting Agent as set forth under "How do I vote for or against the Plan?" in the "Questions and Answers Regarding this Disclosure Statement and the Plan," which begins on page 3.

Nominees must provide appropriate information for each item on the Master Ballot, including, without limitation, identifying the votes to accept or reject the Plan.

By returning a Master Ballot, each Nominee will certify to the Debtors and the Bankruptcy Court, among other things, that:

- it has received a copy of the Disclosure Statement and other solicitation materials attached thereto, and delivered the same to the Beneficial Holders such Nominee represents;

- it has received a completed and signed ballot from each Beneficial Holders whose vote is reflected on such Master Ballot;

- it is a bank, broker, or other nominee (or agent thereof) for its respective Beneficial Holders of the Prepetition Credit Agreement Secured Claims identified on such Master Ballot;

- it has properly disclosed the (a) customer account, serial number and/or other identification number for the Beneficial Holder, (b) amount of Prepetition Credit Agreement Claims held by the Beneficial Holder, and (c) Beneficial Holder's respective vote, if any, concerning the Plan;

- each Beneficial Holder has certified to the Nominee that such Beneficial Holder has not submitted any other ballots for such Claims held in other accounts or other names, or, if it has submitted another ballot held in other accounts or names, that the Beneficial Holder has certified to the Nominee that such Beneficial Holder has cast the same vote for such claims, and the undersigned has identified such other accounts or owner and such other ballots; and

- it has been authorized by such Beneficial Holder to vote on the Plan.

Each Master Ballot must be returned in sufficient time to allow it to be <u>received</u> by the Voting Agent by no later than the voting deadline on **[●], 2009, at 5:00 p.m. (Prevailing Eastern Time)**.

**ARTICLE X**

**CERTAIN U.S. FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN**

<u>CIRCULAR 230 DISCLOSURE</u>: ANY U.S. TAX ADVICE CONTAINED HEREIN (A) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED IN THIS DISCLOSURE STATEMENT, AND (B) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING U.S. TAX PENALTIES.  EACH HOLDER OF CLAIMS SHOULD SEEK ADVICE BASED ON THE HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

The following is a discussion of certain significant federal income tax considerations of the Plan under the Tax Code. This discussion is limited to certain tax considerations for Holders of Claims that are U.S. Holders and that hold their Claims as capital assets (generally, property held for investment within the meaning of Section 1221 of the Tax Code) and will hold the New Common Stock or Beneficial Interests, as applicable, as capital assets.  A "<u>U.S. Holder</u>" means a beneficial owner of a Claim that is, for U.S. federal income tax purposes:

- an individual citizen or resident of the U.S., including an alien individual who is a lawful permanent resident of the U.S. or who meets the "substantial presence" test under Section 7701(b) of the Tax Code;

- a corporation or other entity taxable as a corporation for U.S. federal income tax purposes created or organized in the U.S. or under the laws of the U.S., any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income tax regardless of its source;

- or a trust, if (i) a U.S. court can exercise primary supervision over the administration of the trust and one or more United States persons (within the meaning of the Tax Code) have the authority to control all substantial trust decisions or (ii) a valid election is in place to treat the trust as a United States person.

This general discussion does not address all aspects of U.S. federal income tax that may be relevant to a Holder of Claims in light of such Holder's specific circumstances, or to certain types of Holders of Claims subject to special treatment under the federal income tax laws, including but not limited to (i) banks, financial institutions, insurance companies, expatriates or former long-term residents of the United States, Holders subject to the alternative minimum tax, individual retirement accounts or other tax-deferred accounts, tax-exempt organizations, regulated investment companies, real estate investment trusts, insurance companies, employee stock ownership plans, brokers, dealers in securities or currencies, partnerships or other pass-through entities, (ii) Holders who hold Claims or who will hold the New Common Stock or Beneficial Interests as part of a straddle, hedge, conversion transaction or other integrated investment, (iii) Holders whose functional currency is not the U.S. dollar and (iv) Holders who use the mark-to-market method of accounting. In addition, this discussion does not address state, local or foreign taxes, or estate or gift tax issues. Finally, this discussion does not address the tax consequences of actions that might be taken on or after the Effective Date by Holders with respect to New Common Stock received pursuant to the Plan (such as causing the Debtors to make distributions to the holders of New Common Stock), including actions that might be integrated for federal tax purposes with and thereby affect the tax consequences of the transactions contemplated by the Plan.

This discussion is based upon laws, regulations, rulings and decisions now in effect and upon proposed regulations all of which are subject to change (possibly with retroactive effect). No opinion of counsel has been sought or obtained with respect to the federal income tax consequences of the Plan and no tax opinion is given by this Disclosure Statement. No rulings or determination from the IRS or any other taxing authorities have been obtained or sought with respect to the Plan, and the description below is not binding on the IRS or such other taxing authorities. With respect to some of the federal income tax consequences discussed herein, the tax law is unclear. Accordingly, it is possible that the IRS will disagree with the description of the tax consequences, and there can be no certainty that the IRS would not prevail in any challenge it may decide to make in that regard.

FOR THE FOREGOING REASONS, ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS AS TO THE SPECIFIC TAX CONSEQUENCES (FOREIGN, FEDERAL, STATE AND LOCAL) OF THE PLAN TO THEM. THE DEBTORS ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE CONFIRMATION AND CONSUMMATION OF THE PLAN AS TO THE DEBTORS OR TO ANY SPECIFIC HOLDER OF A CLAIM.

## A.     TAX CONSEQUENCES TO THE COMPANY

The Debtors estimated that they had a net operating loss ("NOL") carryover for federal income tax purposes of over $1.3 billion as of April 1, 2009. The Debtors expect that they derived taxable income after April 1, 2009, primarily in connection with the Sale, and thus expect that their NOL

carryovers will be reduced by that taxable income. The amount of such NOL carryovers and other loss carryforwards remains subject to adjustment by the IRS and may be subject to limitations. Moreover, as discussed below, the NOL carryovers and certain other tax attributes of the Debtors may be reduced and/or subject to limitations as a result of the implementation of the Plan.

## 1.    Cancellation of Debt Income

As a result of the anticipated exchange of the Prepetition Credit Agreement Secured Claims for New Common Stock (the "Exchange") and the issuance of Beneficial Interests in respect of other Allowed Claims pursuant to the Plan, the amount of the Debtors' outstanding indebtedness will be reduced. In general, a debtor will realize cancellation of debt ("COD") income when a creditor accepts less than full payment in satisfaction of its debt. Although the amount of COD income realized generally must be included in gross income for federal income tax purposes, Section 108 of the Tax Code provides in relevant part that gross income does not include COD income if the discharge occurs in a case under the Bankruptcy Code. Instead, the taxpayer applies the COD income that would otherwise be included in gross income to reduce the following tax attributes in the following order: net operating losses and net operating loss carryovers, carryovers of the general business credit, carryovers of the minimum tax credit, net capital losses or capital loss carryovers, basis of the taxpayer's depreciable and non-depreciable property, passive activity loss and credit carryovers and carryovers of foreign tax credit. Alternatively, the taxpayer may elect to change the order of reduction of tax attributes by electing to first reduce the basis of depreciable property.

The Debtors expect to realize significant COD income as a result of the transactions contemplated by the Plan. Because the realization of COD income will occur in a title 11 case, the Debtors will not recognize such COD income, but instead will reduce tax attributes after determining the tax for the tax year in which the COD income is recognized.

## 2.    Section 382 Limitation

Under Section 382 of the Tax Code, if a loss corporation undergoes an "ownership change," the amount of its pre-change losses that may be utilized to offset future taxable income generally will be subject to an annual limitation. Such limitation may also apply to subsequently recognized "built-in" losses (*i.e.,* losses economically accrued but unrecognized as of the date of the ownership change). In general, pursuant to Section 382(l)(6) of the Tax Code, the annual limitation for a corporation that undergoes an ownership change pursuant to a plan of reorganization in a title 11 case would be equal to the product of (i) the value of the loss corporation's outstanding stock immediately after the ownership change (taking into account any increase in the value of the corporation resulting from any surrender or cancellation of creditors' claims in the transaction) and (ii) the "long-term tax exempt rate" for the month in which the ownership change occurs (which, for example, is 4.58% for ownership changes occurring in July 2009). Any unused portion of the annual limitation would be available in subsequent years. However, if the loss corporation does not continue its historic business or use a significant portion of its business assets in a new business for two years after the ownership change, the annual limitation will be zero.

In general, an ownership change occurs if the percentage of the value of the loss corporation's stock owned by one or more direct or indirect 5% shareholders (within the meaning of Section 382 of the Tax Code) has increased by more than 50 percentage points over the lowest percentage of that value owned by such 5% shareholders at any time during a three-year testing period. It is anticipated that the issuance of the New Common Stock pursuant to the Plan will result in an ownership change of the Debtors.

As stated above, Section 382 also can operate to limit built-in losses recognized subsequent to the date of the ownership change. If a loss corporation has a net unrealized built-in loss at the time of the ownership change, then any built-in losses recognized (including by way of depreciation deductions) during the following five years (up to the amount of the original net built-in loss) generally will be treated as a pre-change loss and similarly will be subject to the annual limitation. Conversely, if the loss corporation has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net built-in gain) generally will increase the annual limitation in the year recognized such that the loss corporation would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10,000,000 or (ii) 15% of the fair market value of its assets before the ownership change.

An exception to the foregoing annual limitation (and built-in gain and loss rules) generally applies pursuant to Section 382(l)(5) of the Tax Code when shareholders and qualified creditors of the debtor receive at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed title 11 plan. Under this exception, a debtor's pre-change losses are not limited on an annual basis but are reduced by the amount of any interest deductions claimed during the three taxable years prior to and including the reorganization in respect of the debt converted into stock of the corporation. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the application of Section 382(l)(5) of the Tax Code, and the Section 382 limitation for the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income will be zero. A qualified creditor is a creditor who either (i) has held its debt continuously beginning at least 18 months prior to the filing of the title 11 case, or (ii) has owned at all times since such claim arose a claim that qualifies as an "ordinary course" claim (*e.g.*, a trade creditor).

Notwithstanding the foregoing, even if a loss corporation qualifies for and elects to apply Section 382(l)(5), the benefits of that provision in terms of increased ability of the loss corporation to use NOLs and built-in losses may be disallowed by the IRS unless the loss corporation carries on more than an insignificant amount of an active trade or business during and subsequent to the title 11 case. The determination of whether the loss corporation carries on more than an insignificant amount of an active trade or business is based on all the facts and circumstances, including, for example, the amount of business assets that continue to be used, or the number of employees in the work force who continue employment, in an active trade or business (although not necessarily the historic trade or business).

The Debtors have not yet determined whether they will be eligible for, and will choose to be governed by, the Section 382(l)(5) exception, or whether they will instead be subject to the Section 382(l)(6) annual limitation and built-in gain and loss rules described above. In addition, the Debtors may not be able to qualify as carrying on more than an insignificant amount of an active trade or business during and subsequent to the title 11 case, in which case tax benefits that would otherwise be available under Section 382(l)(5) would be subject to disallowance.

**3.     Transfer of Asset to the Liquidating Trust**

Pursuant to the Plan, the Liquidating Trust Assets will be transferred to the Liquidating Trust. The Debtors will not have any beneficial interest in the Liquidating Trust. Upon consummation of the Plan, all interests in the Liquidating Trust will be owned by the Holders of Priority Tax Claims, Priority Claims and General Unsecured Claims, or held in the Disputed Claims Reserve pending the resolution of any Disputed Claims.

The Debtors will treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of such assets to the beneficiaries of the Liquidating Trust followed by (ii) a transfer of such assets by such beneficiaries to the Liquidating Trust, with the beneficiaries being treated as the grantors and owners of the Liquidating Trust. The Debtors' transfer of assets to the beneficiaries of the Liquidating Trust will constitute a taxable disposition of such assets. The Debtors will be required to use the valuation of the assets provided by the Liquidating Trustee for all federal income tax purposes. The transfer of assets likely will result in recognition of income by the Debtors based on the value of such assets on the Effective Date, although the Debtors may be able to offset such income with their net operating loss carryforwards.

### 4. <u>Alternative Minimum Tax</u>

In general, the alternative minimum tax ("<u>AMT</u>") is imposed on a corporation's alternative minimum taxable income at a 20% rate to the extent that such tax exceeds the corporation's regular federal income tax. For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated. In particular, even though a corporation might otherwise be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only 90% of a corporation's taxable income for AMT purposes may be offset by available NOL carryforwards (as recomputed for NOL purposes). Accordingly, it is possible that the Debtors may have an AMT liability as a result of taxable income generated by the Sale or otherwise or as a result of the transactions contemplated by the Plan.

In addition, if a corporation undergoes an ownership change within the meaning of Section 382 of the Tax Code and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets would be adjusted for certain AMT purposes to reflect the fair market value of such assets as of the change date.

## B.    TAX CONSEQUENCES TO HOLDERS OF CLAIMS

### 1. <u>Exchange of Priority Tax Claims, Other Priority Claim, and General Unsecured Claims for Beneficial Interests</u>

Pursuant to the Plan, the Liquidating Trust Assets will be transferred to the Liquidating Trust. All parties will be required to treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (i) a transfer of such assets to the beneficiaries of the Liquidating Trust followed by (ii) a transfer of such assets by such beneficiaries to the Liquidating Trust, with the beneficiaries being treated as the grantors and owners of the Liquidating Trust. Except as discussed in section XI.B.2 below with respect to holders of Prepetition Credit Agreement Claims, each Holder of Claims that receives Beneficial Interests pursuant to the Plan generally will recognize gain or loss in its taxable year that includes the Effective Date in an amount equal to the difference between the amount realized in respect of its Claim and its adjusted tax basis in such Claim. The amount realized for this purpose should generally equal the amount of cash and the fair market value of any other assets received or deemed received for federal income tax purposes under the Plan in respect of such Holder's Claim. A Holder that receives or is deemed to receive for federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of receipt. The Liquidating Trustee shall value the Liquidating Trust Assets as of the Effective Date and shall notify in writing the Beneficiaries of such valuations. Each of the Liquidating Trust, the Liquidating Trustee and the Beneficiaries shall be required to use such valuations for all applicable reporting purposes, including for federal income tax purposes.

A grantor trust is treated as a pass-through entity for federal income tax purposes. Accordingly, in general, no tax should be imposed on the deemed transfer of assets by a Holder to the Liquidating Trust. In addition, no tax should be imposed on the Liquidating Trust on the receipt (or deemed receipt) of such assets or on income earned or gain recognized by the Liquidating Trust with respect to those assets. Instead, the Holders of Beneficial Interests will be taxed on their respective allocable shares of such net income or gain in each taxable year and will be responsible for paying the taxes associated with such income or gain whether or not they received any distributions from the Liquidating Trust in such taxable year.

There can be no assurance that the IRS will agree with the classification of the Liquidating Trust as a grantor trust. A different classification could result in a different income tax treatment of the Liquidating Trust. Such treatment could include, but is not limited to, treatment of the Liquidating Trust as a partnership for federal income tax purposes or the imposition of an entity-level tax on the Liquidating Trust.

**2.      Exchange of the Prepetition Credit Agreement Claims for New Common Stock and Beneficial Interests**

Whether and to what extent Holders of Prepetition Credit Agreement Claims will be required to recognize gain or loss in connection with their participation in the exchange of their Prepetition Credit Agreement Claims for New Common Stock and Beneficial Interests (the "Exchange") will depend on whether the Exchange qualifies as a recapitalization pursuant to Section 368(a)(1)(E) of the Tax Code. In general, the Exchange will qualify as a recapitalization if the Prepetition Credit Agreement Claims constitute "securities" for purposes of Section 368(c)(1)(E) of the Tax Code.  The rules for determining whether a debt instrument constitutes a security under the recapitalization provisions of U.S. federal income tax law are unclear. The term "security" is not defined for this purpose in the Tax Code or the Treasury Regulations and has not been clearly defined by judicial decisions. The determination of whether a debt instrument is a security involves an overall evaluation of the nature of the debt instrument, the debt holder's exposure to the substantial risks of the enterprise, the extent of the debt holder's proprietary interest in the issuer compared with the similarity of the debt instrument to a right to receive a cash payment and certain other considerations.

One of the most significant factors considered in determining whether a particular debt instrument is a security is its original term.  In general, debt instruments with a term of less than five years are not likely to (but may in certain circumstances) be considered securities, debt instruments with a term of ten years or more are likely to be considered securities, and debt instruments with an initial term at issuance of five to ten years are often considered securities, but their status may be unclear. The revolver and the term loans were initially issued with a maximum term of five years, and a subsequent tranche of the term loans (which are otherwise fungible with the other term loans) were issued with a term of less than five years.  Under these circumstances, it is unclear whether any of the Prepetition Credit Agreement Claims will be considered securities for these purposes.  Holders should consult their tax advisers as to whether the Prepetition Credit Agreement Claims are properly classified as securities and accordingly whether the Exchange will be treated for federal income tax purposes in whole – or in part if certain of the Prepetition Credit Agreement Claims were treated as securities and others were not – as a recapitalization.

(a)      Treatment of the Exchange as a Taxable Transaction

If the Exchange is not treated as a recapitalization, a Holder of Prepetition Credit Agreement Claims generally will recognize gain or loss equal to the difference between the amount realized and the Holder's adjusted tax basis in the Prepetition Credit Agreement Claims.  The amount realized on an

exchange of Prepetition Credit Agreement Claims will be equal to the fair market value of the New Common Stock received by the Holder plus the fair market value of any Liquidating Trust Assets deemed to be received by the Holder as a result of receipt of Beneficial Interests (as described in section XI.B.1), but excluding any amount treated as received in respect of accrued but unpaid interest not previously included in income by the Holder. For these purposes, as discussed under section XI.B.3 below, amounts received or deemed received are intended to be treated as received in exchange for the principal amount of each of the Prepetition Credit Agreement Claims to the full extent thereof, and only thereafter to be received in respect of accrued but unpaid interest on the Prepetition Credit Agreement Claims. Any gain or loss recognized by a Holder as a result of its participation in the Exchange that is not attributable to market discount, as described below, generally will be capital gain or loss and will be long-term capital gain or loss if the Holder's holding period in the Prepetition Credit Agreement Claims exceeds one year at the time of the Exchange. The deductibility of capital losses is subject to limitations under the Tax Code.

If a Holder holds Prepetition Credit Agreement Claims acquired at a market discount, any gain recognized by the Holder pursuant to the Exchange would be recharacterized as ordinary income to the extent of the accrued market discount that has not been previously included as ordinary income. In general, the Prepetition Credit Agreement Claims will have accrued market discount if they were acquired after their original issuance at a discount to their adjusted issue price.

(b)     <u>Treatment of the Exchange as a Recapitalization</u>

If the Exchange qualifies as a recapitalization, a Holder of Prepetition Credit Agreement Claims generally will recognize gain, but will not be permitted to recognize loss, on the exchange of Prepetition Credit Agreement Claims for New Common Stock and Beneficial Interests. Such a Holder generally will recognize gain (if any) equal to the lesser of (a) the excess of the fair market value of the New Common Stock received and the Liquidating Trust Assets deemed received in the Exchange (but excluding any amounts treated as received in respect of accrued but unpaid interest not previously included in income by the Holder) over the Holder's adjusted tax basis in its Prepetition Credit Agreement Claims, and (b) the fair market value of the Liquidating Trust Assets deemed received in the Exchange (again excluding any amounts treated as received in respect of accrued but unpaid interest not previously included in income by the Holder). Any such gain generally would be treated as capital gain, except to the extent of any market discount on the Prepetition Credit Agreement Claims not previously taken into income by the Holder. Such a Holder's initial tax basis in New Common Stock received pursuant to Exchange will be equal to the sum of the Holder's adjusted tax basis in the Prepetition Credit Agreement Claims less the fair market value of any Liquidating Trust Assets deemed received in the Exchange and increased by any gain recognized on the Exchange. The Holder's holding period for the Common Stock received in the Exchange generally will include the period during which the Holder held its Prepetition Credit Agreement Claims prior to the Exchange.

If the Exchange is treated as a recapitalization, each Holder who exchanges Prepetition Credit Agreement Claims for the exchange consideration pursuant to the Exchange is required under Treasury Regulation section 1.368-3(b) to file an information statement with such Holder's U.S. federal income tax return for the Holder's tax year including the date of the Exchange. The information statement must set forth (i) the tax basis of the Prepetition Credit Agreement Claims surrendered and (ii) the fair market value, on the date of the exchange, of the Common Stock received and Liquidating Trust Assets deemed received in the Exchange.

Assuming that the Exchange is treated as a recapitalization, Holders of Prepetition Credit Agreement Claims that have accrued market discount in such Prepetition Credit Agreement Claims that is not recognized in the Exchange would carry over such portion of accrued market discount to the New

67

Common Stock received in the Exchange.  If New Common Stock received in the Exchange is treated as including market discount, the Holder will be required to treat any gain recognized on its disposition as ordinary income to the extent of the accrued market discount not previously included in income. If the Holder disposes of New Common Stock received in the Exchange in certain otherwise nontaxable transactions, the Holder may be required to include accrued market discount in income as ordinary income as if the Holder sold the property at its then fair market value.

### 3.     Allocation of Plan Distributions between Principal and Interest

The Plan provides that, to the extent that any Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest on such indebtedness, such distribution will, to the extent permitted by applicable law, be allocated for federal income tax purposes first to the principal amount of the Claim and second, to the extent the distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.   Current federal income tax law is unclear on this point, and no assurance can be given that the IRS will not challenge the allocation set forth in the Plan.  If, contrary to the intended position, such a distribution were treated as allocated first to accrued but unpaid interest, a Holder would realize ordinary income with respect to such distribution in an amount equal to any accrued but unpaid interest not already taken into income under the Holder's method of accounting, regardless of whether the Holder would otherwise realize a loss as a result of the Plan.

## C.     DISPUTED CLAIMS RESERVE

Subject to the receipt of any definitive guidance of the IRS or the Bankruptcy Court, the Disputed Claims Reserve is intended to qualify and to be treated as a disputed ownership fund pursuant to Treasury Regulation Section 1.468B-9.  As such, the Disputed Claims Reserve shall be treated for federal income tax purposes as a separate entity taxable as a "C corporation" and, therefore, shall report and pay any taxes on its income; the Liquidating Trustee shall act as the "administrator" of the disputed ownership fund; and, the Disputed Claims Reserve shall be subject to the continuing jurisdiction of the Bankruptcy Court.

## D.     BACKUP WITHHOLDING

Under certain circumstances a Holder (other than an exempt recipient, such as a corporation) may be subject to backup withholding with respect to "reportable payments" at the then applicable rate (currently 28%).  The Debtors will be required to deduct and withhold the prescribed amount if (a) the Holder fails to furnish a taxpayer identification number to us in the manner required, (b) the IRS notifies us that the taxpayer identification number furnished by the Holder is incorrect, (c) there has been a failure of the Holder to certify under penalties of perjury that the Holder is not subject to withholding, or (d) the Holder is notified by the IRS that he or she failed to report properly payments of interest and dividends and the IRS has notified us that he or she is subject to backup withholding.

Backup withholding is not an additional tax.  Any amount withheld from a payment to a Holder under the backup withholding rules is allowable as a credit against such Holder's U.S. federal income tax liability (and may entitle such Holder to a refund), provided that the required information is furnished to the IRS on a timely basis.  Holders should consult their own tax advisors regarding the application of backup withholding to their particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such exemption, of available.

## RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to the Debtors' creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Dated:  August 17, 2009

Respectfully submitted,

GRAPHICS PROPERTIES HOLDINGS, INC.
(for itself and on behalf of each of the Debtors)

By: _____
    Name:  Barry J. Weinert
    Title:   Chief Restructuring Officer

Prepared by:

ROPES & GRAY LLP
1211 Avenue of the Americas
New York, NY 10036
Tel:  212-596-9000
Fax: 212-596-9090

Attorneys for the Debtors
and Debtors in Possession